UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 05-386 (ESH) |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE MAYNARD, | : | |
| Defendant. | : | |
| | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
*PRO SE* MOTION TO WITHDRAW GUILTY PLEA

The United States, by its counsel, the United States Attorney for the District of

Columbia,  respectfully opposes the defendant's *pro se* motion to withdraw his guilty plea and

associated evidentiary motions.  The government relies upon the following arguments, points

and authorities, and on any others which may be made at a hearing on this matter.

**FACTUAL BACKGROUND**

The defendant was arrested in the fall of 2005, and charged with Conspiracy to Distribute

and to Possess with the Intent to Distribute 5 Kilograms or More of Cocaine, and 50 Grams or

More of Cocaine Base.  This charge arose out of a long-term narcotics-trafficking investigation

being conducted by the joint FBI/MPD Safe Streets Task Force, into cocaine selling by Antoine

Jones, who operated the nightclub Levels, in Northeast, Washington, D.C., and the defendant,

Jones's club manager and drug-trafficking associate.

Using information gained from various confidential sources, along with other

investigative tools, including surveillance, analysis of pen register data from the cellular

telephones of Jones and Maynard, and evidence gained from a traffic stop of Maynard in

Durham, NC on April 5, 2005, which revealed in excess of $67,000, in cash in a hidden

compartment in the minivan owned by Jones and driven by Maynard, investigators obtained a

Title III wire intercept on the cellular telephone of Jones, which ran from September 2, 2005, through October 24, 2005.

Throughout the course of the investigation prior to the wire interception, several members of Jones's organization were identified, including Lawrence Maynard, who is both the nightclub's manager, and Jones's right-hand man in the drug-trafficking business, frequently serving as a point of contact between Jones and his suppliers and customers. For example, while Jones frequently changed his cellular telephone number to avoid law enforcement, Maynard maintained his telephone number for several years, up to the time of his arrest, and was known to refer customers to Jones's latest telephone number. This information was corroborated by pen register data on Maynard's cellular telephone, which showed that he was having contact with many of the same telephone numbers as Jones was, and in the same timeframe, including telephone numbers from border towns in Texas. This is consistent with information obtained by investigators that Jones's source of supply was from Texas and Mexico.

From the very early days of the wire interception, a clear pattern of telephone contacts was established between Jones and various individuals, whom investigators identified over time. In those calls, Jones and his colleagues discussed the timing and location of meetings, without any other substantive discussion. This pattern is consistent with what confidential sources indicated was his practice: short conversations setting up meetings to drop off money and pick up cocaine, without any further discussion on the telephone, for fear of being intercepted by law enforcement. Further, several common meeting places were discussed between Jones and his various customers, including commercial establishments along Branch Avenue in Maryland, and at the nightclub Levels.

2

Jones also uniformly spoke in code throughout the interception period.  For example, he and his drug-trafficking colleagues spoke frequently of the need for, and delivery of, "tickets," which was a reference to wholesale quantities of cocaine.  They spoke, too, of "VIP tickets" (larger quantities), and occasionally of "flyers."  While also consistent with nightclub business - and thus a good cover - the conversations fairly quickly became obviously a code, based on, among other things, the occasional slip-up, e.g., a request by a customer for a "half ticket," or a query by Jones of another customer as to whether he still needed "that little ticket." Investigators' interpretation of these calls has been confirmed by cooperating witnesses, who were themselves intercepted on the wire speaking of tickets and flyers as code for kilogram quantities of cocaine.

In addition, wire interceptions revealed Jones on occasion telling other known drug-trafficking associates to get in touch with "Lawrence" to pick something up, or simply to "see Lawrence" who would take care of matters.  One of those associates, who was indicted with Jones, Maynard, and others, and who has pleaded guilty and agreed to cooperate with the government, has indicated that what he got from the defendant after these phone calls was a large quantity of cocaine.  Other cooperating witnesses similarly tell of receiving packages of cocaine from Lawrence Maynard at Jones's behest, when Jones was not around.

Within the first few weeks of the wire interception, it further became obvious that Jones was being supplied by Hispanic-sounding males, with cellular telephone exchanges in McAllen, Texas, a major point-of-entry of cocaine into the United States, and Irvine, California. Throughout the course of the interception period, Jones spoke with at least three different Hispanic-sounding males - which investigators confirmed through pen register data were all in

contact with each other - about the timing of shipments of "tickets," "music," and other references to cocaine.  Based on the content of some of these calls, and surveillance of Jones, investigators discerned that Jones was meeting with frequency with one of these men – co-defendant Roel Bermea, Jr., who has pleaded guilty to his role in this conspiracy – at a stash location in Ft. Washington, Maryland.

Based on telephone conversations during the third week in October, 2005, in which Jones discussed with the McAllen-based Hispanic male the fact that the "party" would happen on "Friday," (October 21, 2005), investigators obtained numerous search warrants for the residences of some suspected customers, along with Jones's two residences, the nightclub Levels, and the suspected stash house located at 9508 Potomac Drive, Ft. Washington, Maryland.  In the early morning hours of October 24, 2005, teams of agents executed those search warrants and recovered approximately 97 kilograms of cocaine, 500 grams of crack cocaine, and in excess of $800,000.00, from the stash house alone.  Arrested at that location were defendants Bremea, Alberto Rollando Carrillo-Montelongo, and Ricardo Sanchez-Gonzales, who also have pleaded guilty to Narcotics Conspiracy, and owned up to their roles therein.  Also recovered from various other search locations were smaller, still-wholesale quantities of cocaine, crack cocaine, large amounts of cash, and several weapons.  Recovered from Jones's Jeep was in excess of $69,000.00 in cash.  Recovered from the nightclub Levels, of which Maynard is the manager, was a loaded, stolen .9mm handgun, from the drawer of a desk in the office.  Defendant Maynard was indicted in a separate companion indictment, and arrested on November 23, 2005.

At the time of the Safe Streets investigation, a separate, parallel investigation into Jones, Maynard, and their Mexican suppliers was being undertaken by agents from Immigration and Customs Enforcement, based in Baltimore, and McAllen, Texas. That investigation provided substantial additional evidence corroborating Maynard's role as Jones's right-hand drug-trafficking associate. The ICE investigation revealed that Jones and Maynard were renting stash houses for the Mexican suppliers, in which the suppliers would reside from time to time to dole out drugs and collect money, as much as millions of dollars at a time. For example, Maynard rented a house on Myrtle Avenue house in Bowie, as one such stash location; Jones rented an apartment on Summit Circle and a storage facility on Hampton Park Boulevard, both in Capitol Heights, for this purpose. (This information is corroborated by confidential source information, developed in the Safe Streets investigation, that in 2004 and 2005, Jones rented stash houses for the suppliers, but that he was growing tired of doing so).

Several searches done of these locations provided additional evidence against Maynard, Jones, and the suppliers: (1) the Myrtle Avenue house was searched on February 27, 2004, and noted therein were empty duffel bags, and bags containing shrink wrapping materials, along with religious candles, air mattresses and very little furniture. In addition, all the windows were covered with drapes, sheets, or aluminum foil. These conditions mirrored in many respects the 9508 Potomac Drive stash house, down to the covered windows, air mattresses, shrink wrappings, empty duffel bags, and religious candles; (2) the Capitol Heights apartment was viewed by a maintenance worker on routine maintenance in February, 2004, who reported that it, too, was sparsely furnished, with a few air mattresses, duffel bags, religious candles, and little else; (3) the Hampton Park storage facility was searched on April 30, 2004, the day that Jones

had broken the lease, but while Maynard's Mercury Cougar was still parked out front, and it, too, revealed, shrink wrapping materials, and duffel bags, along with the scent of cocaine detected in several spots within the warehouse by a certified drug-detection canine.

In addition, Hispanic males were observed visiting the Myrtle Avenue house and the Summit Circle apartment on numerous occasions in February, 2004, both by ICE agents and staff at the apartment complex. Finally, Maynard was surveilled on numerous occasions in that same timeframe going to and from the Myrtle Avenue house and the Hampton Park storage facility, at times driving his own Mercury Cougar, and at other times driving a white box truck registered to Jones.

## PROCEDURAL HISTORY

When the defendant was arrested in November, 2005, attorney Edward Sussman, Esq., was appointed by the Court to represent him. After the final superseding indictment was returned in March, 2006, and the possibility of a fall, 2006 trial date became more likely, Mr. Sussman determined that he had a scheduling conflict that would make this timing impossible, so he asked the Court to permit him to withdraw as counsel for Mr. Maynard, and for the Court to appoint Howard Katzhoff, Esq. in his stead. In April, 2006, the Court permitted Mr. Katzhoff to enter his appearance on the defendant's behalf, and in May, 2006, relieved Mr. Sussman of his duties as counsel to the defendant.

When Mr. Sussman was Maynard's counsel, he obtained formal written discovery from the government, and also engaged in numerous live conversations and email exchanges with government counsel regarding details of the government's case against his client. Indeed, in an effort to facilitate Mr. Sussman's conversations with his client regarding the strength of the

government's case, on April 14, 2006, government counsel provided a 5-page, single-spaced

letter to Mr. Sussman which set forth in detail the government's case against Maynard.

(Attached as Exhibit A), and which, as demonstrated by an email exchange between government

counsel and Mr. Sussman, Mr. Sussman reviewed with his client at the Jail on Sunday April 16,

2006.  When Mr. Katzoff entered his appearance, the government transmitted a copy of the letter

to him as well, and similarly engaged in several informal conversations with him regarding

various aspects of the government's case against Mr. Maynard.

        In June, 2006, based on discussions with his client, Mr. Katzoff indicated that Mr.

Maynard was interested in entering a guilty plea to the charge in the indictment.  The

government forwarded a draft plea agreement and statement of facts to Mr. Katzoff, who

reviewed the documents with his client, and requested that a few changes be made – in

particular, Mr. Katzoff was concerned about his client admitting to specific criminal acts in the

State of Maryland, as the authorities in that jurisdiction are not bound by plea agreements in the

District of Columbia.  The government made the changes that Mr. Katzoff requested, and the

defendant plead guilty to one count of Conspiracy to Distribute and Possess with Intent to

Distribute 5 Kilograms or More of Cocaine, in violation of 21 U.S.C. § 846, on June 23, 2006.

At that plea hearing, at Mr. Katzoff's urging, the government agreed to delay sentencing until

after the trial against Mr. Maynard's co-defendants, so  that the government would not be able to

call Mr. Maynard as a witness at that trial.[1]

---

[1]        The thinking on this point was that, because Maynard had not yet been sentenced, the proceedings against him were not yet complete, so he retained a Fifth Amendment right against self-incrimination.

_____The defendant remained held without bond pending sentencing in his case.  Sometime in the middle of August, 2006, in order to make room for a cooperating witness at the Correctional Treatment Facility (CTF), Maynard was transferred from that facility, where he had been held since his arrest in November, 2005, to the D.C. Jail, where the remaining defendants are incarcerated.  In late August, 2006, Mr. Katzoff filed a motion with the Court to withdraw as Maynard's counsel and filed an accompanying proffer *ex parte*.  Shortly thereafter, Mr. Maynard wrote the instant letter to the Court, which the Court directed to be filed on September 8, 2006, and which was styled by the Clerk's Office on September 12, 2006, as a "Motion to Withdraw Plea of Guilty, Motion for  New Evidentiary Hearing, and Motion for Leave to File Motion to Suppress North Carolina Traffic Stop, Bowie House Covert Search, Hampton Park Warehouse Covert Search or Club Levels Search and to Suppress Wiretap."

## ARGUMENT

As the government reads his letter, the defendant seems to be making two claims in support of his request to withdraw his guilty plea: (1) his attorneys Edward Sussman and Howard Katzoff were ineffective in their representation of him; and (2) he is innocent of the charge to which he plead guilty.  Because neither of these claims can be substantiated and because Maynard has not met the rigorous requirements to withdraw his knowing, voluntary guilty plea, his motion must fail.

A guilty plea is "'a grave and solemn act . . . accepted only with care and discernment.'" United States v. Cray, 47 F.3d 1203, 1206 (D.C. Cir. 1995), *quoting* Brady v. United States, 397 U.S. 742, 748 (1970).  Appellate Courts will reverse a district court's denial of a motion to withdraw a guilty plea only for an abuse of discretion. Cray, 47 F.3d at 1206; United States v.

Loughery, 908 F.2d 1014, 1017 (D.C. Cir. 1990); United States v. Ford, 993 F.2d 249, 251 (D.C. Cir. 1993); United States v. Abreu, 964 F.2d 16, 18 (D.C. Cir. 1992).

Federal Rule of Criminal Procedure 11(d)(2)(B) provides that a defendant may withdraw his guilty plea before sentencing if he "can show a fair and just reason for requesting the withdrawal." United States v. West, 392 F.3d 450, 455 (D.C. Cir. 2004); see also United States v. Shah, 453 F.3d 520, 523 (D.C. Cir 2006). However, withdrawal of a guilty plea is never a matter of right (United States v. Russell, 686 F.2d 35, 38 (D.C. Cir. 1982); United States v. Roberts, 570 F.2d 999, 1008 (D.C. Cir. 1977), appeal after remand, 600 F.2d 815 (1978), aff'd, 445 U.S. 552 (1980)), and presentence withdrawal requests are in fact "disfavored." United States v. Watley, 987 F.2d 841, 848 (D.C. Cir. 1993). Ultimately, the decision to allow withdrawal is committed to the sound discretion of the district court. United States v. Ford, 993 F.2d 249,251 (D.C. Cir. 1993); Abreu, supra, 964 F.2d at18.

This Court should consider three factors in assessing whether it should allow the defendant to withdraw his guilty plea: (1) has the defendant asserted a viable claim of innocence?; (2) has the delay between the guilty plea and the motion to withdraw substantially prejudiced the government's ability to prosecute the case?; and (3) was the guilty plea "somehow tainted"? United States v. Hanson, 339 F.3d 983, 988 (D.C. Cir. 2003). "The last of these is the most important, and usually requires a showing that the taking of the plea did not conform to the requirements of Federal Rule of Criminal Procedure 11." West, 392 F.3d at 455, citing United States v. Horne, 987 F.2d 833, 837 (D.C. Cir. 1993).

I.      **There was no taint in the guilty plea.**

We begin our analysis where the West Court placed emphasis – the issue of taint.
Before accepting the defendant's guilty plea, Magistrate Facciola conducted an extensive plea
colloquy.  During that colloquy, the defendant evinced a full understanding of the English
language, and assured the Court that his plea was voluntary, that he understood his plea
agreement, that he understood his waiver of the procedural and substantive rights associated
with a trial, that the facts contained in the factual proffer, and reviewed by Magistrate Judge
Facciola in detail, were true, and that he understood the implications of his guilty plea.  See
generally 6/23-TR-2-9, appended hereto as Attachment B.  Such sworn statements at a Rule 11
hearing are "presumed to be true."  United States v. Wah, 920 F.2d 1039 (D.C. Cir. 1990).

Further, the defendant plead guilty pursuant to a written plea agreement, which he
acknowledged to the Court that he had reviewed with his attorney, Mr. Katzoff (6/23-TR-6).
Further, when the Court asked him on two occasions whether he had any further questions for
Mr. Katzoff, Maynard stated unequivocally that he did not.  6/23-TR-6-7.  The fact that Mr.
Katzoff had carefully reviewed the agreement with his client is supported by email exchanges
between Mr. Katzoff and government counsel in which Mr. Katzoff states on June 20, 2006,
regarding the draft plea agreement: "I will review it with my client ASAP, hopefully
tomorrow, and let you know if he is requesting any modifications."  In the meantime, I made a
few minor changes which I have saved as 'pleafacts II', partly because of my concern about
admitting specific Maryland conduct.  See if these modifications are a problem." (See 6/21/06
email exchange between AUSA Lieber and Howard Katzoff, appended hereto as Attachment
C).  Followed on June 22, 2006, by another email from Mr. Katzoff to government counsel,

10

indicating that he did, indeed, discuss the plea agreement and facts with Mr. Maynard on June 21, 2006, as planned: "Mr. Maynard does not believe he ever met or knew Mr. Carter prior to his arrest.  I have noted that in my most recent proposed proffer – "pleafacts II 062206." Please note two changed to the proffer – the sentence regarding the apartment and the oral facts."  (See 6/22/06 email appended hereto as Attachment D).

The only challenge to the integrity of the plea process, then, seems to be this claim of ineffectiveness.  To establish that his trial counsel rendered him ineffective assistance, the defendant must prove (1) that his attorney's performance was unreasonably deficient under prevailing professional norms; and (2) that the attorney's deficient performance was so prejudicial as to undermine the court's confidence in the outcome of the trial.  See Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984); United States v. Thompson, 27 F.3d 671, 675 (D.C. Cir.), cert. denied, 513 U.S. 1050 (1994).

To satisfy the first prong of Strickland – trial counsel's performance – defendant must show that his attorney made errors "so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.  Trial counsel's performance is evaluated under a strong presumption that the assistance of counsel fell within the "wide range" of reasonable representation.  Strickland v. Washington, supra, 466 U.S. at 689; United States v. Bruce, 89 F.3d 886, 893 (D.C. Cir. 1996).  The reviewing court must evaluate the asserted errors of counsel in the context of the attorney's overall performance to determine whether the defendant's claims overcome this presumption of competence. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986).  Moreover, the court may not second-guess the tactical decisions of counsel and order a new trial simply because the court or another

11

attorney, with hindsight, might have chosen a different course. Strickland v. Washington, *supra,* 466 U.S. at 689-90; United States v. Foster, 566 F. Supp. 1403, 1413-14 (D.D.C. 1983).

To satisfy the second prong of Strickland – prejudice to the defendant – the defendant must demonstrate that there is a reasonable probability that the outcome of the proceeding would have been different, but for his attorney's incompetence. Strickland v. Washington, *supra,* 466 U.S. at 694. In evaluating prejudice, the court must consider the totality of the evidence presented to the fact finder. Strickland v. Washington, *supra,* 466 U.S. at 695-96.

Further, the defendant must satisfy both prongs of the Strickland standard: "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 700 (emphasis added). The reviewing court need not even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; United States v. Harris, 894 F. Supp. 20, 24 (D.D.C. 1995).

Nor does the standard vary because defendant entered a plea of guilty as opposed to proceeding to trial. The Supreme Court has held that the two-part Strickland standard applies to a defendant's request to withdraw a guilty plea based on allegations of ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58 (1985); United States v. Hanson, 339 F.3d 983, 990 (D.C. Cir. 2003). To satisfy this standard and successfully withdraw a guilty plea, a defendant therefore must show (1) that counsel's assistance was not within the range of competence required of attorneys in criminal cases; and (2) that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Horne, 339 F.3d at 990, *quoting* Hill, 474 U.S. at 59. In other words, defendant must show that his trial counsel's deficient performance "affected the outcome of the plea process. Id. As in the

context of ineffective assistance generally, the reviewing court need not even "address both

components of the inquiry if the defendant makes an insufficient showing on one." Strickland,

*supra,* 466 U.S. at 697.

      The Supreme Court's opinion in Strickland went to great lengths to counsel courts

regarding the review of trial counsel's performance upon a post-conviction complaint.

> Judicial scrutiny of counsel's performance must be highly
> deferential. It is all too tempting for a defendant to second-guess
> counsel's assistance after conviction or adverse sentence, and it is
> all too easy for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act or omission
> of counsel was unreasonable.  A fair assessment of attorney
> performance requires that every effort be made to eliminate the
> distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the defendant must
> overcome the presumption that, under the circumstances, the
> challenged action "might be considered sound trial strategy."
> There are countless ways to provide effective assistance in any
> given case.  Even the best criminal defense attorneys would not
> defend a particular client in the same way.
>
> The availability of intrusive post-trial inquiry into attorney
> performance or of detailed guidelines for its evaluation would
> encourage the proliferation of ineffectiveness challenges.
> Criminal trials resolved unfavorably to the defendant would
> increasingly come to be followed by a second trial, this one of
> counsel's unsuccessful defense. Counsel's performance and even
> willingness to serve could be adversely affected. Intensive scrutiny
> of counsel and rigid requirements for acceptable assistance could
> dampen the ardor and impair the independence of defense counsel,
> discourage the acceptance of assigned cases, and undermine the
> trust between attorney and client.
>
>
> Thus, a court deciding an actual ineffectiveness claim must judge

the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, *supra*, 466 U.S. at 689-90 (emphasis supplied, citations omitted).

Maynard does not and can not establish that either of his counsel rendered ineffective assistance, much less both. His general complaint about both of his attorneys is that they didn't review discovery with him. Specifically, with respect to Mr. Sussman, he claims: "he didn't go over much discovery with me. A few line sheets from a wire tap, a lease agreement, and the NC stop." These very words of the defendant belie his claim of ineffectiveness, for these are among the most damaging categories of evidence against the defendant – calls on the wiretap where he and Antoine Jones discuss in coded language the fact that Maynard will deliver cocaine to various customers; the lease to a house in Maryland, rented by Maynard, which was used as a stash house by Mexican cocaine suppliers; and the North Carolina stop of Maynard, who was driving Jones's minivan, which contained $67,115.00, in cash hidden in a secret compartment in the floor. Further, it stands to reason that in discussing these pieces of evidence with Maynard, Mr. Sussman explained to Maynard why they were relevant, and how they fit into the overall picture of evidence against Maynard, a premise further supported by the April 14, 2006,

14

discovery letter to Mr. Sussman, in which the government set forth its case against Maynard in painstaking detail.

Further, Maynard's claim that his "options in Mr. Sussman's opinion, being an experienced 20 plus year attorney, were (1) government witness or (2) go to trial and receive 22 to 25 years in prison" is not a claim of ineffectiveness at all, but rather evidence that Mr. Sussman told it like it was – at the time that Mr. Sussman represented Mr. Maynard, the government was not making non-cooperation plea offers, so he really did have but those two options: cooperate with the government or go to trial and face the very real likelihood that he would be convicted of drug conspiracy with a quantity of cocaine above 150 kilograms, making him a level 38, with a criminal history of I, or a sentencing range of 235-293 months.

The defendant's claim that Mr. Katzoff offered the same opinion – that Maynard's principal options were "being a (1) government witness or (2) a long prison sentence" – is similarly true, to a point. At the onset of his representation, the government informed Mr. Katzoff that these were, indeed, the two paths available to Mr. Maynard. However, over the course of Mr. Katzoff's representation of Mr. Maynard, and pursuant to many conversations between Mr. Katzoff and government counsel, the government agreed to extend a plea offer to Mr. Maynard that involved a straight plea, with no cooperation. That Mr. Maynard chose this third option in June, 2006 – a noncooperation plea, which significantly reduced his exposure – similarly belies Maynard's claims that "from April to June, Mr. Katzoff only spoke of " either cooperating with the government or going to trial and facing a long prison sentence.

Maynard's further claim that Mr. Katzoff did not review discovery with him is similarly

15

undercut both by his own admissions that Mr. Katzoff informed him that the government had "tons of evidence against [his] codefendants and [him]," and also by the email exchanges between government counsel and Mr. Katzoff, which make clear that Mr. Katzoff was visiting his client with frequency at the Jail and discussing with him various factual aspects of the case. Mr. Maynard's own statements at his plea hearing – that he read the plea agreement before he signed it, that he spoke with his lawyer about it, and that he was satisfied with his lawyer's representation (6/23-TR-6) – further undercut his late-breaking claims of dissatisfaction. Perhaps Mr. Katzoff did not sit down with his client and show him each of the search warrant affidavits and the like. However, it is not, as Maynard suggests, the pieces of paper that are important to an assessment of the strength of the government's case against Maynard, but rather that facts that underlie those documents, which Mr. Katzoff undoubtedly discussed in his many sessions with Maynard at CTF.

Maynard's final knock on Mr. Katzoff – "no motions to suppress North Carolina traffic stop, Bowie house covert search, Hampton Park warehouse covert search or Club Levels search" – can be dispatched with equal ease. By the time the Court set the motions schedule, June 12, 2006, Maynard had already indicated his willingness to plead guilty, and the parties were in the process of hammering out the details. Thus, Mr. Katzoff had neither the motivation nor the opportunity to file such motions, which weren't due until July 10, 2006, fully two weeks after Maynard entered his guilty plea.[2]

---

[2]     Nor should the Court now permit Maynard to file such motions, as they are premature. Should the Court, over government objection, permit the defendant to withdraw his guilty plea, the Court should then set a briefing schedule and accept only those motions which have not already been resolved by the Court as to the other defendants. Once motions are properly filed, the government will respond as appropriate.

Just as Maynard was unable to satisfy the ineffectiveness prong of the <u>Strickland</u> test, so too the second prong of prejudice. The defendant fails to demonstrate prejudice for two reasons: first, Magistrate Facciola's Rule 11 colloquy and the defendant's answers to the Court's questions show that Maynard understood the consequences of pleading guilty; and second, he has not indicated that there is a reasonable probability that but for counsel's alleged errors, he would have insisted on going to trial. <u>Hill</u>, *supra*, 474 U.S. at 58. As the Supreme Court found in <u>Blackledge v. Allison</u>, a defendant's "[s]olemn declarations in open court carry a strong presumption of verity." 431 U.S. 63, 73-74 (1977). After so many opportunities, in both the written plea agreement and the plea colloquy, to challenge the government's evidence of the voluntary nature of his plea, defendant's claim that his plea was involuntary cannot now be believed. Second, defendant cannot prove that there is a reasonable probability that if his trial counsel had performed differently, he would have gone to trial and risked the very real possibility of a sentence close to 20 years in prison in light of the overwhelming evidence of his guilt. Defendant cannot demonstrate prejudice and this claim therefore should be denied.

**II.    The defendant does not effectively deny his culpability**.

In ruling on a defendant's motion to withdraw a guilty plea, "[w]hether the movant has asserted his legal innocence is an important factor to be weighed." <u>Barker</u>, 514 F.2d at 220. If the defendant merely asserts a blanket claim of innocence and fails to raise a "legally cognizable defense to the charges, he has not effectively denied his culpability, and his withdrawal motion need not be granted." <u>Id.</u> The defendant's motion does nothing more than assert a general denial, and a desire to now to put the Government to its test.

The defendant readily admitted his guilt to the Court at his plea hearing in no uncertain

terms which he does not dispute.  6/23-TR-9.  He now claims, essentially, that in agreeing to the detailed factual proffer – that he was a coconspirator of Antoine Jones and others in Jones's cocaine trafficking enterprise – and affirming his guilt, that he lied to the Court at the time of his plea.  The assertion of innocence that the defendant did put forth falls woefully short of the "legally cognizable defense" required by law.  The defendant gives no reason why he lied, and has supplied no affidavit asserting his innocence and explaining his perjury to the Court at the Rule 11 hearing.

The defendant's assertion of innocence is patently insufficient to meet the burden he shoulders in this regard.  As this Court found in Cray, "[a] defendant appealing the denial of his motion to withdraw a guilty plea, unlike a defendant who has not first pled guilty, must do more than make a general denial in order to put to the Government to its proof; he must affirmatively advance an objectively reasonable argument that he is innocent, for he has waived his right simply to try his luck before a jury."  Cray, 47 F.3d a 1209 (citation omitted).

## III.     Prejudice to the government is substantial.

The third factor this Court should consider in assessing whether to allow the defendant to withdraw his guilty pleas is whether withdrawal would substantially prejudice the government or the public interest in finality and the orderly administration of justice.  Cray, 47 F.3d at 1208. As an initial matter, the Court of Appeals noted "in light of the great care with which pleas are taken under [Rule 11] . . ., there is no occasion to inquire into the matter of prejudice to the Government unless the defendant first shows a good reason for being allowed to withdraw his plea."  Id. at 1207.  However, even assuming *arguendo*, that the defendant could so meet the rigorous "good reason" test, and the Court were to consider prejudice to the government, the

Court should find that prejudice to be substantial.  This case involves a nearly 2-year

investigation into multinational cocaine trafficking.  While many defendants were arrested and

charged with this drug conspiracy, only five of them remain set for trial – in but three weeks.

All of the evidence against Mr. Maynard will be admitted at that trial, in which Mr. Maynard

will not be a participant.  To force the government to essentially replay all of that evidence,

which is expected to take two months or more, because of Mr. Maynard's late-breaking change

of heart, would unnecessarily burden the government and for this reason, also, the defendant's

motion to withdraw his guilty plea should fail.

WHEREFORE, the government respectfully requests that the Court deny the defendant's

*pro se* motion to withdraw his guilty plea.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
D.C. Bar No. 451058

_____

Rachel Carlson Lieber
Assistant United States Attorney
D.C. Bar No. 456-491
Organized Crime and Narcotics Trafficking
555 4th Street, N.W., Room 4820
Washington, D.C.  20530
(202) 353-8055; Fax: 514-8707

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this 22nd day of September, 2006.


_____
Rachel Carlson Lieber