

U.S. Department of Justice

Kenneth L. Wainstein
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

April 14, 2006

Edward C. Sussman, Esq.
601 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C. 20004

    Re:    Discovery in <u>United States v. Jones, et. al</u>, 05-386, for Lawrence Maynard

Dear Ed:

    Enclosed you will find the following bits of discovery pertaining to this investigation, which will be scanned onto CDs and produced to you and co-counsel in that fashion in the coming week or so. We provide it to you ahead of the crowd, in order to facilitate discussions with your client, Lawrence Maynard, in advance of the group status hearing next Friday, April 21, 2006. These materials include the following, which supplement documents provided to you on disk last week: (1) paperwork regarding your client's "employment" by both FTN Consultants and the Thomas Brown Agency; (2) paperwork regarding the Myrtle Avenue house your client rented in 2004 in Bowie, MD; (3) photographs from the sneak-&-peek warrant conducted by ICE at the Myrtle Avenue house on February 24, 2004; (4) photographs taken of the Hampton Park storage facility, rented by Jones in Spring, 2004, and frequented regularly by your client; (5) portions of the ICE write-up synopsizing those searches; (6) paperwork, including the lease, pertaining to Jones's rental of that Hampton Park storage facility; and (7) photographs of the April 5, 2005, traffic stop of your client in North Carolina, which netted in excess of $67,000.00, in cash in a hidden compartment.

    As I mentioned in my email yesterday, what follows is an overview, in some detail, of the case the government anticipates presenting against your client, should he elect to go to trial on the forthcoming drug conspiracy indictment, which we expect will differ from the current indictment only in that we intend to add a money laundering count as well, against Jones, and perhaps others, likely your client.

    1. <u>Immigration and Customs Enforcement Investigation</u>: Generally, this investigation revealed that, at least as far back as early 2004, Jones and Maynard were being supplied by Mexican Nationals who moved their cocaine shipments across the border into Texas, specifically the Brownsville area. (This is corroborated by confidential source information in our investigation indicating that Jones and Maynard had stated, on occasion, that their source was

Texas and "the Mexicans" – as set forth more fully in the affidavit in support of the wiretap). The ICE investigation further revealed that Jones and Maynard were renting stash houses for the Mexican suppliers, in which the suppliers would reside from time to time to dole out drugs and collect money, as much as millions of dollars at a time. For example, as you know, Maynard rented the Myrtle Avenue house in Bowie, as one such stash location; Jones rented an apartment on Summit Circle and a storage facility on Hampton Park Boulevard, both in Capitol Heights, for this purpose. (This information is corroborated by confidential source information, developed in our investigation, that in 2004 and 2005, Jones rented stash houses for the suppliers, but that he was growing tired of doing so).

These conclusions by the ICE agents were corroborated by several searches that were done of these locations: (1) the Myrtle Avenue house was searched on February 27, 2004, and noted therein were empty duffel bags, and bags containing shrink wrapping materials (see photos), along with religious candles, air mattresses and very little furniture (see ICE investigation report). In addition, all the windows were covered with drapes, sheets, or aluminum foil. These conditions mirrored in many respects the stash house in our investigation, at 9508 Potomac Drive, Ft. Washington, Maryland, down to the covered windows, air mattresses, shrink wrappings, empty duffel bags, and religious candles; (2) the Capitol Heights apartment was viewed by a maintenance worker on routine maintenance in February, 2004, who reported that it, too, was sparsely furnished, with a few air mattresses, duffel bags, religious candles, and little else; (3) the Hampton Park storage facility was searched on April 1, 2004, the day that Jones had broken the lease, but while Maynard's Mercury Cougar was still parked out front, and it, too, revealed, shrink wrapping materials, and duffel bags, along with the scent of cocaine detected in several spots within the warehouse by a certified drug-detection canine.

In addition, Hispanic males were observed visiting the Myrtle Avenue house and the Summit Circle apartment on numerous occasions in February, 2004, both by ICE agents and staff at the apartment complex. Further, Maynard was surveilled on numerous occasions in that same timeframe going to and from the Myrtle Avenue house and the Hampton Park storage facility, at times driving his own Mercury Cougar, and at other times driving a white box truck registered to Jones.

Finally, a review of the rental paperwork for those locations reveals lots of suspicious information provided by both Jones and Maynard, including, but not limited to, the following: (1) throughout various rental applications and the like, Jones and Maynard refer variously to working for "FTN Consultants" and "FTN Delivery Services #1"; in addition, Jones's wife, Deneice Jones, has from time to time, listed this place, which apparently stands for "Faith Travel Network" on applications for various things – however, no such entity is registered to do business, or pays taxes, or any other indicia of valid existence, in the state of Maryland; (2) The address Jones provides for FTN Consultants in April, 2004, is actually the address of one of his houses, 12221 Brandywine Road, Brandywine, Maryland; (3) the address Maynard provides for FTN Delivery Services #1 in March, 2004, is 400 Hampton Boulevard, Capitol Heights, Maryland – the address of the storage facility which Jones rented and then abandoned on April 1, 2004; (4) Jones and Maynard also variously note that they are also employed by the "Thomas

Brown Agency" with an address remarkably similar to yours – 601 Pennsylvania Avenue, N.W., Suite 900, Washington, D.C. 20004. As you and I have discussed, no such "agency" was ever a tenant of that building, which is an office building, during the relevant timeframe in 2004, or ever for that matter; (5) indeed, no such entity has ever registered to do business in the District of Columbia, or paid taxes, or any other indicia of a legitimate business; (6) when Maynard needed an excuse to terminate the lease on the Myrtle Avenue house after several Hispanic males discovered on February 27, 2004 (the date of the sneak-&-peek, when ICE agents had to break a window to get into the house to execute the warrant) that there had been a break-in to that house, he had "Thomas Brown" write a letter "To Whom it May Concern" indicating that he needed to lay off Maynard effectively immediately, "due to a slow down in business at this time." In that letter, which is on "letterhead" insofar as the company name and address is stamped onto the top of a piece of paper, Mr. Brown neglects to even include the quadrant of the city in his address, which again is suspicious, particularly coupled with the above.

    2. <u>North Carolina Traffic Stop</u>: As detailed in the affidavit in support of the wiretap application, your client was stopped in a speed trap in North Carolina. Based on the inconsistencies in what he said with the statements of his passenger and your client's seemingly nervous behavior, the officers ordered up a narcotics-detection canine to search the minivan your client was driving, which was registered to Jones. The dog alerted on a the minivan, and an extensive search revealed a sophisticated hidden compartment containing in excess of $67,000.00, bundled up and contained in 6 Target shopping bags. As you might expect, Maynard and the passenger denied any knowledge of the cash, which was seized. Further, Jones's minivan was impounded, and significantly, no one ever came to claim that van, or challenge its seizure. Maynard and Jones were never heard from again by the North Carolina troopers.

    3. <u>Pen register</u>: From some time in late January, 2005, through November, 2005, we had a pen register on your client's cellular telephone, which had something like 17,000, activations during that time frame. Among those activations were numerous text-messages, copies of which you have, and several of which, as we have discussed, were suspicious in nature. For example, Maynard refers to the fact that his "man is back up and working with a monster." This coincides with the timing in which confidential sources tell us that Jones, who was low on cocaine for a time in the Spring of 2005, became flush with cocaine again. This is but one example of the messages which are suspicious in nature; these messages are discussed more fully in the affidavit in support of the wiretap application. Further, among the many phone calls your client made were numerous calls to prepaid cellular telephones with McAllen, Texas prefixes. As you know, McAllen is a major point of entry of cocaine into the United States, and in fact, is the area of Texas which testifying sources tell us Jones and Maynard's cocaine suppliers are from. Significantly, for example, on the day of the North Carolina traffic stop set forth above, Maynard received a call from "Henry Garcia" at a telephone number listed to the Boost Mobile address in Irvine, California. Maynard also made calls to and received calls from, other telephone numbers with California and Georgia prefixes, which were listed in the names of Hispanic males.

4. <u>Wire Interceptions</u>: As you noted at your client's detention hearing, there are numerous legitimate telephone conversations between Maynard and Jones in the course of the 7-week wire interception, largely pertaining to Levels business. However, there are also numerous telephone calls between Jones and Maynard which refer to their illegitimate drug-trafficking business. For example, on October 5, 2005, in calls 3685, 3686, and 3687, Jones and co-conspirator John Adams discuss a discrepancy in the amount of money that Adams thought he paid Jones for cocaine and the amount of money Jones thought he received from Adams. It is clear from the text of these calls that they are discussing discrepant drug debt, but we have a witness who is prepared to testify that these were, indeed, drug discussions. Then, in call 3690, Jones can be heard telling Adams that he and your client "looked over the dates" – a thinly veiled reference to drug money – and that they were correct. Your client then gets on Jones's cellular telephone with Adams and concurs. This is but one example of many in which your client is heard discussing cocaine in the code that Jones and his co-conspirators had established.

5. <u>October 24, 2005, Search Warrants</u>: As you and your client are undoubtedly well aware, agents on the case conducted simultaneous search warrants at nine residences and Levels on this date, and recovered cocaine, money, and drug packaging materials at the residences of your client's co-defendants. In addition, from the stash house in Ft. Washington was recovered 100 kilograms of powder and crack cocaine, and a huge amount of money, in a house that was remarkably similar to the Myrtle Avenue, Summit Circle, and Hampton Park locations – air mattresses, devotional candles, sparse furnishings, and Hispanic male occupants. All of this, the government posits, corroborates the wire interceptions insofar as it makes clear that Jones was a high-level cocaine dealer, and many of Maynard's co-defendant's were his customers. As does the fact that Jones frequented that Ft. Washington stash house on numerous occasions during the course of the wire interception, as reflected in the Global Positioning System tracker which was placed on Jones's vehicle, pursuant to a Court Order, in late September, 2005.

6. <u>Confidential Sources</u>: At this writing, the government has four cooperating witnesses who are in a position to testify about your client's role in Jones's drug trafficking operation – that of an able assistant in the enterprise, who dealt with the Mexican suppliers, frequently transported drugs and money for Jones, served as a constant point of contact for the customers, as Jones frequently changed his telephone number to avoid detection by law enforcement, and actually delivered money and cocaine on Jones's behalf. In addition, the government anticipates that at least one more witness will be coming on board in the coming month or so, bringing the number of eyewitnesses to your client's drug dealing to five. As noted variously above, these sources are corroborated by other aspects of the investigation.

Case 1:05-cr-00386-ESH    Document 190-2    Filed 09/22/2006    Page 8 of 10

      As you might imagine, what I have detailed above is in no way the entirety of the evidence against your client. Rather, it is intended as an overview of the quantum and types of evidence the government intends to use against him at trial. As things go forward, feel free to call me with questions, which I will be happy to answer.

                                            Sincerely,


                                          Rachel Carlson Lieber
                                          Assistant United States Attorney

Enclosures