UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAWRENCE MAYNARD<br>  (Lead Defendant:<br>   Antoine Jones) | Crim. No. 05-386-10  (ESH)<br><br>Status Hearing Date:<br>March 23, 2007, 9:30 a.m. |

**DEFENDANT LAWRENCE MAYNARD'S RENEWED MOTION TO
VACATE DETENTION ORDER AND TO SET CONDITIONS OF RELEASE**

BACKGROUND

On November 22, 2005, defendant Lawrence Maynard was indicted in Cr. No. 05-417 (ESH) with one count of narcotics conspiracy in violation of 18 U.S.C. § 846, for activities that formed the basis of a multi-count indictment against Antoine Jones and others in this case. Defendant was arrested the next day, November 23, 2005.

Following a detention hearing before Magistrate Judge Alan Kay, defendant was held without bond pursuant to 18 U.S.C. § 3142(e). On November 30, 2005, Judge Kay issued a Detention Memorandum in which he concluded that although defendant's "case presents a close call,"[1] defendant had not overcome the

---

[1] Detention Order at 5, Doc. 4, Cr. No. 05-417 (ESH).

1

presumption of danger to the community under § 3142(e).

On December 29, 2005, after briefing by the parties, this Court issued a Memorandum Opinion[2] upholding Judge Kay's decision to hold defendant without bond. Thereafter, the indictment against defendant in Cr. No. 05-417 (ESH) was dismissed, and defendant was added as a defendant in the superseding indictment against Antoine Jones and other defendants in this case.

For the reasons that follow, we respectfully ask the Court to revisit its December 29, 2005, decision upholding Judge Kay's detention order, and to modify defendant's conditions of release.

## **DEFENDANT LAWRENCE MAYNARD**

As a supplement to the materials presented by prior counsel,[3] we set forth here some additional details about defendant Maynard's personal history and background. We believe this supplement is important to a proper resolution by the Court of our request herein.

1.  Defendant Lawrence Maynard, 45, was born August 21, 1961, in Washington, D.C.[4] He attended Saint Benedict the Moor School, grades 1-6, and Elliot Junior High School, grades 7-9. He then went to Eastern High School and received his high school

---

[2] Memorandum Opinion (Doc. 8), Cr. No. 05-417 (ESH).

[3] See Docs. 3, 7, Cr. No. 05-417 (ESH).

[4] Defendant is one of three children born to Vincent and Marie Maynard. Defendant's brother, Vernon Maynard, 42, lives in Temple Hills, Maryland; his sister, Veronica Maynard, 51, lives in Washington, D.C. Defendant's parents separated when he was 5 years old. His mother, who is in her 80s, lives in Crofton, Maryland; his father died in 1995.

diploma in the summer of 1979.

2. A few months after he graduated, defendant voluntarily enlisted in the United States Marine Corps Reserve. On September 3, 1979, he started boot camp at Parris Island, South Carolina, and successfully completed the strenuous 12-week training regimen.[5]

Following boot camp, defendant was assigned to the United States Marine Corps Headquarters Maintenance Supply Group (HMS 41) at Andrews Air Force Base, Camp Springs, Maryland.[6] He served in the Marine Corps Reserves at Andrews Air Force Base from January 1980 until August 1986, when he was honorably discharged from further reserve duty.

3. While attending Eastern High School, defendant began dating Joyce Pitt, whom he had known since he was a child, and who was also a student at Eastern. Their relationship continued after they both graduated from Eastern[7] and they were married on December 17, 1982. In July 1983, they purchased their current home, a modest 3-bedroom house, located at 7711 Greenleaf Road, Landover, Maryland.[8]

4. Mrs. Maynard has been employed with the Department of

---

[5] Undersigned counsel, having gone through Parris Island boot camp over fifty years ago, can attest that defendant's successful completion of the 12-week regimen was no small accomplishment.

[6] At the time, the Marine Corps had a Marine Air Group located at Andrews Air Force Base.

[7] Mrs. Maynard graduated from Eastern in 1980, a year after defendant graduated.

[8] The purchase price for the residence was $46,000.

Defense for the past 20 years. She worked for 12 years at the Pentagon as a Management Assistant. Since 1991, she has worked at the Navy Yard in Washington, D.C., as an Administrative Assistant.

5. Mrs. Maynard and defendant are the parents of two children: Bryan A. Maynard, born March 13, 1983; and Tyffany M. Maynard, born November 9, 1988. Brian is employed as a Budget Analyst with the Department of Justice in D.C.,[9] and Tyffany works at the Alexandria Virginia Courthouse as a Records Clerk. Both children live with their mother at the family home in Landover.

Mrs. Maynard and defendant are also the legal guardians of Whitney M. Moten, 16, Mrs. Maynard's niece.[10] Whitney has lived with the Maynards at the Landover residence since she was four years old.[11]

6. During the past 25 years, defendant has been gainfully employed. Based on defendant's best recollection, defendant's work history is summarized as follows:

---

[9] Prior to joining the Department of Justice, Brian was employed as a budget analyst at NIH. He attended junior college and is working on a college degree from the University of Maryland.

[10] Whitney's mother, Mrs. Maynard's sister, was murdered in March 1995. Not long after this tragedy, Mrs. Maynard and defendant petitioned the court and were awarded legal guardianship of Whitney.

[11] Whitney attends DuVal High School in Lanham, Maryland.

- 12/79 to 4/80[12]          Clerical Assistant/Volunteer
                             National Legal Aid and
                               Defenders Association
                             1725 K Street, N.W.
                             Washington, D.C.

- 4/80 to 1/86               Storeroom Manager
                             S.S. Kresge Company
                             500 7th Street, N.W.
                             Washington, D.C.

- 12/82 to 6/86              Night Cleaner
                             Hyatt Regency Hotel
                             400 New Jersey Avenue, N.W.
                             Washington, D.C.

- 6/86 to 12/90              Route Sales Driver[13]
                             Coca Cola/Potomac Beverage Supply
                             Capitol Heights, MD

- 12/90 to 1/93              Driver
                             Embassy Dairy
                             Waldorf, Maryland

- 1/93 to 2/96[14]           Driver
                             Jack & Jill Ice Cream
                             Forestville, Maryland

- 2/96 to 4/98               Driver
                             Pepsi Cola Company
                             Forestville, Maryland

- 5/98 to 5/01               Driver
                             Room Store

---

[12] Defendant began his volunteer work after returning home from boot camp at Parris Island. In addition to the jobs listed during January 1980 to August 1986, defendant, as noted, also served in the United States Marine Corps Reserve, assigned to the Marine Air Group HMS 41 at Andrews Air Force Base, Camp Springs, Maryland.

[13] Defendant obtained a commercial B-Class driver's license in 1985, and his Commercial Driver's License ("CDL") in 1990. His CDL continues to be valid.

[14] We note that during the period from 1992 to 1995, besides his regular employment as indicated, defendant did volunteer work with his wife and some of her co-workers at the Emory Elementary School Men's Shelter, Lincoln Road, N.E., Washington, D.C.

                                Landover, Maryland[15]

- 5/01 to 9/01          Driver/Mover
                        Bennett Delivery Service
                        Upper Marlboro, Maryland

- 9/01 to 8/03          Driver/Laborer
                        Instiform East
                        Landover, Maryland[16]

- 8/03 to 2/04          Driver/Manager
                        Faith Travel Network Delivery
                        Brandywine, Maryland[17]

- 2/04 to 10/05         Manager[18]
                        Levels Nightclub
                        1960 Montana Avenue, N.E.
                        Washington, D.C.

- 11/05 to 11/23/05     Driver
                        NBS Janitorial Supply Company
                        Beltsville, Maryland[19]

---

[15] Defendant's position at Room Store included: local and long-distance delivery; daily inspection of trucks; inspection of merchandise prior to and after delivery; routing of deliveries from PA, MD, VA, NJ, and DC; and operation of a 26-foot, 6-speed truck with a lift gate.

[16] Defendant's duties at Instiform East included: local and long-distance daily driving of vehicles, varying from light trucks with trailers to 16-speed boiler and vacuum trucks; and loading and unloading various equipment needed at job sites, e.g., pumps, traffic signs, generators, and personal protection equipment.

[17] Defendant's duties at Faith Travel Network Delivery included: delivery and pickup service; storing and taking inventory; customer service; routing multiple deliveries; daily light maintenance and fueling of a 16-foot, 14-ton truck; and loading and unloading shipments.

[18] While working at Levels nightclub, defendant was a licensed ABC manager.

[19] As the Court is aware, the "take down" of Antoine Jones and others in this case, as well as the execution of the search warrant for Levels, occurred October 24, 2005. Because the FBI seized the ABC license for Levels it was impracticable to keep the club open for business, and defendant found himself unemployed. After a few weeks, defendant got a job as a truck driver for NBS Janitorial Supply Company, located in Beltsville, Maryland. He was on the job for only
(continued...)

7.   Defendant has never been convicted of a criminal offense, either as a juvenile or as an adult.[20]

8.   In addition to his clean criminal record, defendant has a spotless institutional record since his incarceration.  He has never been "written up" for any criminal violation or for any administrative violation while at CTF or at D.C. Jail.[21]  During his incarceration at CTF, defendant, a Catholic,[22] served as the Religious Coordinator for his unit under the supervision of Reverend Napper.  At D.C. Jail, he is currently the Religious Coordinator for Unit Southeast 2 and works with Chaplain Betty Green and Reverend McKinley Battle.

9.   Lastly, we note that defendant is drug-free[23] and is in good physical and mental health.

---

[19](...continued)
a few days when on November 23, 2005, he was arrested in this case.

[20]   Indeed, prior to this case, defendant had never been arrested for a criminal offense as a juvenile or as an adult, with one exception.  In 1993 he was arrested on a drug charge and was later charged in Superior Court with distribution of cocaine.  Following a jury trial, he was found not guilty.

[21]   Defendant was originally housed at D.C. Jail.  On December 13, 2005, he was transferred to CTF, and on August 7, 2006, he was sent back to D.C. Jail.

[22]   Defendant was baptized into the Catholic faith in August 1961 and was raised a Catholic.  After moving to Maryland, he became a member of Saint Joseph's Catholic Church in Landover, Maryland, and on occasion attended services at Saint Mary's Catholic Church in Upper Marlboro, Maryland, his mother's parish.

[23]   The Pretrial Services Agency report prepared November 23, 2005, the day when defendant was arrested and first brought to court, states that defendant's test results showed "no drug use."

**ARGUMENT**

**The Circumstances Of This Case At This Time Rebut
The Statutory Presumption That Defendant Is A
Flight Risk And A Danger To The Community.**

We recognize that because defendant is indicted for a narcotics conspiracy that carries a maximum of life imprisonment, a rebuttable presumption exists that "no conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community" under 18 U.S.C. § 3142(e). As we show, the circumstances of this case at this time rebut the statutory presumption that defendant is a flight risk and a danger to the community.

**A.    Flight Risk**

In our view, the defendant easily rebuts the presumption of flight risk, even though he faces a statutory maximum of life imprisonment and a mandatory minimum sentence of 10 years if convicted.[24]

1.    Throughout the detention hearing process, the

---

[24] Presumably the government would argue that if convicted, defendant should be held accountable for 150 kilograms or more of cocaine under U.S.S.G. § 1B1.3 and thus his total offense level should be no less than 38 (235-293 months) under § 2D1.(c)(1) and that any sentence lower than the guideline range would be "unreasonable."  In contrast, the defense would argue that under the so-called "parsimony" mandate of 18 U.S.C. § 3553(a), and considering defendant's background, the Court should grant defendant a substantial "variance" from the guideline range under Booker. Any "variance" that the Court would deem appropriate, however, would be limited by the statutory mandatory minimum sentence of 10 years under 18 U.S.C. §§ 846 and 841(b)(1)(A)(ii).

government stressed that the "strength of the evidence[25] against defendant is <u>compelling</u>" and shows that he knowingly participated as the "<u>right-hand associate</u>" of Antoine Jones in Jones's wide-reaching narcotics conspiracy.[26]  Judge Kay, and this Court in affirming Judge Kay, relied heavily on the government's recitation of "compelling" evidence in holding defendant without bond.[27]

At this point in time, however, the government's purported "compelling" evidence must be heavily, if not completely, discounted by the jury's verdicts in the recent trial of Antoine Jones and his then co-defendants Adrian Jackson, Michael Huggins, and Kevin Holland.

From October 27, 2006, through December 5, 2006, the government presented to the jury the same litany of evidence that it proffered at the detention hearings in this case.[28]  The

---

[25]   The "weight of the evidence against the person" is one of the factors to be considered by the judicial officer in making its detention decision under 18 U.S.C. § 3142(g)(2).

[26]   Government's Supplemental Opposition to Defendant's Motion for Modification of Conditions of Release, Doc. 6, at 2, 8, Cr. No. 05-417 (ESH).  (Emphasis added.)

[27]   Docs. 4, 8, Cr. No. 05-417 (ESH).

[28]   The government's evidence included: the ICE investigation of Jones and Maynard and others in Maryland; the April 5, 2005, North Carolina traffic stop of Maynard driving a vehicle owned by Jones and the seizure of $67,000 from a secret compartment within the vehicle; numerous telephone conversations between Jones and the other alleged co-conspirators, including Maynard, in which the speakers used code words, e.g., "tickets," to hide their narcotic trafficking; Jones's use of his Levels nightclub, which Maynard managed, as a "front" for his drug dealing; the testimony of several cooperating individuals explaining the workings of the multi-kilogram narcotics conspiracy that Jones allegedly ran, including his distribution of wholesale
(continued...)

evidence, however, did not satisfy the jury that the alleged narcotics conspiracy had been proven.  The jury acquitted Jackson, Huggins and Holland of the conspiracy and was unable to reach a verdict as regards Jones.[29]

    2.    Defendant has no history of fugitivity from the criminal system.  Prior to this case, defendant had been involved in only one criminal case -- the narcotics charge in Superior Court for which he was found not guilty.  He was released in that case pending trial and he appeared at all court sessions when required.

    3.    As regards this case, defendant was not arrested until almost a month after Jones and the other defendants were taken into custody.  During this hiatus, defendant had contact with Jones at the D.C. Jail[30] and was fully aware of the seriousness of the charges involved and the likelihood that he would also be

---

[28](...continued)
amounts of drugs to Jackson, Huggins and Holland; and the results of the "take down" search warrants, including the seizure from the "stash" house of 97 kilograms of cocaine and 3 kilograms of "crack" cocaine, along with $87,000 in cash.

[29]  In addition to the conspiracy, the indictment charged each of the four defendants with various telephone counts in violation of 21 U.S.C. § 843(b).  The government was no more successful with the telephone counts than it was with the conspiracy count.  The jury acquitted the defendants of most of the telephone counts, and the jury was unable to reach a verdict on one of the telephone counts against Huggins and several of the telephone counts against Jones.

[30]  See Government's Supplemental Opposition to Defendant's Motion for Modification of Conditions of Release at 6, Doc. 6, Cr. No. 05-417 (ESH).

arrested as part of the alleged conspiracy run by Jones.[31]  Yet, defendant made no effort, whatsoever, to flee the jurisdiction. To the contrary, he stayed put with his family and went out and got a new job.  Moreover, the jury's recent defense verdicts dissipate any possible temptation that may exist for defendant to leave the jurisdiction and try to escape trial.

    4.   Lastly, as detailed above, the defendant has exceptionally strong personal and family ties to the District of Columbia metropolitan area.  Mrs. Maynard has shared with undersigned counsel that her marital relationship with her husband is as strong as ever.  She and her children have kept close contact with defendant since his arrest and she says that they will continue -- as they have for the past 15 months -- to give defendant their love and emotional support.[32]  This support provides a powerful incentive to defendant not to become a hunted fugitive if released.

    **B.**    **Danger to the Community**

In holding defendant without bond, Judge Kay and this Court relied heavily on the statutory presumption that defendant would

---

[31] Prior to his arrest, defendant came to the courthouse and watched some of the various detention proceedings for the other defendants in the case.

[32] Mrs. Maynard has authorized undersigned counsel to represent to the Court that subject to the approval of the lienholders on the family residence, she is willing to put up the residence as collateral for defendant.

pose a danger to the community if released.[33] As regards the issue of danger to the community we note the following legal principles.

Shortly after the passage of the Bail Reform Act of 1984, 18 U.S.C. § 3142, federal courts began to grapple with the import of the statutory presumption of § 3142(e). Initially, some courts considered the presumption to shift the burden of persuasion to the accused to show that he or she was not dangerous. See, e.g., United States v. Aiello, 598 F.Supp. 740 (S.D.N.Y. 1984). But, the vast majority of the courts -- including our Court of Appeals -- early on rejected the Aiello rationale and held that the presumption shifts only a burden of production to the defendant, not the burden of persuasion. See United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985).[34]

Although the presumption is not a "bursting bubble" and does not evaporate completely when rebutted, the "emphasis should be on the Government's burden to establish a finding of dangerousness by clear and convincing evidence, as required by 18 U.S.C. § 3142(f)." United States v. Cox, 635 F. Supp. 1047, 1050 (D. Kan. 1986). (Emphasis Added.) It is critical that courts take this "clear and convincing" burden seriously "to stay within the constitutionally permissible societal interests that Congress

---

[33] See Judge Kay's Detention Memorandum at 5-6, Doc. 4, Cr. No. 05-417 (ESH) and this Court's Memorandum Opinion at 5, Doc. 8, Cr. No. 05-417 (ESH).

[34] See also United States v. Cox, 635 F. Supp. 1047, 1050, n.5 (D. Kan. 1986) (collecting cases).

intended [the Bail Reform Act] to address." Id. at 1051.

As Senior District Judge Joseph Lord eloquently stressed shortly after the Bail Reform Act was enacted, even in narcotic conspiracy cases where the presumption is otherwise applicable --

> it must be remembered that we are dealing with the deprivation of the liberty of a citizen of the United States who is presumed to be innocent. In my judgment the clear and convincing evidence requirement rightly places a heavy burden upon the Government before this radical interference with freedom is imposed.

United States v. Fisher, 618 F.Supp. 536, 537 (E.D.Pa. 1985).

More recently, Judge Kennedy of this court reaffirmed the foregoing legal principles in United States v. Hudspeth, 143 F. Supp. 32, 37 (D.C. Cir. 2001), a multi-kilogram narcotics case, in which Judge Kennedy -- mindful of the government's burden and the statutory presumption -- upheld Magistrate Judge Robinson's decision to allow Hudspeth to be placed on electronic monitoring, notwithstanding Judge Robinson's finding that the evidence of Hudspeth's participation was "substantial." Id. at 37.

In sum, "the presumption can be a part of the government's arsenal in seeking to meet [the clear and convincing] standard, but the presumption, even unrebutted, is insufficient standing alone to meet the burden of clear and convincing evidence." United States v. Cox, supra, 1051-1052. (Emphasis in original.)

Viewed against the foregoing legal backdrop, we submit that the circumstances of defendant's case at this time rebut the presumption of dangerousness and preclude a finding that the government has shown by clear and convincing evidence that if

13

released, the defendant will traffic in drugs or endanger the community by other criminal activity.

    1.   At the outset we note that unlike the many "street" and "crew" narcotic conspiracies prosecuted in this courthouse, the conspiracy alleged in this case does not involve violence, e.g., murders or other violent assaultive acts to facilitate and expand the alleged drug operation.  The indictment in this case alleges no crimes of violence or weapon violations other than the 18 U.S.C. § 924(c) charge against Adrian Jackson arising from a weapon that was found during the execution of a search warrant for his residence.  The jury acquitted Jackson of this charge.[35]

    2.   Unlike several of the co-defendants in this case, defendant has no history of past convictions for drug trafficking or other crimes that might suggest a continuing propensity to commit crime in the future if released.  To the contrary, as noted, defendant's record (both juvenile and adult) is devoid of any criminal convictions.  Indeed, defendant has never been arrested for a criminal offense, other than for the narcotics charge for which he was acquitted in Superior Court almost 15 years ago.

    3.   Although the government's evidence arguably suggests

---

[35] As regards the stolen handgun that was found during the search of Levels nightclub, which defendant managed, we have found no mention in the indictment relating to this weapon and we do not believe the government has produced any evidence that defendant had sole access to the weapon or that he ever carried or used the weapon in the club or elsewhere.  Moreover, neither Judge Kay nor this Court in their respective detention memoranda rely on the weapon as an indicium that defendant would be dangerous if released.  See Docs. 4, 8, Cr. No. 05-417.

that defendant had a trusted relationship with Jones and may have participated in Jones's narcotics conspiracy[36] -- a conspiracy that the jury did unanimously find to have existed -- we do not believe there is any credible evidence that if released, defendant would be able to perpetrate the conspiracy in lieu of Jones.

As noted, defendant was in the community from October 24, 2005, when the "take down" was executed until November 23, 2005, when he was arrested. There is no clear and convincing evidence that during this period defendant had the ability to, or tried to, perpetrate Jones's drug operation.

    a. The government's assertion that Jones tried to contact defendant from jail through letters sent to an intermediary to be delivered to defendant falls far short of hard evidence. As Judge Kay noted, the government produced "no evidence as to the contents of any of these letters, or whether any such letters in fact exist." Doc. 4 at 3, Cr. No. 05-417 (ESH). Because of this lack of evidence, Judge Kay was unable to say that Jones and Maynard were continuing to deal in drugs. Rather, Judge Kay could only speculate that "Jones may be

---

[36] E.g., evidence of the April 5, 2005, North Carolina traffic stop and a call shortly after the stop to a telephone number in McAllen, Texas, which was suspected to be the telephone number of one of Jones's narcotics suppliers; intercepted discussions between Jones and defendant and others about "tickets"; and defendant's rental of 8550 Myrtle Avenue, Bowie, Maryland, a suspected "stash house." As noted, however, under the Bail Reform Act, defendant does not have the burden of persuasion that he is not guilty of the conspiracy. See United States v. Alatishe, supra, 768 F.2d at 371; United States v. Cox, supra, 635 F.Supp. at 1050, n.5.

attempting to use the Defendant to continue his operation." Doc 4, at 5, Cr. No. 05-417 (ESH). (Emphasis added.) Indeed, this Court itself acknowledged that although "highly suspicious," the government's information about the letters "does not necessarily support the inference that Jones and Maynard are continuing to engage in illegal activities." Doc. 8 at 4, Cr. No. 05-417 (ESH).

Other than the foregoing, the government, to our knowledge, has produced not one iota of evidence tying defendant in with continued drug dealing during the month prior to his arrest, e.g., continued phone calls to any of Jones's known drug suppliers; purchases by defendant of any drugs from Jones's suppliers or from anyone else; or distribution by defendant of any drugs to any of Jones's customers or to anyone else.

  b. Moreover, when the authorities executed a search warrant on defendant's home in Maryland on November 23, 2005, they did not find any drugs, drug paraphernalia, weapons, large amounts of cash, records, writings, memoranda or any other items that suggested defendant was continuing to run Jones's drug operation or that he was setting up a new drug operation.

  c. Lastly, defendant's getting a job as a truck driver in mid-November when it became obvious that he could no longer work at Levels nightclub is hardly consistent with continuing to be -- as the government would have it -- a "high-level go between" in a large scale drug conspiracy involving

Jones and his suppliers in Texas and Mexico.[37]

4.  Just as there is no evidence that defendant dealt drugs or tried to deal drugs during the period from October 24, 2005, to November 23, 2005, there is no evidence to our knowledge that indicates defendant has dealt or has been trying to deal drugs since his incarceration.

In sum, we respectfully suggest that the foregoing analysis of the evidence and the particular circumstances of this case demonstrate that notwithstanding the admittedly seriousness of the crime for which defendant is charged and the statutory presumption of dangerousness, the government has failed to prove by clear and convincing evidence that the defendant would engage in drug trafficking or other criminal behavior if released under strict conditions.

### C.  Proposed Plan of Release

Like prior counsel,[38] undersigned counsel asks that the Court release defendant under strict conditions with house arrest enforced by electronic monitoring with permission to leave the house only for employment,[39] court appearances and drug testing,

---

[37] We also note that if released, defendant as a practical matter could not deal narcotics with Jones's prior suppliers even if he wanted to. No experienced drug trafficker would supply drugs to a person who has been locked up for over a year and is suddenly on the street awaiting trial for fear that the reason defendant is on the street is because he now is a government "snitch" working for his 5K1.1 letter.

[38] See Doc. 3, at 3-4, Cr. No. 05-417 (ESH).

[39] Defendant's CDL license is in good standing and he should have no difficulty obtaining employment as a commercial truck driver
(continued...)

meetings with counsel, religious services, and medical needs.

Other conditions the Court may wish to consider are: (1) that defendant consent to random inspection of his home by a probation officer; that defendant consent to the use of a pen register on his telephone to be installed at the government's discretion; (3) that defendant shall avoid all contact with any alleged participant of the conspiracy charged in this case, including the co-defendants who have been acquitted, unless defendant's own counsel is physically present and while in preparation of his defense; and (4) that defendant shall not possess a firearm either in his Maryland home or elsewhere.

The foregoing conditions were used by Judge Brotman in United States v. Vastola, 652 F.Supp. 1446 (D. N.J. 1987), in releasing two defendants who had been charged in a complex Title III narcotics case and who were subject to the statutory presumption. Judge Brotman initially held the defendants without bond in September 1986; however, when it was later anticipated that the defendants would not get to trial until one and a half years after their arrests, Judge Brotman, sua sponte, reconsidered his earlier detention order, and on February 6, 1987, released defendants to home arrest with strict conditions, recognizing that --

> although the release of these defendants
> cannot be executed free of all risk that they

---

[39](...continued)
if released. Indeed, we are hopeful that by the time of the upcoming status call, we will have a definite job offer for defendant to present to the Court.

18

>will not attempt to deal illegal drugs and
>narcotics, the court finds that the
>defendants can no longer be detained within
>constitutional limits. 652 F. Supp. at 1448.

Judge Brotman "designed" the conditions of release as he did to reasonably assure "that have no opportunity to deal in illegal drugs and narcotics." Id.[40]

### D.  A Final Thought

We close where we began with the words of Judge Kay: "This particular case presents a close call."[41] Considering all of the foregoing, we respectfully suggest that the case should be revisited in the light of the intervening jury defense verdicts and the fact that defendant will not go to trial for another eight months[42] -- almost two years since his arrest on November

---

[40]  We are aware that the Court recently modified the conditions of co-defendant Kirk Carter (who was previously convicted of narcotics conspiracy and was sentence to 135 months according to Agent Yanta's September 2, 2005, Title III affidavit at 14) and released him to "Work Release/Halfway House." Doc. 321. Although the Court may wish to modify defendant's bond conditions in the same manner as it did for co-defendant Carter, we believe that our proposed plan of release better serves the interests of the community.

[41]  Doc. 4, at 5, Cr. No. 05-417 (ESH).

[42]  Courts have recognized that delay in getting to trial is a legitimate factor to be considered in assessing the equities of detaining an accused without bond, notwithstanding the statutory presumption of the Bail Reform Act. See e.g., United States v. Vastola, supra. Indeed, because of the crucial liberty interest at stake, there comes a point -- even in serious drug cases where the statutory presumption applies -- where lengthy pretrial detention of an accused violates the Due Process Clause. See e.g., United States v. Accetturo, 783 F.2d 382, 388 (3rd Cir. 1986); United States v. Gonzalez-Claudio, 806 F.2d 334, 341-343 (2nd Cir. 1986); United States v. Ojeda Rios, 846 F.2d 167, 168 (2nd Cir. 1988); United States v. Millan, 824 F.Supp. 38, 40-45 (S.D.N.Y. 1993) (23-month pretrial detention in a heroin CCE conspiracy case exceeds due process and defendant released under a strict home detention monitored release program).

23, 2005. What may have been "a close call" back on November 30, 2005, should now, in our view, be decided in favor of the defendant.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons and for such reasons as may be presented at the upcoming status call, we ask that this motion be granted.

>                                     Respectfully submitted,
>
>                                     _____/s/_____
>                                     James L. Lyons  (50690)
>                                     Kellogg, Williams & Lyons
>                                     1925 K Street, N.W., Suite 200
>                                     Washington, D.C.  20006
>                                     (202) 496-0722
>                                     (202) 331-1257  (fax)
>                                     JamesLyons@verizon.net (e-mail)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of March 2007, I caused a true and correct copy of the foregoing pleading to be delivered to the parties in this case via the Court's Electronic Case Filing (ECF).

>                                     _____/s/_____
>                                     James L. Lyons