UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 05-386 (ESH) |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE MAYNARD, | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR MODIFICATION OF CONDITIONS OF RELEASE**

The United States, by its counsel, the United States Attorney for the District of Columbia, respectfully opposes the defendant's motion to modify his conditions of release. The government relies upon the following arguments, points and authorities, and on any others which may be made at a hearing on this matter.

**PROCEDURAL HISTORY**

Because the Court and the parties are familiar with the extensive procedural history of the defendant's case, what follows is a brief synopsis of the pertinent facts: The defendant was indicted in November, 2005, on one count of conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine and 50 kilograms or more of cocaine base. After his arrest that month, the Magistrate Judge held him without bond pending trial, a determination which this Court upheld shortly thereafter. The grand jury issued a superseding indictment in March, 2006, incorporating the defendant's case with that of co-defendants Antoine Jones and approximately 10 additional defendants. The defendant plead guilty in June, 2006, to this indictment. However, three months later, the defendant had a change of heart and moved to withdraw his guilty plea in September, 2006, which this Court granted on February 2, 2007.

Having been permitted to withdraw his guilty plea on purely technical grounds,[1] the defendant now urges this Court to release him on bond pending trial in the case, which is presently set for November 5, 2007. However, notwithstanding the defendant's painstakingly thorough reiteration of the arguments for bond that this Court, and the Magistrate, considered – and rejected – in the fall of 2005, the defendant posits no material change in the defendant's circumstances that would warrant his release at this time. Indeed, if anything, the Court should have greater confidence it its decision to detain the defendant, given his willingness, at least for a time, to accept responsibility for the serious charges levied against him. The defendant remains a danger to the community, and as such, his motion for release should be denied.

## FACTUAL BACKGROUND

The charges against the defendant arose out of a long-term narcotics-trafficking investigation being conducted by the joint FBI/MPD Safe Streets Task Force into cocaine selling by Antoine Jones, who operated the nightclub Levels, in Northeast, Washington, D.C., and the defendant, Jones's club manager and drug-trafficking associate.

Using information gained from various confidential sources, along with other investigative tools, including surveillance, analysis of pen register data from the cellular telephones of Jones and Maynard, and evidence gained from a traffic stop of Maynard in Durham, NC on April 5, 2005 – which revealed in excess of $67,000, in cash in a hidden compartment in the minivan owned by Jones and driven by Maynard – investigators obtained a Title III wire intercept on the cellular telephone of Jones, which ran from September 2, 2005,

---

[1] Because the defendant plead guilty before the Magistrate Judge, and moved to withdraw that plea before this Court formally "accepted" that plea, he was permitted to withdraw that plea "for any reason or no reason." Federal Rule of Criminal Procedure 11(d).

through October 24, 2005.

Throughout the course of the investigation prior to the wire interception, several members of Jones's organization were identified, including Lawrence Maynard, who is both the nightclub's manager, and Jones's right-hand man in the drug-trafficking business, frequently serving as a point of contact between Jones and his suppliers and customers. For example, while Jones frequently changed his cellular telephone number to avoid law enforcement, Maynard maintained his telephone number for several years, up to the time of his arrest, and was known to refer customers to Jones's latest telephone number. This information was corroborated by pen register data on Maynard's cellular telephone, which showed that he had contact with many of the same telephone numbers as Jones was, and in the same timeframe, including telephone numbers from border towns in Texas. This is consistent with information obtained by investigators that Jones's source of supply was from Texas and Mexico.

From the very early days of the wire interception, a clear pattern of telephone contacts was established between Jones and various individuals, whom investigators identified over time. In those calls, Jones and his colleagues discussed the timing and location of meetings, without any other substantive discussion. This pattern is consistent with what confidential sources indicated was his practice: short conversations setting up meetings to drop off money and pick up cocaine, without any further discussion on the telephone, for fear of being intercepted by law enforcement. Further, several common meeting places were discussed between Jones and his various customers, including commercial establishments along Branch Avenue in Maryland, and at the nightclub Levels.

Jones also uniformly spoke in code throughout the interception period. For example, he and his drug-trafficking colleagues spoke frequently of the need for, and delivery of, "tickets," which was a reference to wholesale quantities of cocaine. They spoke, too, of "VIP tickets" (larger quantities), and occasionally of "flyers." While also consistent with nightclub business - and thus a good cover - the conversations fairly quickly became obviously a code, based on, among other things, the occasional slip-up, e.g., a request by a customer for a "half ticket," or a query by Jones of another customer as to whether he still needed "that little ticket." Investigators' interpretation of these calls has been confirmed by cooperating witnesses, who were themselves intercepted on the wire speaking of tickets and flyers as code for kilogram quantities of cocaine.

In addition, wire interceptions revealed Jones on occasion telling other known drug-trafficking associates to get in touch with "Lawrence" to pick something up, or simply to "see Lawrence" who would take care of matters. One of those associates, who was indicted with Jones, Maynard, and others, and who has pleaded guilty and agreed to cooperate with the government, has indicated that what he got from the defendant after these phone calls was a large quantity of cocaine. Other cooperating witnesses similarly tell of receiving packages of cocaine from Lawrence Maynard at Jones's behest, when Jones was not around.

Within the first few weeks of the wire interception, it further became obvious that Jones was being supplied by Hispanic-sounding males, with cellular telephone exchanges in McAllen, Texas, a major point-of-entry of cocaine into the United States, and Irvine, California. Throughout the course of the interception period, Jones spoke with at least three different Hispanic-sounding males - which investigators confirmed through pen register data were all in

contact with each other - about the timing of shipments of "tickets," "music," and other references to cocaine. Based on the content of some of these calls, and surveillance of Jones, investigators discerned that Jones was meeting with frequency with one of these men – co-defendant Roel Bermea, Jr., who has pleaded guilty to his role in this conspiracy – at a stash location in Ft. Washington, Maryland.

Based on telephone conversations during the third week in October, 2005, in which Jones discussed with the McAllen-based Hispanic male – a soon-to-be co-defendant of Jones and Maynard[2] – the fact that the "party" would happen on "Friday," (October 21, 2005), investigators obtained numerous search warrants for the residences of some suspected customers, along with Jones's two residences, the nightclub Levels, and the suspected stash house located at 9508 Potomac Drive, Ft. Washington, Maryland. In the early morning hours of October 24, 2005, teams of agents executed those search warrants and recovered approximately 97 kilograms of cocaine, 500 grams of crack cocaine, and in excess of $800,000.00, from the stash house alone. Arrested at that location were defendants Bremea, Alberto Rollando Carrillo-Montelongo, and Ricardo Sanchez-Gonzales, who also have pleaded guilty to Narcotics Conspiracy, and owned up to their roles therein. Also recovered from various other search locations were smaller, still-wholesale quantities of cocaine, crack cocaine, large amounts of cash, and several weapons. Recovered from Jones's Jeep was in excess of $69,000.00 in cash. Recovered from the nightclub Levels, of which Maynard is the manager, was a loaded, stolen .9mm handgun, from the drawer of a desk in the office. Defendant Maynard was indicted in a separate companion indictment,

---

[2] The government is in the process of presenting evidence to a grand jury in the hopes of obtaining a superseding indictment in the coming days in which this individual will be charged.

and arrested on November 23, 2005.

At the time of the Safe Streets investigation, a separate, parallel investigation into Jones, Maynard, and their Mexican suppliers was being undertaken by agents from Immigration and Customs Enforcement (ICE), based in Baltimore, Maryland, and McAllen, Texas. That investigation provided substantial additional evidence corroborating Maynard's role as Jones's right-hand drug-trafficking associate. The ICE investigation revealed that Jones and Maynard were renting stash houses for the Mexican suppliers, in which the suppliers would reside from time to time to dole out drugs and collect money, as much as millions of dollars at a time. For example, in January, 2004, Maynard rented a house located at 8550 Myrtle Avenue, in Bowie, Maryland, as one such stash location; Jones rented an apartment on Summit Circle and a storage facility on Hampton Park Boulevard, both in Capitol Heights, for this purpose. (This information is corroborated by confidential source information, developed in the Safe Streets investigation, that in 2004 and 2005, Jones rented stash houses for the suppliers, but that he was growing tired of doing so).

Several searches done of these locations provided additional evidence against Maynard, Jones, and the suppliers: (1) the Myrtle Avenue house was searched on February 27, 2004, and noted therein were empty duffel bags, and bags containing shrink wrapping materials, along with religious candles, air mattresses and very little furniture. In addition, all the windows were covered with drapes, sheets, or aluminum foil. These conditions mirrored in many respects the 9508 Potomac Drive stash house, down to the covered windows, air mattresses, shrink wrappings, empty duffel bags, and religious candles; (2) the Capitol Heights apartment was viewed by a maintenance worker on routine maintenance in February, 2004, who reported that it,

too, was sparsely furnished, with a few air mattresses, duffel bags, religious candles, and little else; (3) the Hampton Park storage facility was searched on April 30, 2004, the day that Jones had broken the lease, but while Maynard's Mercury Cougar was still parked out front, and it, too, revealed shrink wrapping materials, and air mattresses, along with the scent of cocaine detected in several spots within the warehouse by a certified drug-detection canine.

      In addition, Hispanic males were observed visiting the Myrtle Avenue house and the Summit Circle apartment on numerous occasions in February, 2004, both by ICE agents and staff at the apartment complex. Finally, Maynard was surveilled on numerous occasions in that same timeframe going to and from the Myrtle Avenue house and the Hampton Park storage facility, at times driving his own Mercury Cougar, and at other times driving a white box truck registered to Jones.

      Finally, the defendant maintained his right-hand status with Jones in the month that Jones was incarcerated, but the defendant was not. Jones made repeated attempts during that time to get in contact with Maynard in a secretive fashion, both on the telephone and in writing. Jones made numerous telephone calls, which were recorded by the Jail. Among those calls were several to Deborah O'Neal, who has been identified both in calls intercepted on the wiretap and in calls intercepted from the Jail, as a romantic interest of Jones. In one such telephone call, on November 3, 2005, at approximately 9:16 p.m., Jones told O'Neal that he had sent her a few letters from the Jail. In particular, he mentioned that when she received letters with another name on them, that she should hold onto the letters and give them to "Lawrence" because "Lawrence" knows what to do with them. Later in this approximately 15 minute telephone call, Jones reminded O'Neal that when she received letters without her name on them, that she should

just hold them. In a later call to O'Neal on November 6, 2005, at approximately 11:57 a.m., Jones and O'Neal discussed "Lawrence" at some length. Jones told O'Neal to tell "Lawrence" to write to him and let him know what was going on, because he doesn't want to be "in the blind." Based on these references, it appeared that in the early days of his incarceration, Jones wrote letters to other members of his illegal narcotics-trafficking operation, but sent them to O'Neal, with orders to pass them to defendant Maynard, in an effort to conceal Jones's communications with those individuals.

Finally, in numerous conversations with his wife, Deniece Jones, from the Jail, Antoine Jones is heard urging her to get into contact with Maynard to tell him that Jones needs to speak with him. On a few occasions, Jones asked his wife to call Maynard on her cellular telephone, while Jones's call from the Jail was underway on the landline. Jones repeatedly told his wife to tell Maynard to come out to the Jail to visit him.

## ARGUMENT

As an initial matter, defendant Maynard has been indicted for an offense in violation of the Controlled Substances Act, which triggers a rebuttable presumption in favor of detention. Because the defendant continues to fail in his obligation to overcome such a presumption, detention is the only viable placement for him pre-trial.

Further, the defendant is not charged with a petty drug offense, but rather with helping to manage a wide-ranging multi-national drug-trafficking operation, the likes of which the District of Columbia has rarely seen. This conspiracy is charged with distributing an enormous amount of cocaine; indeed, a one-time take from one of the organizations's stash houses included 97 kilograms of cocaine and over 500 grams of cocaine base, along with in excess of $800,000 in

cash.  Those facts standing alone justify the orders of detention - as the Magistrate Judge found, and this Court upheld.

In addition, the strength of the evidence against the defendant is compelling, including (1) numerous wire interceptions clearly indicative of drug trafficking by Jones, Maynard, and their associates, which corroborates information provided by confidential sources; (2) the North Carolina traffic stop which revealed $67,000+ in cash secreted in a sophisticated hidden compartment in a Jones minivan driven by Maynard (which Magistrate Judge Kay found to be particularly compelling evidence of Maynard's role in a large-scale drug-trafficking operation); and (3) extensive damning proof developed in the course of the 2004 ICE investigation, including the rental by Maynard of a stash house utilized by his soon-to-be co-defendant Francisco Javier Gonzalez-Ruan to store cash and cocaine.

Against these facts, the defendant relies community ties to overcome the presumption that he should be detained pending trial.  The framers of the 1984 Bail Reform Act felt differently. "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and **has no correlation with the question of the safety of the community.**" S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad. News 3182, 3207 (emphasis added).  Nor is it clear why community ties, which did not stop this defendant from selling drugs before, will keep him from doing so again now.

Defendant Maynard also makes much of his lack of a criminal record.  While it is true that Maynard has never been convicted of a drug offense, he is hardly the type of hand-to-hand drug dealer, selling dime-rocks on the street, who is exposed on a daily basis to aggressive law

enforcement. Rather, he is a high-level go-between in an international cocaine distribution ring, who is likely to get caught up but once in a criminal investigation. As Magistrate Judge Kay found, and this Court concurred, the defendant's family and community ties, and the absence of a criminal history do not rebut the presumption of dangerousness, given the dangerousness inherent in this particular offense – involving an international cocaine-smuggling cartel – and the powerful evidence of defendant Maynard's involvement therein.[3]

WHEREFORE, the government respectfully requests that the Court deny the defendant's Motion for Modification of Conditions of Release.

> Respectfully submitted,
>
> Jeffrey Taylor
> United States Attorney
> D.C. Bar No. 498-610
>
> _____
>
> Rachel Carlson Lieber
> Assistant United States Attorney
> D.C. Bar No. 456-491
> Organized Crime and Narcotics Trafficking
> 555 4th Street, N.W., Room 4820
> Washington, D.C.  20530
> (202) 353-8055; Fax: 514-8707

---

[3] Defendant seems to argue that the Court should consider as a "change in circumstances" the jury's verdict in United States v. Antoine Jones, et. al, which was tried before this Court from October through December, 2006: "A this point in time, however, the government's purported 'compelling' evidence must be heavily, if not completely, discounted by the jury's verdicts in the recent trial of Antoine Jones and his then co-defendants Adrian Jackson, Michael Huggins, and Kevin Holland." (Defendant's Bond Review Motion at 9). However, it is not the jury's arguably anomolous verdict in acquitting Jackson, Huggins, and Holland, that controls the "strength of the government's case" analysis, but rather this Court's view – which, as the Court made clear at various points throughout the trial, was that the evidence of guilt was "overwhelming." Further, with respect to Jones, with whom Maynard is inextricably linked by the evidence posited above, the jury did not acquit, but rather voted overwhelmingly to convict, with a very few jurors in dissent.

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this 20thday of March, 2007.

                                                                                        Rachel Carlson Lieber