UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAWRENCE MAYNARD<br>   (Lead Defendant:<br>    Antoine Jones) | Crim. No. 05-386-10   (ESH)<br><br>Status Hearing Date:<br>Sept. 7, 2007, 11:00 a.m. |

# ATTACHMENT A

FILED
MAR - 2 2007
LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 06-5245

3-04-cr-83-R

UNITED STATES OF AMERICA,
    Plaintiff - Appellant,

v.

REGINALD SHANTEZ RICE, JOSE-ALBERTO JIMENEZ-HUERTA, GERMAN JOSE JIMENEZ-HUERTA, MARSHALL THOMAS EVANS, JR., DERRICK ALLEN SMITH, DEMETRIUS CRENSHAW, JAMES CRENSHAW, TERRY MIDDLETON, YOLANDA RAYMEL WALKER, DAMON L. SHEPPARD, MONTEZ MARCELLUS MOORE, TERRELL GRAY,
    Defendants - Appellees.

Before: MOORE and CLAY, Circuit Judges; BELL, Chief District Judge.

## JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's orders suppressing the fruits of the wiretap and denying the government's motion for reconsideration are AFFIRMED.

ENTERED BY ORDER OF THE COURT

Leonard Green, Clerk

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellant,*

v.

REGINALD SHANTEZ RICE, JOSE-ALBERTO JIMENEZ-HUERTA, GERMAN JOSE JIMENEZ-HUERTA, MARSHALL THOMAS EVANS, JR., DERRICK ALLEN SMITH, DEMETRIUS CRENSHAW, JAMES CRENSHAW, TERRY MIDDLETON, YOLANDA RAYMEL WALKER, DAMON L. SHEPPARD, MONTEZ MARCELLUS MOORE, TERRELL GRAY,

    *Defendants-Appellees.*

No. 06-5245



Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00083—Thomas B. Russell, District Judge.

Argued: December 6, 2006

Decided and Filed: March 2, 2007

Before: MOORE and CLAY, Circuit Judges; BELL, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellant. Michael R. Mazzoli, COX & MAZZOLI, Louisville, Kentucky, for Appellees. **ON BRIEF:** Terry M. Cushing, Monica Wheatley, Amy M. Sullivan, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellant. Scott C. Cox, Mark D. Chandler, COX & MAZZOLI, Louisville, Kentucky, R. Kenyon Meyer, DINSMORE & SHOHL, Louisville, Kentucky, Jamie L. Haworth, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, Frank A. Mascagni III, Louisville, Kentucky, Keith E. Kamenish, Louisville, Kentucky, Kevin C. Burke, BURKE LAW OFFICE, Louisville, Kentucky, Alex Dathorne, Scott James Barton, Louisville, Kentucky, L. Stanley Chauvin III, Louisville, Kentucky, Steven R. Romines, ROMINES, WEIS & YOUNG, Louisville, Kentucky, Richard L. Receveur, Louisville, Kentucky, Rob Eggert, Louisville, Kentucky, for Appellees.

---

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

1

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. BELL, Chief D. J. (pp. 11-14), delivered a separate dissenting opinion.

## OPINION

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant United States of America ("the government") brings this interlocutory appeal challenging an order to suppress the fruits of a wiretap used in the government's case against the Defendants-Appellees,[1] and an order denying the government's motion for reconsideration. Because the district court did not err in suppressing the fruits of the wiretap, and because there is no good-faith exception for warrants obtained pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, codified as 18 U.S.C. §§ 2510 *et seq.* ("Title III"), we **AFFIRM** the district court's orders.

## I. BACKGROUND

The facts giving rise to this case started when another wiretap on the phone of Shawn Bullitt ("Bullitt") recorded a discussion with Reginald Shantez Rice ("Rice") where the two spoke of the imminent arrival of "a hundred." Joint Appendix ("J.A.") at 572-74 (Wenther Test. at 315-17). Federal Bureau of Investigation ("FBI") Special Agent Scott Wenther ("Wenther") thought this was a reference to a large quantity of cocaine. *Id.* Within ten days of hearing this conversation, the government sought permission to use the wiretap which is the subject of this appeal ("the Rice wiretap"). J.A. at 575 (Wenther Test. at 318). The Rice wiretap warrant was issued; as a result, the government ultimately collected evidence leading to the defendants' indictments.

### A. The Wenther Affidavit

The wiretap application was based on the Wenther Affidavit. J.A. at 632. The Wenther Affidavit contained a section entitled, "Alternative Investigative Procedures." J.A. at 649 (Wenther Aff. at 18). It summarized these procedures as follows:

> All normal avenues of investigation have been carefully evaluated for use or have been attempted with minimal results. The traditional investigative techniques utilized thus far have included the use of confidential sources (against known members of the Shawn B[ullitt] organization), obtaining toll records for other phone lines and for the target telephone, and physical surveillance. Also closely considered, but not deemed likely to succeed for reasons set forth below, include the use of undercover agents, use of a Federal Grand Jury, the serving of search warrants, interviews of subjects or associates, and the use of "trash pulls."

J.A. at 649-50 (Wenther Aff. at 18-19). Each type of alternative investigative procedure is set forth below.

#### 1. Physical Surveillance

The Wenther Affidavit averred that "[p]hysical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success.

---

[1] The Defendants-Appellees are Reginald Shantez Rice, Jose-Alberto Jimenez-Huerta, German Jose Jimenez-Huerta, Marshall Thomas Evans, Jr., Derrick Allen Smith, Demetrius Crenshaw, James Crenshaw, Terry Middleton, Yolanda Raymel Walker, Damon L. Sheppard, Montez Marcellus Moore, and Terrell Gray ("the defendants").

No. 06-5245          *United States v. Rice et al.*                              Page 3

Physical surveillance has identified locations and vehicles utilized by members of this organization. Physical surveillance has also corroborated information provided by the CS." J.A. at 651 (Wenther Aff. at 20). The affidavit goes on to state:

> The risk of conducting long-term physical surveillance in this investigation is two-fold. As previously outlined, this organization utilizes violence and/or the threat of violence as intimidation to further their drug trafficking activities. Members of this criminal organization with known violent histories routinely carry firearms and wear bullet-resistant vests, which poses an unreasonable danger to law enforcement personnel attempting to conduct physical surveillance.

J.A. at 652 (Wenther Aff. at 21).

The district court found that, based on this affidavit, an issuing judge would mistakenly think that agents had conducted physical surveillance on Rice and/or his associates, and that Wenther had information leading him to believe that "Rice and/or his associates had used violence or threats of violence, had violent histories, carried firearms, and wore bullet-proof vests." J.A. at 375 (Oct. 13, 2005 Order at 22). In fact, the later testimony of Wenther at the suppression hearing revealed that agents had not conducted any physical surveillance on Rice and that they had no specific information on whether Rice carried a firearm. J.A. at 544, 559 (Wenther Test. at 287, 302). Further, the district court found that "the bald statement that '[m]embers of this criminal organization . . . routinely carry firearms and wear bullet-resistant vests' does not provide sufficient information to the magistrate about [] Rice to determine whether physical surveillance was too dangerous to be attempted." J.A. at 377 (Oct. 13, 2005 Order at 24).

### 2. Confidential Source

The Wenther Affidavit states that:

> It appears from the information received from the CS [confidential source], as well as my own experience, that Reginald R[ice] is unlikely to discuss the full extent of his organization's activities or membership. The CS utilized in the investigation of the Shawn B[ullitt] organization was unable to meet directly with others associated with B[ullitt], including Reginald R[ice] . . . .
>     . . . [The] CS has not been able to purchase controlled substances from Reginald R[ice]. The CS is not closely associated with Reginald R[ice] and is therefore not in a position to attempt the purchase of controlled substances. No other confidential source has been identified in this investigation that would be in a position to attempt the purchase of controlled substances from Reginald R[ice].
>     [The] CS has stated that he/she has limited ability to introduce unfamiliar individuals to R[ice] or his co-conspirators.

J.A. at 650-51 (Wenther Aff. at 19-20). The district court found that, with respect to the attempt to use a CS, the only information directly pertaining to Rice in the Wenther Affidavit was that the CS who was used in the Bullitt investigation was not in a position to assist with gathering information about Rice, and that the government had not identified a CS that would be in a position to do so. J.A. at 373 (Oct. 13, 2005 Order at 20). However, "[t]here is no indication that the government took any steps to develop such a source, nor is there any information about [] Rice's 'organization' specifically that suggests that to do so *in this case* would be unlikely to succeed or dangerous . . . ." *Id.* (footnote omitted). The district court found inadequate the generic information included regarding how drug traffickers normally operate. *Id.*

### 3. Pen Registers and Telephone Toll Analysis

The Wenther Affidavit stated that, although a pen register and a trap and trace had been used on Rice, this was of limited usefulness. Although it indicated a pattern of telephone use by Rice with others suspected in the illegal-drug trade, the pen register did not identify the individuals actually making and receiving the calls, and did not reveal the contents of the conversations. J.A. at 653 (Wenther Aff. at 22). Therefore, according to the Wenther Affidavit, the information obtained by these methods did not establish the existence of a criminal conspiracy. *Id.*

The district court found this part of the affidavit mainly focused on "general language about the usefulness of pen registers in general." J.A. at 374 (Oct. 13, 2005 Order at 21). The only information specific to Rice was that "within the limitations of the technology, the pen register has been as useful as it possibly can be—linking Mr. Rice with other individuals with known drug histories." *Id.*

### 4. Other Techniques

The Wenther Affidavit also discussed three other investigative techniques which were not attempted, and asserted that these techniques would not work. These techniques were a grand jury investigation, use of search warrants and subject interviews, and trash pulls. J.A. at 654-55 (Wenther Aff. at 23-24).

The district court found that the explanations offered for not attempting these techniques all "suffer[] from the same problem; [they] discuss[] typical problems with the techniques in typical drug cases, but make[] no reference to any facts about [] Rice specifically which would make the techniques ineffective or dangerous." J.A. at 379 (Oct. 13, 2005 Order at 26). Further, in making credibility determinations, the district court found "insufficient credible evidence" that other investigative methods had been considered. J.A. at 443 (Jan. 17, 2006 Order at 4).

### B. The District Court's Decision to Suppress

The district court found that the misleading statement pertaining to physical surveillance was made recklessly. J.A. at 442 (Jan. 17, 2006 Order at 3). The district court found that the statements made in the Wenther Affidavit about the dangers of using surveillance were "equally unavailing" in that there was nothing in the affidavit that was specific to Rice (or even to those operating in his organization) that would lend credence to the assertion that he used firearms and bullet-proof vests. J.A. at 377 (Oct. 13, 2005 Order at 24). In light of the misleading information contained in the affidavit that was presented to the issuing judge, the district court found that it could not afford the same deference ordinarily due to an issuing judge's determination. *Id.*

The district court found that the Wenther Affidavit did not "indicate[] []either 'serious consideration' of other investigative techniques []or the reasons for [] Wenther's belief in the inadequacy of the other measures *as used against* [] *Rice.*" J.A. at 369 (footnote omitted) (Oct. 13, 2005 Order at 16). According to the district court, "[o]ther than some uncorroborated thoughts and opinions there is no evidence that any other investigative technique was ever used or even seriously considered." J.A. at 379 (Oct. 13, 2005 Order at 26).

Further, the district court found that the government was using the wiretap in a forbidden manner—as the first step in its investigation against Rice. Because the district court found that the Wenther Affidavit failed to satisfy the requirements under Title III, it granted the defendants' motion to suppress the fruits of the unlawful wiretap. J.A. at 380 (Oct. 13, 2005 Order at 27).

### C. The District Court's Denial of the Motion for Reconsideration

The government then moved the district court to reconsider its suppression order. The government argued, inter alia, that the district court should have applied the good-faith exception under *United States v. Leon*, 468 U.S. 897 (1984), and should have found that, despite the warrant's infirmities, the evidence was not subject to suppression. The district court determined that, assuming the good-faith exception applied in Title III cases, there was no good faith present here because the affiant acted with reckless disregard for the truth. J.A. at 444 (Jan. 17, 2006 Order at 5). Thus, the district court denied the government's motion for reconsideration. This interlocutory appeal follows; we have jurisdiction pursuant to 18 U.S.C. § 3731.

## II. THE NECESSITY REQUIREMENT

### A. Standard of Review

When evaluating a decision to suppress a wiretap, we review the district court's findings of fact for clear error. *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002), *cert. denied*, 537 U.S. 1138 (2003), 537 U.S. 1146 (2003), 538 U.S. 1036 (2003). We review questions of law de novo. *Id.* The determination as to whether a statement made in an affidavit is made with reckless disregard for the truth is a fact question. *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (applying the clear error standard to such a question).

Generally, "[i]n reviewing the validity of an electronic surveillance order, we will accord great deference to the determinations of the issuing judge." *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (internal quotation omitted). However, this deference does not logically apply where the issuing judge is given misleading information in the wiretap application or supporting affidavits.

### B. Applicable Law Under Title III

Title III requires that an application for a wiretap order contain "'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Stewart*, 306 F.3d at 304 (quoting 18 U.S.C. § 2518(1)(c)). This is referred to as the "necessity requirement." *Id.* The purpose of the necessity requirement is "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir.), *cert. denied*, 488 U.S. 821 (1988) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). Further, the necessity requirement protects against the impermissible use of a wiretap as the "initial step in [a] criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

Although Title III sets forth elaborate procedures for obtaining permission to use a wiretap, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. Rather, "[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Id.* at 163-64 (internal quotation marks omitted). "While the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be . . . inadequate compliance with the statute." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.), *cert. denied*, 434 U.S. 855 (1977).

The Supreme Court explained the remedy for violations of Title III as follows:

> [18 U.S.C. §] 2515 provides that no part of the contents of any wire or oral communication, and no evidence derived therefrom, may be received at certain proceedings, including trials, "if the disclosure of that information would be in violation of this chapter." What disclosures are forbidden, and are subject to motions to suppress, is in turn governed by [§] 2518(10)(a), which provides for suppression of evidence on the following grounds:
>
> "(i)   the communication was unlawfully intercepted;
>
> "(ii)  the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> "(iii) the interception was not made in conformity with the order of authorization or approval."

*Giordano*, 416 U.S. at 524-25 (footnote omitted). Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed.

### C. The District Court Did Not Commit Clear Error In Determining That Statements About Physical Surveillance in the Wenther Affidavit Were Misleading and Were Made Recklessly.

As outlined in the Background section *supra*, the district court closely examined each part of the Wenther Affidavit and compared it to the testimony at the suppression hearing. After discovering that no physical surveillance had actually been conducted on Rice, the district court found that the Wenther Affidavit would erroneously lead an issuing judge to believe that such surveillance had been conducted. J.A. at 376 (Oct. 13, 2005 Order at 23). The district court concluded that the statement about surveillance was made recklessly. J.A. at 442 (Jan. 17, 2006 Order at 3). After reviewing the Wenther Affidavit, we cannot say that the district court committed clear error in determining that this part of the Wenther Affidavit was misleading to the issuing judge.

### D. The District Court Did Not Err In Determining That The Wenther Affidavit, When Reformed for its Factual Deficiencies, Failed to Meet the Necessity Requirement.

After determining that it could not consider the misleading information, the district judge examined what was left of the Wenther Affidavit to determine whether the necessity requirement was fulfilled. What remained in the Wenther Affidavit was the following: (1) that the CS used in the investigation of Bullitt was not able to make contact with Rice and, therefore, would not be of use; and (2) that pen registers and telephone tolls revealed possible connections to other people with histories of drug-related arrests. Beyond that, the district court found that the Wenther Affidavit contained generalized and uncorroborated information about why grand jury subpoenas, witness interviewing and search warrants, and trash pulls would not be useful. J.A. at 443 (Jan. 17, 2006 Order at 4) ("There was insufficient credible evidence to support or even confirm those assertions. . . . [A]fter the hearing, the [c]ourt was in the best position to determine these credibility issues concerning unused investigative techniques.").

After reviewing the record, we find that the district court was not in error in concluding that what was left of the Wenther Affidavit did not provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be

No. 06-5245         *United States v. Rice et al.*                                Page 7

unlikely to succeed if tried or to be too dangerous." *Stewart*, 306 F.3d at 304. Thus, we affirm the district court's decision to suppress the fruits of the wiretap.

### III. THE GOOD-FAITH EXCEPTION OF *LEON*

#### A. The *Leon* Decision

In its order denying the government's motion for reconsideration, the district court rejected the government's argument that the warrant was valid under the good-faith exception to the warrant requirement. Because we have not previously made clear whether the good-faith exception applies to warrants improperly issued under Title III, the district court addressed the government's good-faith argument "out of an abundance of caution." J.A. at 444 (Jan. 17, 2006 Order at 5). We hold that the government's good-faith argument is without merit, because the good-faith exception to the warrant requirement is not applicable to warrants obtained pursuant to Title III.

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court created a good-faith exception to the usual rule that courts should exclude evidence obtained in violation of the Fourth Amendment. We have summarized *Leon* as follows:

> *United States v. Leon* modified the exclusionary rule so as not to bar from admission evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). Where an officer's reliance on a warrant is objectively reasonable, the Supreme Court held, no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search. *See id.* at 922. However, the good-faith exception is inapposite in four situations: (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient. *See id.* at 923.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006) (parallel citations omitted).

The rule announced in *Leon* was borne out of a lengthy discussion on the social costs and benefits of the exclusionary rule. *See Leon*, 468 U.S. at 906-13. The Supreme Court explained that "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," and that the exclusionary rule developed as "'a judicially created remedy designed to safeguard Fourth Amendment rights . . . .'" *Id.* at 906 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Because the exclusionary rule is a judicial remedy, it is within the judiciary's province to determine when the rule applies. *See id.* at 906-07 (explaining that the question before the Supreme Court was for it to determine when the rule applies by "weighing the costs and benefits"). Thus, the rationale supporting the holding in *Leon* was firmly rooted in the idea that the exclusionary rule is a judicially created remedy used to ameliorate violations under the Fourth Amendment, and that, as a judicially created remedy, it is subject to judicial modification based on social utility analysis.

No. 06-5245     *United States v. Rice et al.*     Page 8

### B. *Leon* Is Inapplicable To Warrants Improperly Issued Under Title III

The language and legislative history of Title III strongly militate against engrafting the good-faith exception into Title III warrants. First, the language in Title III provides that exclusion is the exclusive remedy for an illegally obtained warrant. In contrast to the law governing probable cause under the Fourth Amendment, the law governing electronic surveillance via wiretap is codified in a comprehensive statutory scheme providing explicit requirements, procedures, and protections. 18 U.S.C. §§ 2510 *et seq.*; *see also Giordano*, 416 U.S. at 514-15 (setting forth the statutory framework for obtaining a wiretap warrant under Title III). Section 2515 of Title III provides that "[w]henever any wire . . . communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . ." 18 U.S.C. § 2515. *See also* 18 U.S.C. § 2518(10)(a) (providing aggrieved persons with the power to move for suppression of evidence obtained pursuant to an unlawful wiretap). The statute is clear on its face and does not provide for any exception. Courts must suppress illegally obtained wire communications.

Second, the Senate Report discussing Title III indicates no desire "to press the scope of the suppression role beyond *present* search and seizure law." S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2185 (emphasis supplied). Title III was passed in 1968; *Leon* was decided in 1984. Congress obviously could not know that Fourth Amendment search and seizure law would embrace a good-faith exception sixteen years after the passage of Title III, and the language from the Senate Report indicates a desire to incorporate only the search and seizure law that was in place at the time of the passage of Title III.

Finally, as mentioned, the Supreme Court's *Leon* decision is the product of judicial balancing of the social costs and benefits of the exclusionary rule. The judicial branch created the exclusionary rule, and thus, modification of that rule falls to the province of the judiciary. In contrast, under Title III, Congress has already balanced the social costs and benefits and has provided that suppression is the sole remedy for violations of the statute. The rationale behind judicial modification of the exclusionary rule is, thus, absent with respect to warrants obtained under Title III's statutory scheme. *See United States v. Spadaccino*, 800 F.2d 292, 296 (2d Cir. 1986) (using this same rationale and reaching the same conclusion in analyzing whether the *Leon* good-faith exception applied to a state wiretapping statute).

In holding that the *Leon* exception does not apply to warrants improperly issued under Title III, we note that there are no prior cases which either require us to conclude otherwise or which persuade us that we should conclude otherwise. In *United States v. Baranek*, 903 F.2d 1068, 1072 (6th Cir. 1990), a panel of this court decided that under the peculiar facts of the case presented, it was appropriate to apply the plain-view doctrine to a suppression case brought under Title III. The issue in *Baranek* was framed narrowly as "whether a conversation overheard on a telephone that is the subject of a Title III wiretap should be suppressed when, at the time of the interception, the telephone was inadvertently off the hook and not in use." *Id.* at 1069. The panel made clear that it intended the holding to be quite narrow, stating that "since the circumstances involved are wholly fortuitous, we will not impact or shape future conduct . . . ." *Id.* at 1070. The panel explained that it was applying the plain-view exception because it involved an unusual scenario "clearly not contemplated by [Title III]." *Id.* at 1072. Further, the decision stated "that where Title III provides greater protection than the fourth amendment a defendant is entitled to the enhanced protection . . . ." *Id.*

The *Baranek* decision is a narrow holding confined to its facts. In contrast, the case at bar presents a garden-variety fact scenario: the government desires a wiretap, submits a wiretap application, obtains permission to use a wiretap, and collects information from that wiretap which

No. 06-5245          *United States v. Rice et al.*          Page 9

it then seeks to use as evidence against the defendant. The scenario in the case at bar is the very type contemplated by Title III, and nothing in *Baranek* changes our analysis today.[2]

In *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994), *cert. denied*, 514 U.S. 1121 (1995), the Eighth Circuit held that the *Leon* good-faith exception applies to § 2518(10)(a) of Title III. The court found that *Leon* applied for two reasons. First, it determined that § 2518(10)(a) "is worded to make the suppression decision discretionary ('If the motion is granted') . . . ." *Id.* Second, it determined that the "legislative history [of Title III] expresses a clear intent to adopt suppression principles developed in Fourth Amendment cases." *Id.* (citing S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2185).

The Eighth Circuit's conclusion that *Leon* applies to warrants improperly issued under Title III is built on faulty reasoning. First, the Eighth Circuit took the statement "if the motion is granted" out of context, thereby erroneously concluding that § 2518(10)(a) makes the suppression decision discretionary. Of course, the district court decides whether or not to grant a motion to suppress, but that does not mean it has unbridled discretion in making that decision. Section 2518(1) sets forth what a valid application for a wiretap warrant must contain. Section 2515 requires that evidence obtained in violation of the provisions of the Act must be suppressed. When read as a whole, it is clear that the suppression decision must be made within the strict confines of Title III itself, and is far from "discretionary" in the sense which the Eighth Circuit implies.

Second, as we have already explained, the legislative history does not clearly express an intent to import Fourth Amendment principles such as those arising from *Leon* into Title III; in fact, it does the very opposite. If anything, the meaning of the Senate Report is that it intends Title III to incorporate only what Fourth Amendment jurisprudence existed at the time of the Act's passage (which was before *Leon*) and nothing more.

In *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988), *cert. denied*, 489 U.S. 1024 (1989), 489 U.S. 1029 (1989), the Eleventh Circuit also held that the *Leon* good-faith exception applied to a warrant improperly issued under Title III. In *Malekzadeh*, the court merely recites the rationale for *Leon*, stating that although the point of the exclusionary rule is deterrence, "in some circumstances, application of the rule affords none of these protections . . . ." *Id.* The opinion then states that the same rationale should be applied to the case at bar. *Id.* The Eleventh Circuit made no attempt to explain why reasoning from a Fourth Amendment exclusionary-rule case was appropriately imported into a Title III case. Simply put, we are unpersuaded.[3]

Because we conclude that the *Leon* exception to the warrant requirement does not apply to warrants improperly issued under Title III, we affirm the district court's order denying the government's motion to reconsider.

---

[2] The government's brief also relies on dicta in the footnote of an unpublished case that "observe[d] in passing that the good faith exception may also apply to evidence obtained by wiretap." *United States v. Holloway*, No. 98-5175, 1998 WL 833767, at *3 n.4 (6th Cir. Nov. 19, 1998) (per curiam), *cert. denied*, 526 U.S. 1033 (1999). This statement only speculates as to the *possibility* that the good-faith exception applies to Title III cases. Today we lay that speculation to rest.

[3] The Fourth Circuit also wrote a recent unpublished decision which contained dicta approving of the use of the *Leon* good-faith exception in Title III cases. *United States v. Brewer*, No. 05-4942, 2006 WL 3147558, at *3 (4th Cir. Nov. 3, 2006). However, *Brewer* exclusively relied on *Moore*, *Malekzadeh*, and *Baranek* in reaching this conclusion. As we have set forth above, such reliance is misplaced.

## IV. CONCLUSION

Because the district court did not err in suppressing the fruits of the wiretap, and because there is no good-faith exception for warrants improperly issued under Title III, we **AFFIRM** the district court's orders suppressing the fruits of the wiretap and denying the government's motion for reconsideration.

No. 06-5245         *United States v. Rice et al.*                                    Page 11

### DISSENT

BELL, Chief District Judge, dissenting. I concur with the majority that there is no good-faith exception for warrants obtained pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 *et seq.* However, I respectfully dissent from the majority's conclusion that the district court did not err in suppressing the fruits of the wiretap.

Chief District Court Judge John G. Heyburn, II, issued the wiretap at issue in this matter and determined that the government had satisfied the necessity requirement of 18 U.S.C. § 2518(1)(c) by establishing that "normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." J.A. at 696. "Generally, a district court's finding that the requirements of § 2518(1)(c) have been met are afforded 'considerable discretion.'" *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). *See also United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) ("In reviewing the validity of an electronic surveillance order, we will accord 'great deference' to the determinations of the issuing judge."). However, I believe the district court did not give the issuing judge the deference he was due based upon the reviewing judge's determination that "the Wenther Affidavit's misleading characterization of its use of physical surveillance requires that the Court analyze the necessity determination anew." J.A. at 377.

The district court found the following statement to be misleading: "Physical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success. Physical surveillance has identified locations and vehicles utilized by members of this organization." Wenther Aff. ¶ 36. The district court found that this statement "would cause a reasonable judge reading the affidavit to believe that the agents had performed surveillance on Mr. Rice to no avail." J.A. at 376-77. The district court noted that this was not true because Agent Wenther acknowledged at the hearing on June 20, 2005, that no surveillance had been conducted on Mr. Rice. J.A. at 377. On reconsideration the district court stated that it assumed that "Agent Wenther did not deliberately attempt to mislead the issuing judge; however, in light of the importance of the statement in question his mistake was reckless." J.A. at 442.

The sufficiency of a previously issued and executed wiretap warrant is analyzed under the procedure outlined in *Franks v. Delaware*, 438 U.S. 154 (1978). *Stewart*, 306 F.3d at 304-06. Under *Franks*, if a defendant shows that the affiant included a false statement in the warrant affidavit knowingly and intentionally, or with reckless disregard for the truth, the false material must be set aside and the affidavit must be reviewed for sufficiency on the basis of the remaining content. 438 U.S. at 155-56.

In its June 23, 2004, wiretap application, the government advised the court that it was investigating nineteen target subjects concerning a conspiracy to distribute controlled substances. J.A. at 603. The Wenther affidavit did not state that physical surveillance had been conducted on each and every one of those nineteen subjects. Neither did it state that physical surveillance had been specifically conducted on Rice. Accordingly, the statement that "[p]hysical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success," is not false.

There is not even evidence in the record to support a finding that the statement was misleading. The twenty-six page affidavit contains numerous references to facts pertaining to unspecified members of the drug distribution organization and other references to facts pertaining specifically to Rice. Every time the affidavit discusses facts specific to Rice it names Rice and

No. 06-5245     *United States v. Rice et al.*                                   Page 12

places his name in capital letters. The statements regarding physical surveillance do not mention Rice. There is nothing in this record to indicate that the issuing judge was misled about the nature of the surveillance conducted on Rice.

Furthermore, the district court did not find that Wenther intended to deliberately mislead the issuing judge. Instead, the district court found that the statements concerning physical surveillance were objectively misleading and that Wenther's mistake was reckless. "Allegations of negligence or innocent mistake are insufficient" to show the deliberate falsity or reckless disregard that will justify impeaching the affidavit. *Franks*, 438 U.S. at 171. "[I]f the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment." *Id.* at 172 n.8. *See also United States v. Charles*, 138 F.3d 257, 263-64 (6th Cir. 1998) (upholding district court's decision not to set aside statements in affidavit for poor draftsmanship or unintentional errors).

Based upon the record before him, the most the district court could properly find was that the statements regarding physical surveillance on Rice were ambiguous, or that they were negligently made. *Franks* made it clear that a negligent misstatement in the underlying affidavit would not provide a sufficient basis for attacking a search warrant. 438 U.S. at 171. Because there is no evidence that any statements in the affidavit were deliberately false or were made with reckless disregard for the truth, the district court's decision not to give deference to the issuing judge's necessity determination was clearly erroneous.

Not only did this district court err in failing to give deference to the issuing judge's necessity determination, it also erred in the manner in which it conducted its own review. The district court concluded that the Wenther affidavit failed to satisfy the necessity requirements because it lacked the specificity required to enable the issuing judge to perform his review. The district court further concluded that the affidavit demonstrated that the government used the wiretap as the first step in its investigation of Rice. J.A. at 380. These conclusions are the product of an unduly restrictive application of the law and several clearly erroneous factual determinations.

Federal law requires that a wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "This statutory 'necessity requirement' was designed to insure that 'wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime.'" *Stewart*, 306 F.3d at 304 (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)). The burden of showing necessity is not a heavy one. "[T]he government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163.

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

*Id.* at 163-64 (quoting *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)). The necessity requirement is to be tested "in a practical and common sense fashion." *Landmesser*, 553 F.2d at 19-20 (quoting S. REP. NO. 1097, 1968 U.S.C.C.A.N., p. 2190).

The district court acknowledged that the affidavit contained an explicit assertion that Rice and Bullitt were associated with each other in the drug trade and that this association was corroborated by the conversation between Rice and Bullitt recorded under the May wiretap order. J.A. at 362. Nevertheless, in its necessity analysis the district court refused to consider substantial

No. 06-5245　　　*United States v. Rice et al.*　　　Page 13

information in the Wenther affidavit because the information was not directed specifically toward Rice.[1] This exacting evidentiary requirement is not consistent with the court's obligation to test the necessity requirement "in a practical and common sense fashion." *Landmesser*, 553 F.2d at 19-20. As a practical matter, facts about others in the organization may very well be relevant to establishing the necessity of a wiretap as to others in the organization, and may be some of the only evidence available on someone who is higher up in the organization. In *Alfano* we held that where the government had "indicated the steps it had taken with regard to other investigative targets, and the difficulties in placing an informant in or maintaining continual surveillance of those involved in far-flung operations" it had satisfied its obligation of showing both the "serious consideration" of other measures and the "reasons" for the belief in their inadequacy. 838 F.2d at 164. We accordingly reversed the district court's suppression order. *Id.*

The district court's refusal to credit evidence in the affidavit that related to drug conspiracies in general was also error. Although a "purely conclusory affidavit" unrelated to the specific case would be inadequate to comply with the statute, "the mere fact that the affidavit . . . rested in part on statements that would be equally applicable to almost any [similar type of case] does not render the affidavit insufficient," provided that there is also "information about particular facts of the case at hand which would indicate that wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *Landmesser*, 553 F.2d at 20 (citations omitted).

In support of its finding that the Wenther affidavit failed the necessity requirements, the district court noted that the pen register was "inherently limited in its usefulness" and the confidential source had not been able to meet with, introduce people to, or conduct controlled purchases from Rice. The fact that alternative investigative techniques had been attempted and had not been successful is precisely the kind of evidence that the court should accept as support for the required showing that traditional techniques will not suffice to expose the crime. *See Stewart*, 306 F.3d at 304.

As explained in the Wenther affidavit, drug conspiracies are difficult to investigate because of their secrecy. The most definitive evidence the government was able to develop on Rice came through the wiretap of Bullitt's telephone. We have previously recognized that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Stewart*, 306 F.3d at 305 (quoting *Landmesser*, 553 F.2d at 20). This was such a case.

In addition to taking too narrow a view as to the applicable law, the district court also refused to credit information that did relate specifically to Rice. For example, the district court found that there was no evidence of Rice's dangerousness, when in fact there were allegations in the affidavit that Rice has prior drug and robbery arrests and convictions on narcotics charges dating from 1992 to 2003, that he has been listed as a subject in numerous local, state and federal investigations, and that he has a well-known reputation as being a violent, large-scale cocaine distributor who has successfully intimidated individuals through violence and/or the threat of violence. Wenther Aff. ¶¶ 8 & 10.

---

[1] For example, the district court held that the affidavit was insufficient because it did not indicate why other investigative measures were inadequate "as used against Mr. Rice." J.A. at 369. The district court refused to consider the physical surveillance of other members of the organization and evidence that other members routinely carried firearms and wore bullet-resistant vests as having any relevance to the necessity for a wiretap on Rice. J.A. at 376. According to the district court, the affidavit should not have indicated that confidential sources had been used because the source referred to had been recruited to provide information on Bullitt rather than on Rice. J.A. at 378. The district court also criticized the affidavit because the discussion of investigative techniques that had not been used focused on typical problems with the techniques in typical drug cases, but made "no reference to any facts about Mr. Rice specifically which would make the techniques ineffective or dangerous." J.A. at 379.

No. 06-5245          *United States v. Rice et al.*                                            Page 14

Finally, the district court erroneously found that the government used the wiretap application as the first step in its investigation of Mr. Rice. This conclusion was based in part on the district court's finding that the government requested a wiretap "[w]ithin ten days of the first hint of Mr. Rice's involvement." J.A. at 379. On June 13, 2004, the government intercepted a telephone call between Bullitt and Rice regarding a large cocaine shipment and on June 23, 2004, it applied for the wiretap on Rice's telephone. However, contrary to the district court's finding, the intercepted call was not the "first hint" of Rice's involvement. The government had been gathering information about Rice since at least October 29, 2003, some eight months before the wiretap application for Rice's telephone, when the Confidential Source provided information that Rice and Bullitt were associated with each other and involved in the trafficking of multi-kilogram quantities of cocaine. Wenther Aff. ¶ 7(d). Rice was also named as a target subject in the May 26, 2004 application for the wiretap of Bullitt's telephone.

Accordingly, I respectfully conclude this district judge erred by failing to give the issuing judge the deference he was due and in failing to test the necessity requirement in a practical and common sense fashion. The issuing judge did not abuse his considerable discretion when he found that the Wenther affidavit had demonstrated the required necessity for the wiretap of Rice's telephone. I would therefore REVERSE the district court's suppression order.