UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**LAWRENCE MAYNARD**<br>  (Lead Defendant:<br>   Antoine Jones) | Crim. No. 05-386-10  (ESH)<br><br>Status Hearing Date:<br>Sept. 7, 2007, 11:00 a.m. |

**DEFENDANT LAWRENCE MAYNARD'S REPLY TO
GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' LEGAL MOTIONS**

In its Omnibus Response to Defendants' Legal Motions (Document 381), the government argues that none of the several motions filed by the defendants has any real merit. We disagree.

As regards the motions filed by defendant Maynard,[1] we make the following points.

**ARGUMENT**

    **A.**    **Maynard's Motion to Adopt (Document 355)**

The government brushes aside Maynard's argument that the Court should hold a <u>Franks</u> hearing concerning the failure of Agent Yanta's Title III affidavit to mention Harold Holden as a possible cooperator/infiltrator of Jones's suspected trafficking enterprise. (Document 381 at 12-15)  The government's treatment

---

[1] As regards the motions filed by defendant Antoine Jones, we join in the reply to be submitted by counsel for defendant Jones.

of this issue is far too facile.

    1.   The government does not dispute that Harold Holden entered a guilty plea in a sealed matter involving narcotics and weapons charges arising from his arrest on June 26, 2004; that following his plea he was released into the community; that he was a long-time friend of Jones; that he worked at Levels during the late summer and early fall of 2005[2]; and that he was in a position to be the "eyes and ears" of the government vis-a-vis Jones.

    2.   Considering the allegations of how Jones used Levels to facilitate his drug trafficking, coupled with Holden's drug background and his personal relationship with Jones, it is hard to believe that Holden would not have valuable information about Jones's illegal drug dealings or that Holden would not have been in a position to develop "key" incriminating evidence for the government concerning Jones's operation.

    3.   Agent Yanta apparently has informed the prosecutors that she was not aware of Holden's relationship with Jones until "subsequent to October 24, 2005." (Document 381 at 12, n.5) But, given the investigative procedures and techniques of the FBI and MPD and the close cooperation between law enforcement officers in this jurisdiction as regards investigation of suspected major drug traffickers, it is difficult to fathom how the <u>entire</u>

---

[2] Holden worked as the chief of security at Levels from February 2004 up to the time of the "takedown" on October 24, 2005, except for the time he was incarcerated in the case before Judge Roberts. He had keys to Levels and access to the upstairs and downstairs offices and he made payments with club money toward a variety of club expenses.

investigative team that was working with Agent Yanta and developing information that was eventually put into the Title III affidavit was unaware of Holden's cooperation and his unique position to infiltrate Jones's operation.  In light of all the circumstances, we believe the defense should be able to question Agent Yanta under oath as regards her knowledge or lack of knowledge of Holden, and if she did not know about Holden, whether her ignorance was reckless.

    4.    Also, notwithstanding the general allegation in the affidavit at 54 that Jones was suspicious of individuals who had been arrested and might thus be cooperating, it does not follow that Jones would feel that way about Holden, whom he trusted and who worked closely with Jones at the club.  Indeed, it was incumbent upon the government to explain satisfactorily why Holden -- as opposed to others -- could not have been utilized by the authorities to infiltrate Jones's suspected drug enterprise.

    5.    As cited by the government, United States v. Canales Gomez, 358 F.3d 1221 (9th Cir. 2004), did reverse a district court's suppression of a wiretap on the ground that informants had not been sufficiently pursued as an alternative investigate technique.  But, Canales is inapposite to the situation here.  In Canales, the three FBI informants in question were in custody "no longer in contact with members of the organization" and thus were not capable of developing any viable information against the targets.  358 F.3d at 1225.  In this case, however, the informant Holden was actually working with the main target Jones on a daily

basis and had the trust of Jones.

    6.   In short, the government has failed to show that the defense is not entitled to a limited <u>Franks</u> hearing as regards Holden.[3]  And, if any <u>Franks</u> violation has occurred, the government should not be permitted to absolve itself under the "good faith" doctrine of <u>United States</u> v. <u>Leon</u>, 468 U.S. 897 (1984).[4]

    We close by reference again to the Fourth Amendment constitutional constraints that govern the disposition of this motion:  a Title III wiretap is permissible <u>only</u> in exigent circumstances -- where the government demonstrates that normal investigative techniques have failed or are unlikely to succeed if tried, or are too dangerous -- and can be used <u>only</u> to the extent reasonably necessary to achieve its goals.

    Neither Congress nor the Supreme Court has ever viewed wiretapping as but one more tool in the government's arsenal of investigative weapons.  It was rather to be the ultimate weapon -- the final resort by a government unable to bring to justice suspected criminal violators by any other investigative

---

[3] For the reasons advanced by counsel for defendant Jones, we believe the Court should reconsider its prior ruling and grant the defense a full-fledged <u>Franks</u> hearing as regards the multiple points raised by Jones.

[4] As the government points out (Document 381 at 12, n.4), <u>United States</u> v. <u>Rice</u>, 478 F.3d 704, 711 (6th Cir. 2007), held that the "good faith" exception of <u>Leon</u> does not apply to Title III, although there are several federal cases to the contrary.  <u>Id</u>. at 713-714.  We have found no case in this jurisdiction dealing with the issue.  For the reasons discussed in <u>Rice</u>, we submit that the better view is that <u>Leon</u> should not be applied to motions to suppress under Title III.

means.  So limited, court-authorized wire interception may be said to secure "the overall combination of law and justice that is the inspiration of a democratic society."  <u>Dorman</u> v. <u>United States</u>, 435 F.2d 385, 394 (D.C. Cir. 1970) (<u>en banc</u>).  In this case, we believe the wire interception unfortunately overstepped the foregoing limitations imposed by Title III.

Accordingly, we respectfully request the Court to reconsider its prior ruling and grant the relief we seek herein.

### B.   Maynard's Motion to Suppress Evidence of the 8550 Myrtle Avenue, Bowie, Maryland Search (Document 358)

The government argues that defendant Maynard's motion to suppress evidence obtained by ICE officers on February 27, 2004, from 8550 Myrtle Avenue during the execution of a "sneak and peek" warrant should be denied because by the time notice was required to be given, Maynard was no longer a resident of the property and the notice given to the management company was sufficient; and even if notice to Maynard was required, he is not entitled to suppression.  (Document 381 at 38-44)  This argument is flawed.

1.   Under the "sneak and peek" warrant issued to ICE Agent Katerina Gikas on February 27, 2004, by Magistrate Judge Grimm, notice was to be given defendant Maynard on or before March 29, 2004, <u>i.e</u>., 30 days from February 27, 2004, when the warrant was executed.  It is undisputed that the government did not notify Maynard as required by the warrant, although the government knew of Maynard's home address at 7711 Greenleaf Road, Hyattsville,

5

Maryland.

2. The government states that because Maynard had "abandoned" the premises on March 2, 2004, and because the ICE agents gave notice to the management company within the 30-day period, there was no legal need to notify Maynard. But, Maynard did not actually turn his keys back to the management company and have a final walk-through inspection until <u>after</u> March 29, 2005.[5]

3. As regards the government's argument that any notice deficiency caused by Agent Gikas should be excused because she was verbally informed by Magistrate Judge Grimm that notice to Maynard was not required because he had terminated his lease, the government cites no law that permits "substitute notice" to a management company of the execution of a "sneak and peek" warrant.[6] In short, we believe that Magistrate Judge Grimm was wrong in ignoring the notice provisions of the statute in the absence of a specific written finding of necessity of an "adverse result," as required by 18 U.S.C. 3103a. Moreover, we submit that under the circumstances it was unreasonable for Agent Gikas to abandon notice to Maynard without a judicial written finding

---

[5] When Maynard informed the management company in early March that he needed to terminate the lease he was told that the management company had to first speak with the owner of the premises. Eventually the owner did agree to a shortened lease and Maynard and Mr. Kelly of the management company had the final walk-through of the premises sometime in April.

[6] No doubt Agent Gikas did not instruct the managment company to pass along to Maynard notice that there was a "sneak and peek" search of his premises on February 27, 2004. Indeed, Mr. Kelly made no mention of the search to Maynard during the walk-through in April, 2004.

of an "adverse result" by Magistrate Judge Grimm.

    4.   United States v. Johns, 948 F.2d 599 (9th Cir. 1991), cited by the government (Document 381 at 41-42), is not controlling in our view.  Johns, which did not consider notice as a fundamental constitutional requirement of a search warrant, was decided years before passage of the PATRIOT Act in which Congress laid down explicit statutory directives to judges as regards the issuance and notice of execution of "sneak and peek" warrants.  These statutory requirements were obviously designed by Congress to avoid constitutional attack, given the Supreme Court's unanimous decision in Wilson v. Arkansas, 514 U.S. 927 (1995), which held that notice was of constitutional dimension.

    5.   Moreover, the government fails to address our independent argument (Document 358 at 6-7) that the "sneak and peek" warrant was fatally defective on its face in that the judge failed to make an express finding of "necessity" for the seizure, as required by 18 U.S.C. § 3103a(b)(2).[7]  And, because the warrant was facially defective, Agent Gikas should not be permitted to rely on it under Leon.

    6.   Lastly, the government's argument that failure to give proper notice to Maynard should not result in exclusion of the evidence rests primarily on the premise that such a violation "is

---

[7] As can be seen from inspection of the "sneak and peek" warrant (Document 358-2), the warrant is silent on its face that Magistrate Judge Grimm considered the "necessity" requirement of § 3103a(b)(2), or if he did, that he made a determination that there was a "reasonable necessity" to permit seizure of property found at the premises even though there would be notice of the seizure to the legal occupant of the premises.

not a constitutional one." (Document 381 at 43) This argument is mistaken. As noted, in <u>Wilson</u> v. <u>Arkansas</u>, <u>supra</u>, the Supreme Court laid to rest the notion that lack of notice is not of constitutional dimension.[8]

7. In sum, given that the "sneak and peek" warrant at issue is facially defective and that there was no legal justification for failing to give notice to defendant Maynard, the remedy of suppression is entirely proper in this case.

   **C. Maynard's Motion to Suppress Evidence of the Durham, North Carolina Traffic Stop (Document 357)**

The government argues that the April 5, 2005, Durham, North Carolina, traffic stop of the minivan that defendant Maynard was driving and the subsequent search of the minivan was justified without a warrant because of two independent bases -- "Maynard's consent and the drug dog's alert." (Document 381 at 37-39)

1. The entirety of the government's argument is based on the testimony Officer Frederick Whitehead gave at the first trial. But, as the government acknowledges, defendant Maynard did not participate at the first trial nor was he a party to any hearing regarding the legality of the North Carolina search and seizure. Moreover, the government does not dispute that defendant Maynard has standing under the Fourth Amendment to raise the legality of the stop and search of the minivan he was

---

[8] None of the cases cited by government, as we read them, treat the requirement of notice as specified in the PATRIOT as a constitutional requirement. Accordingly, in our view, they are inapposite to this case.

driving on April 5, 2005. Lastly, the government does not dispute that it has the burden to show that the search in this case fell within one of the "few specifically established and well delineated exceptions" to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); Katz v. United States, 389 U.S. 347, 357 (1967); Rouse v. United States, 359 F.2d 1014, 1016 (D.C. Dir. 1966).

    2.   In our view, the government's argument is premature. It should await the conclusion of the evidentiary hearing on the defense motions now scheduled for October 11-12, 2007, at which we understand Officer Whitehead will testify in the presence of Maynard and be subjected to cross-examination by Maynard's counsel concerning the circumstances of the traffic stop of the minivan, the "consent" that Maynard purportedly gave to the officer to search the minivan, and the reliability of the "canine hit" that occurred.

    As stated in our motion, we expect at the conclusion of the hearing at which defendant Maynard and Derrick Gordon may (or may not testify), the Court will conclude from all the evidence, including the cross-examination of Officer Whitehead, that even if the initial stop was warranted, defendant Maynard's purported "consent" was not effective to justify the search and that the canine alert was deficient.

    3.   The government cites no authority for the proposition that defendant Maynard should be conclusively bound by Officer Whitehead's prior trial testimony where Maynard was not a party

to the trial.  Moreover, the testimony of Officer Whitehead was not focused or cross-examined as regards the legality of the search.  Rather, the focus was on the $67,115 that was found in a hidden compartment in a vehicle registered to defendant Jones and driven by his accomplice.

    4.   Further, the Court's comments at the last status call about motions requiring an evidentiary hearing clearly indicated to undersigned counsel that defendant Maynard was not bound by Officer Whitehead's prior trial testimony and that the officer would be called by the government at the upcoming motions hearing to testify on the specifics of the legality of the search vis-a-vis Maynard.

    5.   In sum, defendant Maynard should be afforded the right to an evidentiary hearing to determine whether his Fourth Amendment rights were or were not violated.

### D.   Maynard's Motion for Rule 14 Severance Document 356)

    1.   The government correctly states the general rule that a properly joined defendant in a conspiracy case is not automatically entitled to a Rule 14 severance simply because the evidence against him or her is less that the evidence against defendants.  (Document 381 at 35-37)

    2.   At the same time, the government does not dispute the discretion of a trial judge to grant a Rule 14 severance in a conspiracy case where the disparity of the evidence creates the likelihood of a "spillover" effect that severely compromises the jury's ability to view a particular defendant's case on its own

merits.  See United States v. Mardian, 546 F.2d 973, 979-981 (D.C. Cir. 1976); United States v. Sampol, 636 F.2d 621, 642-651 (D.C. Cir. 1980); United States v. Andrews, 754 F. Supp. 1161 (N.D. Ill. 1990); United States v. Kelly, 349 F.2d 720 (D.C. Cir. 1965).

    3.   In arguing that there is insufficient disparity of evidence between defendant Jones and defendant Maynard, the government relies heavily on the evidence recovered from the Durham, North Carolina, search.  (Document 381 at 37)  But, the admissibility of that particular evidence is subject to a pending motion to suppress.  Should the evidence of the North Carolina search be suppressed, the quantum of evidence against Maynard is weakened substantially and his need for severance is sharply heightened.

    4.   In sum, we ask the Court to defer its ruling on our motion for severance until after its ruling on the search issue.

## **CONCLUSION**

    For all the foregoing reasons, and for reasons to be presented at the motions hearing, we respectfully submit that all of defendant Maynard's motions should be granted.

                              Respectfully submitted,

                              _____/s/_____
                              James L. Lyons  (50690)
                              Kellogg, Williams & Lyons
                              1350 Connecticut Avenue, N.W.
                              Suite 600
                              Washington, D.C.  20036
                              (202) 496-0722
                              (202) 331-1257  (fax)
                              JamesLyons@verizon.net (e-mail)

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 30th day of August, 2007, I caused a true and correct copy of the foregoing pleading to be delivered to the parties in this case via the Court's Electronic Case Filing (ECF).

                                               /s/
                                       James L. Lyons