UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>    v.<br><br>**LAWRENCE MAYNARD**<br>  (Lead Defendant:<br>   Antoine Jones) | Crim. No. 05-386-10  (ESH)<br><br>Motions Date:<br>Nov. 6, 2007, 10:00 a.m. |

**DEFENDANT LAWRENCE MAYNARD'S SUPPLEMENT
TO HIS MOTION TO SUPPRESS EVIDENCE OF
THE DURHAM, NORTH CAROLINA, TRAFFIC STOP**

Defendant Lawrence Maynard, by and through his attorney, respectfully submits the following supplemental points and authorities to be considered by the Court in reaching a decision as regards defendant's motion to suppress evidence from the Durham, North Carolina, traffic stop (Doc. 357).[1]

I.

A routine traffic stop is viewed as more analogous to a "so-

---

[1] As the Court will observe, our memorandum sets forth general search and seizure principles relevant to our suppression motion and does not attempt to argue the facts of this case -- argument that must await the conclusion of the November 6 evidentiary hearing. Although the Court no doubt is well versed in the legal principles discussed herein, we believe it helpful to have the principles set forth and organized in an analytical format. We have found very few cases from our Court of Appeals dealing with the precise search and seizure issues that are presented by the routine traffic stop in this case. For this reason, we have cited several state cases -- in addition to Supreme Court and federal cases -- that we believe are helpful in understanding the intricacies of the issues presented here.

called 'Terry stop'[2] than to a formal arrest.  Berkemer v. McCarty, 468 U.S. 420, 439 (1984).  The routine traffic stop is considered a "seizure" of the driver under the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief."  Delaware v. Prouse, 440 U.S. 648 (1979). Thus, at a minimum, to stop a vehicle under Terry, the officer must have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime.[3]

An officer who has probable cause to believe that a motorist has violated a traffic law may temporarily detain the motorist, even if a reasonable officer would not ordinarily stop a motorist for such a violation without some additional law enforcement objective, and even if the officer had suspicions or motivations unrelated to the enforcement of traffic laws.  United States v. Whren, 517 U.S. 806 (1996).[4]

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

[3] The Supreme Court has identified at least three separate categories of police-citizen encounters in determining the level of scrutiny to apply under the Fourth Amendment:  (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, Florida v. Bostick, 501 U.S. 429 (1991); Florida v. Royer, 460 U.S. 491 (1983); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied under Terry; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, Brown v. Illinois, 422 U.S. 590 (1975); Dunaway v. New York, 442 U.S. 200 (1979).

[4] We note that the detention of the motorist in Whren was extremely brief and that the motorist's arrest for violation of the narcotics laws instantaneously followed the stop.  In short, Whren itself, a 9-0 decision, without concurring opinions, did not provide guidance as to just how far the police may go in detaining and
(continued...)

1.      Under North Carolina law, an officer "may arrest without a warrant any person who the officer has probable cause to believe has committed a criminal offense in the officer's presence."  N.C. Gen. Stat. § 15A-401(b).  The officer may also issue a citation to any person he has probable cause to believe has committed a misdemeanor or infraction.  §15A-302(c) and (d).

2.      Under Terry, not only must the initial detention be justified but the subsequent action must be reasonably related in scope to the circumstances justifying the initial interference.  392 U.S. at 20.  See United States v. Sharpe, 470 U.S. 675, 682 (1985).  The scope of an investigative detention "must be carefully tailored to its underlying justification . . . and [may] last no longer than is necessary to effectuate the purpose of the stop."  Florida v. Royer, 460 U.S. 491, 500 (1983).

   a.   Considering the "scope" limitation of Terry, cases have held that during a routine traffic stop the officer may request to see the driver's license and registration; ask about destination and purpose; check the VIN number of the car; question any passenger about destination, route and purpose to verify information provided by the driver; and check for any outstanding warrants.  United States v. Chavez-Valenzuela, 268 F.3d 719, 726 (9th Cir. 2001); see United States v. Ward, 2006 U.S. Dist. LEXIS 26936, collecting cases.

---

⁴(...continued)
interrogating someone who has been stopped on the pretext of the enforcement of the traffic laws.  See discussion of Whren in Whitehead v. Maryland, 698 A2d. 1115, 1120 (Md. App. 1996).

   b. In conducting a routine traffic stop, the officer may direct the driver to get out of the car and step to the side or rear of the car during the officer's checking of documents. This may be done in the absence of any further suspicion beyond the traffic violation itself. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). The officer may also direct any passenger to get out of the car and stand aside during the officer's checking of documents, even though there is no suspicion as regards any passenger. Maryland v. Wilson, 519 U.S. 408, 410 (1997).

   c. Under Terry, an officer conducting a routine traffic stop may perform a patdown of the driver or any passenger who gives the officer reasonable suspicion of being armed or dangerous. And, the officer may conduct a Terry patdown of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and might gain immediate control of a weapon. Michigan v. Long, 463 U.S. 1032, 1049 (1983).

   d. The scope of a routine traffic stop may be expanded only if the officer is able to "articulate a reasonable suspicion of other illegal activity beyond the traffic offense." United States v. Perkins, 348 F.2d 965, 970 (11th Cir. 2003). An "inchoate and unparticularized suspicion or 'hunch'" cannot withstand scrutiny under the Fourth Amendment. United States v. Sokolow, 490 U.S. 1, 15 (1989), quoting Terry. In the absence of evidence giving rise to reasonable suspicion of illegal activity other than the traffic offense, when the driver has produced a valid license and proof that he is entitled to operate the

vehicle, he must be allowed to proceed on his way without further delay by the officer for further questioning. United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).

(1) Nervousness alone does not justify extended detention and questioning about matters not related to the stop. See cases collected in United States v. Chavez-Valenzuela, 268 F.3d 719 (9th Cir. 2001). Most people show signs of nervousness when confronted with law enforcement officers, and the officers have no basis to compare the motorist's behavior during the stop with his usual demeanor. United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997). In the words of the Supreme Court, a traffic stop is an "unsettling show of authority" that may create "substantial anxiety." Delaware v. Prouse, 440 U.S. 648, 657 (1979). See also United States v. Fernandez, supra, 18 F.3d at 879.[5]

(2) Inconsistent statements of the driver and passenger, coupled with nervousness, do not add up to reasonable

---

[5] In Whitehead v. Maryland, supra, 698 A.2d at 1119, the court in discussing "nervousness" of a motorist stopped for a routine traffic violation as an indicium of criminality observed as follows:

> There is no earthly way that a police officer can distinguish the nervousness of an ordinary citizen under the circumstances from the nervousness of a criminal who traffics in narcotics. An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting a citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review.

suspicion of criminal behavior such as to justify extending the scope of the initial traffic stop.  United States v. Perkins, supra, 348 F.3d at 970.  See also United States v. Santiago, 310 F.3d 336, 338-339, 342 (5th Cir. 2002); United States v. Mesa, 62 F.3d 159, 162-163 (6th Cir. 1995).

II.

In routine traffic stop cases where the government argues that the officer's (1) questioning the driver about transporting illegal contraband and (2) obtaining the driver's consent to search the car occurred during a "consensual encounter" and thus does not bring into play Fourth Amendment scrutiny, the following legal principles are relevant.

1.  If a routine traffic stop becomes a consensual encounter, the Terry inquiry is replaced by the Supreme Court's analysis in Florida v. Bostick, 501 U.S. 429 (1991), because a consensual encounter does not "trigger Fourth Amendment scrutiny." 501 U.S. at 434.  Under Bostick, the test for a consensual encounter is whether under all of the circumstances, a reasonable person innocent of wrongdoing[6] would feel that he or she "was not free to decline the officer's requests or otherwise terminate the encounter."  501 U.S. at 439.[7]

---

[6]  The "reasonable person" test is objective and "presumes an innocent person."  Florida v. Bostick, 501 U.S. at 429.

[7]  In Florida v. Royer, 460 U.S. 491 (1983), the Supreme Court found that the officer's initial detention of the accused to ask a few questions was not unreasonable under the Fourth Amendment because there was a consensual encounter; however, further detention of the accused, without justification, to gain his consent to search his
(continued...)

2.   In Ohio v. Robinette, ("Robinette I") 653 N.E.2d 695, 698 (1995), involving a routine traffic stop and subsequent questioning about contraband leading to a purported consent search of the vehicle, the Ohio Supreme Court ruled that the evidence should be suppressed because the encounter between Robinette and the police officer after the routine traffic stop was not consensual.  The court stated:

> The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred.  The undetectability of that transition may be used by the police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.* * * * Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them.  The police officer retains the upper hand and the accouterments of authority.  That the officer lacks legal license to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.[8]

---

[7](...continued)
luggage was unlawful.

[8]   In Ohio v. Robinette, 519 U.S. 33 (1996) ("Robinette II"), the Supreme Court held that -- contrary to the position taken by the Ohio Supreme Court -- the subjective motivation of the officer was irrelevant to the legality of the search under Whren.  The Supreme Court also held that the Fourth Amendment does not necessarily require a person to be told he or she "is free to go" before his or her consent to search will be recognized as voluntary.  The Supreme Court avoided resolving the issue of the legality of Robinette's detention at the time Robinette purportedly consented to the search of his vehicle.  See Consent Searches Following Routine Traffic Stops:  The Troubled Jurisprudence of a Doomed Drug Interdiction Technique, 28 Ohio N.U.L. Rev. 1 at 11-16.

Following remand from the Supreme Court, the Ohio Supreme Court ultimately held that the evidence had to be suppressed because under
(continued...)

3.  In determining whether there has been a transition from a routine traffic stop into a consensual encounter, i.e., whether a reasonable motorist would feel free "to decline the officer's requests or otherwise terminate the encounter" (Bostick 501 U.S. at 439), courts use a totality-of-the-circumstances approach, with no single factor dictating whether a seizure has or has not occurred.[9]  Various factors include, but are not limited to, time, place and duration of the initial encounter; the number of officers present and whether they were uniformed; whether the person was removed to a different location; whether the person's license and other documents were returned; whether the person was informed that he or she was free to go; display of weapons by the officers; officer's language or tone of voice.  See e.g., United States v. McCarthur, 6 F.3d 1270, 1275-1276 (7th Cir. 1993); Ferris v. Maryland, 735 A.2d 491, 502 (Md. Ct. App. 1997).

   a.  If the officer returns the motorist's documents[10] and tells the motorist he or she is "free to go," it does not necessarily follow that the subsequent encounter between the officer and the motorist is consensual under the Fourth

---

[8] (...continued)
the circumstances there was no consensual encounter between Robinette and the officer and Robinette's consent was not voluntarily given. Ohio v. Robinette, 685 N.E.2d 762 (1997) (Robinette III).

[9]  As the Supreme Court has observed, there is no "litmus-paper test for distinguishing a consensual encounter from a seizure. . . ." Florida v. Royer, 460 U.S. at 506.

[10]  The Tenth Circuit "follow[s] the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned." United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005).

Amendment. Even with the "free to go" statement and the return of documents an unjustified non-consensual seizure may occur. See, e.g., Reittinger v. Commonwealth, 532 S.E.2d 25 (Va. 2005); Commonwealth v. Freeman, 757 A.2d 903 (Pa. 2000); State v. Ballard, 617 N.W.2d 837 (S.D. 2000).

    4.  If the consent of the motorist to search the car was obtained during a period of illegal detention, i.e., during an unjustified non-consensual seizure, any evidence obtained pursuant to the consent search "is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" United States v. Washington, 490 F.3d 765, 774 (9th Cir. 2007), citing Wong Sun v. United States, 371 U.S. 471, 488 (1963).

    The test for admissibility of the evidence under these circumstances is two-fold:  not only must the consent be voluntary, but it must also "be sufficiently an act of free will to purge the primary taint."  Wong Sun, 371 U.S. at 486; see also Brown v. Illinois, 422 U.S. 590 602 (1975).  Although there is overlap between the voluntariness test and the "fruits" test for attenuation, the two tests are not congruent, and evidence derived from a consensual search is only admissible if "the consent was both voluntary and not an exploitation of the prior illegality."  Wayne R. LaFave, 4 Search and Seizure § 8.2(d)(listing cases so holding).

        a.  In considering whether an otherwise voluntary consent was "purged of taint," the factors to be considered are:

9

(1) "the temporal proximity" of the consent and the illegal seizure; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 603-604.[11]

### III.

Assuming that a routine traffic stop has turned into a permissible consensual encounter during which the motorist gives the officer consent to search the vehicle, the government still must carry its burden and show that the motorist's consent was given voluntarily.[12]

1. In Schneckloth v. Bustamonte, 412 U.S. 218 (1973), the Supreme Court held that a person's waiver of Fourth Amendment rights need only be voluntary, unlike rights more directly affecting the trial process, which must be not only voluntary, but knowing and intelligent as well. In Bustamonte, the Supreme Court held that "while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." 412 U.S. at 248-249.

2. As noted, in Robinette II the Supreme Court held that

---

[11] As our Court of Appeals recently held, "[a]lthough Brown involved a confession following an illegal arrest, its analysis applies equally to consent given after an illegal search or seizure." United States v. Holmes, No. 05-3171, decided October 23, 2007, slip op. at 10. Other federal circuits apply the factors listed in Brown to the situation of consent after an illegal seizure of the person. See United States v. Washington, 490 F.3d at 777, citing cases.

[12] The prosecution has the burden on the issue of consent. See, e.g., Florida v. Royer, 460 U.S. at 497.

in the context of a routine traffic stop, a motorist does not have to be told expressly that he or she is free to go in order for the motorist's consent to be considered voluntary under the Fourth Amendment.[13]

    3.   In determining whether consent is voluntary, courts examine the totality of circumstances surrounding the alleged consent in similar fashion as when examining whether a routine traffic stop has turned into a consensual encounter -- with no one factor being determinative. See e.g., Kansas v. Thompson, 166 P.3d 1015, 1046 (Kansas 2007)(factors relating to voluntariness "are much the same as those applied to determine if an encounter is consensual," citations omitted).[14]

    4.   The scope of a consent search may not exceed the scope of the consent given. Florida v. Jimeno, 500 U.S. 248, 251 (1991).

IV.

As regards the dog alerts, we note the following legal

---

[13] Certain state appellate courts have recently applied a heightened review of the issue of consent in routine traffic stop cases. See e.g., State v. George, 557 N.W.2d 575 (Minn. 1997). This need for heightened review arises from three factors according to the Minnesota court. First is the problem created by Whren insofar as it removes any Fourth Amendment barriers to routine traffic stops that are made for pretexual reasons. Second is the concern that police may use their "enormous discretion in enforcing traffic laws" to target motorists for stops based on impermissible factors. Third is the "similar concern" that the concept of voluntary consent may arguably be meaningless in the coercive context of police-citizen encounters such as a traffic stop. Id. at 579-580 (citations omitted). See generally discussion in 28 Ohio N.U.L. Rev. 1 (2001) at 34-41.

[14] The court also looks to the age, intelligence, education, language ability and other particular characteristics of the person. See Schneckloth, 412 U.S. at 226.

principles.

1.  In United States v. Place, 462 U.S. 696 (1983), the Supreme Court found that the use by law enforcement officers of drug-sniffing dogs to detect contraband is sui generis because it does not require the exposure of non-contraband items and, as such, is not considered a "search" within the meaning of the Fourth Amendment.

2.  The Supreme Court relied on the sui generis nature of canine searches in its recent decision in Illinois v. Caballes, 543 U.S. 405 (2005), in which it held that an officer does not need reasonable suspicion before conducting a dog sniff during a legitimate routine traffic stop where the dog sniff was performed on the exterior of the vehicle and occurred during the lawful traffic stop.  Id. at 409.[15]

3.  If the dog sniff occurs during a routine traffic stop that has turned into an unjustified non-consensual encounter between the motorist and the police officer, the evidence recovered as a result of the dog sniff must be suppressed.  As the Supreme Court stated in Caballes:

---

[15] The key underpinning of United States v. Place and the majority opinion in United States v. Caballes is the proposition that sniffs by a "well-trained" narcotics dog are sui generis because a reaction by the dog in "alerting" is a response to nothing but the presence of contraband.  See dissenting opinion of Justice Souter in Caballes, 543 U.S. at 411.  But, as Justice Souter demonstrates, the empirical evidence indicates that the "infallible dog, however, is a creature of legal fiction."  Id.  See e.g., United States v. $242,484.00, 351 F.3d 499, 511 (11th Cir. 2004) (noting that because as much as 80% of all currency in circulation contains drug residue, a dog alert "is of little value"), vacated on other grounds, 357 F.3d 1225 (11th Cir. 2004).

> <u>Here, the initial seizure of respondent when he was stopped on the highway was based on probable cause, and was concededly lawful</u>. It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution, <u>United States</u> v. <u>Jacobsen</u>, 466 U.S. 109 (1984). A seizure that is justified solely by the interest of issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete the mission. In an earlier case involving a dog sniff that occurred during an unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the subsequent discovery of contraband were the product of an unconstitutional seizure. <u>People</u> v. <u>Cox</u>, 782 N.E.2d 275 (2002). <u>We may assume that a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained</u>. 543 U.S. at 407-408 (Emphasis added.)

In short, "[w]hen a canine narcotics sniff is performed as the result of the exploitation of [an illegal detention], the fruits of that canine sniff must be suppressed." <u>United States</u> v. <u>Page</u>, 154 F.Supp.2d 1320, 1328 (M.D. Tenn. 2001), citing <u>United States</u> v. <u>Buchanon</u>, 72 F.3d 1217, 1226 (6th Cir. 1995).[16]

4. Several circuit courts treat a positive alert by a "well-trained narcotics detection dog" as establishing probable cause to search a vehicle or a train roomette (or other types of containers) for contraband without any other indicia of criminality. <u>See</u> cases cited in Government's Omnibus Response to

---

[16] Unlike the Sixth and other circuits, the Eight Circuit has sustained dog sniffs performed within a few minutes of the conclusion of a traffic stop. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Williams</u>, 429 F.3d 767 (8th Cir. 2005).

Defendant's Legal Motions (First Trial, Doc. 151) at 61-64.[17]

In contrast with these cases, our Court of Appeals does not consider a dog alert itself as the equivalent of probable cause. For example, in United States v. Thayer, 898 F.2d 805, 808 (D.C. Cir. 1989), the Court held that a canine alert by itself did not establish probable cause to search a train roomette because "a dog may alert to traces of drugs left in a roomette by previous inhabitants."[18]

In United States v. $639,558.00 in U.S. Currency, 955 F.2d 712 (D.C. Cir. 1992), a civil forfeiture action, Judge Randolph noted that the record contained evidence that one out of every three U.S. bills have been involved in a cocaine transaction and that a dollar bill containing as little as a millionth of a gram of cocaine can easily be detected by a dog sniff. Judge Randolph went on to note that a "court considering whether a dog sniff provided probable cause may have to take into account the possibility that the dog signaled only the presence of money, not drugs." Id., 955 F.2d at 714, n. 2.

More recently, Magistrate Judge Alan Kay in Lopez v. United States, 2006 U.S. Dist. LEXIS 69113 (Sept. 16, 2006), relying on Judge Randolph's observations in $639,558 in U.S. Currency and other cases discussed the "limited probative value" of canine

---

[17] In Caballes the qualifications of the canine were not seriously contested. 543 U.S. at 409.

[18] The Court went on to hold that the the dog alert in combination with suspicious traveling arrangements to Florida, a known source area for cocaine, established the requisite probable cause to search the roomette. 898 F.2d at 808.

alerts.

5.   There must be probable cause to search for contraband at a location at the time the actual search is performed.  Put another way, probable cause may not be based on "stale" facts. Sgro v. United States, 287 U.S. 206 (1932).

V.

We close this pleading with the notion expressed by Judge Guy in United States v. Mesa, 62 F.3d 159, 163 (6th Cir. 1995), in which the Sixth Circuit reversed the conviction of a motorist who purportedly consented to a search of her car after a routine traffic stop and the police found five kilograms of cocaine and two loaded firearms hidden in a partition in the trunk.  Judge Guy stated:

> Although there is always a temptation in cases of this nature when a substantial quantity of drugs and firearms are found to let the end justify the means, it must be remembered that the courts only see cases in which the conduct of the officer resulted in contraband being found.  If the officers had found no drugs in defendant's car, obviously we would not even know that this traffic stop had ever occurred.  Therefore, we must accept that courts will always be "thwarting" what some may view as a good piece of police work when a motion to suppress is granted in cases of this nature.  Notwithstanding the importance of drug interdiction, however, we are still charged with the responsibility of seeing that the interdiction occurs without the Constitution being violated.  Such was not the case here.

15

Respectfully submitted,

　　　　　　　　　/s/
James L. Lyons   (50690)
Kellogg, Williams & Lyons
1350 Connecticut Avenue, N.W. #300
Washington, D.C.   20036
(202) 496-0722
(202) 331-1257   (fax)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of November, 2007, I caused a true and correct copy of the foregoing pleading to be delivered to the parties in this case via the Court's Electronic Case Filing (ECF).

　　　　　　　　　/s/
　　　　　James L. Lyons