UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. CR-05-0386 (ESH) |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE MAYNARD | : | |
| | : | |
| Defendant. | : | Sentencing Date: April 24, 2008 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing decision. The government has no objection to the Presentence Report, except that the quantity of cocaine attributable to Maynard in paragraph 55 of the report should be in excess of 15 kilograms of cocaine, which would result in a base offense level of 34, with a guideline sentencing range of 151-188 months.[1] The United States recommends a sentence of 151 months.

A. Offense Conduct

  1. Applicable Guideline and sentencing principles

Pursuant to sentencing guideline § 1B1.3 (a) (1)(A) a defendant is responsible for guideline purposes for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant". In jointly undertaken

---

[1] Both parties agree that paragraph 106 of the report dealing with statutory provisions is incorrect in assigning a minimum mandatory sentence of 10 years to the offense of conviction. Given that the jury found Maynard responsible for more than 500 grams but less than 5 kilograms of cocaine, the applicable sentencing provision is 21 U.S.C. § 841(b)(1)(B) which carries a minimum sentence of 5 years and a maximum sentence of 40 years.

-2-

criminal activity, including a conspiracy, this responsibility extends to "all reasonably foreseeable acts and admissions of others in furtherance of the jointly undertaken criminal activity" Guideline § 1B1.3(a)(1)(B). Assuming, of course, that the activity involved "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense" Guideline § 1B1.3(a).

In determining the full scope of the activity chargeable to a defendant under the guidelines "a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury." United States v. Dorcely, 454 F.3d 366, 371 (D.C. Cir.), cert. denied, 127 S. Ct. 691 (2006). Similarly, considering acquitted conduct for sentencing purposes does not offended the due process clause of the Fifth Amendment. Id. at 372 ( "a sentencing court may consider a defendant's past criminal behavior, even if no conviction resulted from that behavior, without violating due process") (internal quotations and citation omitted). And the acquitted conduct need only be found to a preponderance standard. Id. at 372-73. The evidence here shows that Maynard's activity, even without considering the acts of those jointly undertaken with him, strongly supports a finding that he is responsible for in excess of 15 kilograms of cocaine.

2. <u>The Evidence at the Trials in this Case</u>

Given that this Court has heard much of the evidence in this case twice, there is little need for a lengthy factual rendition of the overall evidence. However, a brief summary may be helpful, followed by a focus on the evidence of Maynard's direct involvement in the conspiracy in three areas; renting a location for the suppliers to stay in this area, picking up cocaine in Atlanta, and assisting in the distribution of cocaine to local customers.

a. <u>An overview of the activity</u>

In the fall of 2004, the Safe Streets Task Force, run out of the Washington Field Office of the Federal Bureau of Investigation (FBI), began investigating possible cocaine-trafficking by a District of Columbia night club owner named Antoine Jones. As part of the investigation they conducted a Title III wire intercept on Jones' cell phone from September 2, 2005, to October 24, 2005. In the course of the wire interception Jones was overheard speaking with various individuals in what investigators interpreted as coded conversations regarding the sale of wholesale quantities of cocaine by Jones to these individuals. In still other conversations, Jones was overheard speaking with three Hispanic men, including Roel Bermea, believed to be connected with Jones's Mexican cocaine suppliers, in what investigators viewed as coded conversations regarding the shipments of cocaine to the D.C. area, and the timing of meetings at a stash location for Jones to pick up the drugs and drop off cash.

Based on calls between Jones and his suspected Mexican supplier, who utilized a cellular telephone with a Texas area code, on October 19, 2005, investigators concluded that a sizeable shipment of cocaine was en route to the Washington, D.C., area on the weekend of October 22-23, 2005. A determination was made that the case should be taken down and that load of cocaine intercepted – and so, over the course of the ensuing days, numerous search warrants were prepared and a team of over 100 federal and local law enforcement agents was assembled to execute those warrants. In the early morning hours of October 24, 2005, agents executed 10 search warrants at residences in the District of Maryland, including those of John Adams and Demetrius Johnson, along with Jones, and at Jones's nightclub, Levels, in the District of Columbia. Recovered from Jones's Jeep Grand Cherokee was in excess of $69,000, in cash, bundled up and stashed in various

bags; recovered from Adams was approximately an eighth of a kilo of cocaine, $10,000, and two guns; recovered from Johnson was 600 grams of cocaine, and $12,000. Recovered from the residences of various other suspected customers were wholesale quantities of cocaine, large amounts of cash, along with firearms, digital scales, and other drug packaging paraphernalia. From the suspected stash house in Ft. Washington, MD, agents recovered 97 kilograms of powder cocaine, just under one kilogram of crack cocaine, and in excess of $850,000, in cash. Roel Bermea, Ricardo Sanchez-Gonzalez, and Alberto Carillo-Montelongo were located there. The house also contained inflatable mattresses, shrink wrapping equipment, and a number of duffel bags, some empty, some containing the cocaine and shrink wrapped currency.

A number of individuals who were arrested in October, 2005, pleaded guilty and agreed to cooperate with the government. Some of them were suspected purchasers from Jones. They confirmed investigators' belief that many of the meetings Jones set up with individuals along Branch Avenue and at the nightclub Levels were for the purpose of exchanging cash and cocaine. They also explained the use of various kinds of "code" in Jones's conversation over the phone. Three of them, John Adams, Demetrius Johnson, and Donald Hunter testified that Maynard had assisted Jones in the distribution activity in various ways. Calls on the wire intercept also demonstrated that Maynard was involved in distributing cocaine to other customers as well.

Bermea, who was part of the organization that supplied Jones, verified that the coded calls between Bermea's Mexico-based boss and Jones pertained to the timing of the delivery of sizable cocaine shipments, often in the 50+ kilogram range. In addition, Bermea stated that his numerous short conversations with Jones were for the purpose of arranging to meet with Jones at the stash house for Jones to pick up cocaine and drop off payments for the drugs. Bermea testified about a

number of trips, including one in which the cocaine was taken to Atlanta where it was picked up in 8-12 kilo loads by Jones and, on two occasions, Maynard.

### b. Specific Evidence as to Maynard

#### i. The ICE investigation

An independent investigation by Immigration and Customs Enforcement linked Jones and Maynard to the Texas/Mexican suppliers prior to the Safe Streets investigation. Francisco Javier Gonzalez-Ruan was placed at 8550 Myrtle Avenue on at least two occasions, once by GPS location on his phone, the other by surveillance agents. (Testimony of SA Gikas, 11/2/06 pm at 125-27; 11/16/06 am at 34).[2] The house had been rented by Maynard using fraudulent income records and citing a false reason - separation from his wife (Exhibits ICE 25 and 29).[3] Maynard, was also seen there by surveillance agents (Testimony of SA Gikas 11/15/06 pm 130). A vehicle parked by the Myrtle Avenue house had a Delaware plate registered to Guadalupe Barrone a/ka/Pelos, (Testimony of SA Gikas 11/15/06 pm at 122-123; Testimony of Bermea 11/26/07 pm at 70-71; Exhibits DMV 6, 7, 8). Inside the otherwise empty house, which was searched pursuant to a delayed notice warrant, agents found empty duffel bags, inflatable mattresses, and shrink wrapping material (Testimony of SA Gikas 11/16/06 am at 25). All the windows of the house were covered in some fashion (Testimony of SA Gikas 11/16/06 am at 26). The day after the delayed entry search, which

---

[2] Citations to witness testimony are to the date, am or pm, and the page number. Some of the testimony is cited to the first trial in this matter either because the witness only testified in that trial or because the United States has not yet obtained that witness' testimony in the second trial.

[3] Although the United States does not at this point have a copy of the testimony of Joyce Maynard she testified that she and the defendant had been happily married for many years while the lease documents list a separation from his spouse as one of the reasons for Maynard renting the house.

required breaking a window in a basement door, Javier and several other came to Myrtle Avenue and departed shortly after they entered, driving at a high rate of speed on I-95 South (Testimony of SA Gikas 11/16/06 am at 34-37). The same day Maynard began the process of breaking the lease on Myrtle Avenue (Exhibits ICE 27, 28).

John Adams testified that during a conversation with Jones about his drug suppliers Jones commented that at one point he used to get his sources places to stay in the area (Testimony of John Adams 11/13/06 am at 82).

### ii. The Atlanta Trips by Maynard

Roel Bermea testified that the second trip he took to help supply Jones with cocaine was to Atlanta. After the drugs arrived, Jones came several days later, driving a blue van which contained a hidden compartment (Bermea testimony 11/27/07 am at 34, 39, 64-70). Jones came a number of times to pick up drugs in Atlanta (Bermea testimony 11/27/07 am at 79). On one of the trips Jones said there had been a slight delay because his partner was driving and got a speeding ticket (Bermea testimony 11/27/07 am at 80). Jones also indicated that he always drove down with someone else because he was tired and it was a long drive (Bermea testimony 11/27/07 am at 81). Prior to one of the scheduled drug pick ups "Primo" informed Bermea that someone else would be comming to pick up the drugs for Jones (Bermea testimony 11/27/07 am at 83-84). The new person was Lawrence Maynard, who was driving the same blue van with a hidden compartment (Bermea testimony 11/27/07 am 85-87). Bermea and the others at the Atlanta house unloaded money from the hidden compartment and put cocaine in and Maynard then departed (Bermea

testimony 11/27/07 am at 85-88).[4] Maynard came again the next week where he received 8-10 kilos of cocaine (Bermea testimony 11/27/07 am at 89). Eventually, only 3 kilos of cocaine were left but they were never picked up because, according to Primo, the van had been stopped by a police officer and the money in the hidden compartment discovered (Bermea testimony 11/27/07 am 91-94).

There was significant corroboration for Bermea's testimony. First, and most obvious, was the testimony of Officer Frederick Whitehead who, on April 5, 2005, stopped a blue van, registered to Antoine Jones, going southbound on I-85, in Durham, North Carolina, driven by Lawrence Maynard with Derrick Gordon as a passenger (Whitehead Testimony 11/1/06 am at 4, 9-11, 16). There were several things that made Officer Whitehead suspicious, including conflicting statements of Maynard and Gordon about their destination and an odd reaction by Maynard when Officer Whitehead asked permission to search the van (Bermea testimony 11/27/07 am at 17, 20-21). Officer Whitehead's search discovered the hidden compartment containing a little over $67,000 in cash in several Target bags (Bermea testimony 11/27/07 am at 30-32).

There was also testimony and documents showing that Maynard had been stopped for speeding in North Carolina on March 13, 2005 and paid the ticket (Exhibits Misc. 22 and 23). Hotel records showed that Maynard had stayed several times at hotels near the stash location during the period Bermea had testified Jones and Maynard were getting cocaine in Atlanta (Exhibits 21 and 22). An analysis of pen registers on Jones and Maynard's phones at that time, in conjunction with information obtained from cell phones seized at the Ft. Washington stash house, showed

---

[4] Bermea did not testify about the specific amount of cocaine Maynard received on this trip, but he did testify that after Jones' first pick up in Atlanta, when it was 18-25 kilograms, the quantity was usually 8-12 kilograms (Bermea testimony 11/29/07 am at 77).

-7-

contacts during this period by both Jones and Maynard with phones linked to the supply organization (Exhibits KOB 3, 4, 13). And Donald Hunter testified that at one point when he was trying to purchase more cocaine from Jones, Jones said that he was waiting for Maynard to come back (Hunter testimony 12/4/07 pm at 32-36).

### iii. Supplying local customers

Several of Jones' customers testified that at various points Maynard played a role in the distribution process. TIII intercepts also showed him being involved with customers who did not testify.

John Adams reported that on one occasion Jones told him to pick up a kilo of cocaine from Maynard at Levels, which Adams did (Adams testimony 11/13/06 am at 90-91). Another time Adams had a kilo at his home which Jones apparently wanted for another customer. Jones instructed Adams to deliver it to Maynard at Levels, which Adams did (Adams testimony 11/13/06 am at 90-91). In an intercepted call, activation 843, Jones tells Adams to "do me a favor and catch up with Lawrence with that ah ah ah um that ticket". Jones adds that Maynard, "he'll know what to do with it."

Demetrius Johnson testified that at one point he received 2 kilos of cocaine from Jones at Levels. As Jones and Johnson were walking toward the exit, with Johnson carrying the cocaine in a shopping bag, Jones became concerned about some police activity in the parking lot. Jones told Johnson to give the bag with the cocaine to Maynard, which Johnson did. Jones and Johnson then ran out of the back door of the club (Johnson testimony 12/10/07 pm at 7-10).[5]

---

[5] Johnson testified that the bag was opaque and the kilograms wrapped in a black coating. He also agreed that he did not say anything to Maynard to indicate that the contents of
(continued...)

Donald Hunter testified that at Jones direction he picked up cocaine from Maynard three times, once in club Levels, the other two times just outside the club (Hunter testimony 12/4/07 pm at 42). The first time was in the club with Maynard giving Hunter a half kilo of cocaine (Hunter testimony 12/4/07 pm at 43-44). The second time Jones told Hunter to follow Maynard to Jones' Jeep where Maynard gave Hunter nine ounces of cocaine (Hunter testimony 12/4/07 pm at 46-48). The third time Hunter got cocaine from Maynard Jones instructed Hunter to follow Maynard to a white truck where Maynard gave Hunter nine ounces of cocaine (Hunter testimony 12/4/07 pm at 49-50).

Some confirmation of Maynard's involvement with Hunter came from the wire intercept. After Hunter was arrested in mid-October 2005 Hunter sent his wife, Angel, to see Jones in an attempt to obtain some money for Hunter's defense. In a series of calls, activations 5433, 5437, and 5442, Jones has Maynard check to make sure that it is safe for him to speak with Goodman. In call activation 5443 Jones tells Goodman that Maynard has a note from Jones, apparently for Hunter. In the next call, activation 5444 Maynard tell Jones that Maynard has received a note for Jones from Goodman. And in a later call, activation 5742, Goodman tells Jones that Hunter has told her that Maynard is "alright".

In a number of intercepted calls, played as tab 6 in Maynard's trial, Jones, Maynard, and several of Jones drug customers discuss transactions that Maynard is helping to facilitate by delivering drugs or picking up payments. For instance in call activation 55, Jones talks to Pauline Spence about something Maynard is to bring her. In call 584 Jones and Maynard discuss

---

[5](...continued)
bag were cocaine. Still, it seems very unlikely that Jones would have told Johnson to hand a bag containing 2 kilograms of cocaine to a total innocent.

something Spence gave Maynard for Jones. In call activation 845-1 Jones tells Maynard to get a "ticket" from John for "Pauline". In a call one minute later Jones tells Spence that Maynard will take care of "[w]hat we were talking about" and that later Jones should have a "VIP ticket" for her.

In call activation 2521 Jones tell Kirk Carter that Maynard "got that box for you." Similarly in call activation 2524 Jones tells Kevin Holland that Maynard is waiting outside for him.

In call activation 4074 Jones tells Alvin Proctor that Jones is "trying to talk to my um uncle tonight for tomorrow right' and that Proctor should "put it in an envelope and give it to Lawrence". In call activation 4079 Jones tell Derrick Barrett to take whatever he got from Tyrone, put it in an envelope and "give it to Lawrence".

      B.  <u>Sentencing Guidelines Analysis</u>

Pursuant to sentencing guideline 2D1.1(a)(3) the base offense level for this offense is determined by the quantity of cocaine attributable to Maynard under the standards described in § A.1 above. Maynard's involvement in this drug conspiracy spanned both supply and distribution. On the supply side there is evidence from the ICE investigation of Maynard renting a stash house for an organization that appears, based on the testimony of Bermea, to have rarely brought less than dozens of kilos to this area at any one time. The evidence of the Atlanta trips places something over 15 kilograms of cocaine, or the intent to have something over 15 kilograms, directly in Maynard's hands. This is a fairly straightforward computation based on the two successful trips, each of which would have involved at least 8 kilograms of cocaine, and the cash seizure by Officer Whitehead, which substantiates an intent to purchase the remaining three kilograms described by Bermea.

In terms of local distribution, the direct testimony of Adams, Johnson, and Hunter places something within a few ounces of 5 kilograms of cocaine directly in Maynard's hands. The additional quantities being discussed in the other intercepted calls outlined, which in turn were a subset of similar calls, easily pushes the amount of local distribution over 5 kilograms. It thus seems clear that to a preponderance standard Maynard was personally involved with transporting, holding, or distributing, at least 15 kilograms of cocaine. The applicable base offense level is thus 34.[6]

C.  Sentencing factors under 18 U.S.C. §3553

The base guideline range for this offense would be appropriate, taking into account the factors set forth in 18 U.S.C. §3553(a), as follows:

>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>    (2) the need for the sentence imposed --
>
>>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>>    (B) to afford adequate deterrence to criminal conduct;
>>
>>    (C) to protect the public from further crimes of the defendant; and
>>
>>    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

---

[6] This does not even include the other distribution activity of Jones which was certainly reasonably foreseeable to Maynard given the degree to which he was involved in several aspects of Jones' operation.

>(3) the kinds of sentences available;
>
>(4) the kinds of sentence and the sentencing range established for
>
>>(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines --
>>
>>>(i) issued by the Sentencing Commission ...; and
>>>
>>>(ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
>(5) any pertinent policy statement --
>
>>(A) issued by the Sentencing Commission ... and
>>
>>(B) that, . . . is in effect on the date the defendant is sentenced.
>
>(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>(7) the need to provide restitution to any victims of the offense.

It is clear from the explicit language of the statute that the statute's framers both endorse and respect the ranges set by and the policy statements made by the United States Sentencing Commission, itself a body made up primarily of experienced District Court Judges. It is also apparent that §3553(a) is the lynchpin of the Guidelines drafted by the Commission, which set forth in its preamble its reliance on the statute and cites each factor set forth there, most particularly, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," which is a core goal of the Guidelines. See 18 U.S.C. §3553(a)(6).

Given the quantity of drugs involved in the defendant's activity the guideline range is appropriate .  And,  other pertinent portions of §3553(a) referencing the Sentencing Guidelines, its policy statements, and its fundamental emphasis on uniform sentencing all strongly support the imposition of a sentence in the guideline range consistent with similar crimes and the defendants committing them.  The government therefore recommends a sentence of 151 months.[7]

WHEREFORE, the government requests that the Court adopt the PSR, except for a finding under paragraph 55 that the quantity of cocaine attributable to Maynard exceeds 15 kilograms, and impose a sentence of 151 months.

      Respectfully Submitted,

      JEFFREY A. TAYLOR
      UNITED STATES ATTORNEY


By: _____

      JOHN V. GEISE
      RACHEL C. LIEBER
      Assistant U.S. Attorneys
      United States Attorney's Office
      555 Fourth Street, N.W. Rm. 8445
      Washington, D.C.  20530
      Tel. (202) 514-7121
      John.Geise@usdoj.gov

---

[7] If the quantity of cocaine attributable to Maynard was found to be in the 5 to 15 kilogram range for a guideline of 121-151 months the United States, given the length of Maynard's involvement in the conspiracy and the range of his activity,  would continue to recommend a sentence of 151 months.

-14-