**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAWRENCE MAYNARD<br>(Lead Defendant:<br>Antoine Jones) | Crim. No. 05-386-10  (ESH)<br><br>Sentencing Date:<br>April 24, 2008, 12:00 p.m. |

<u>**DEFENDANT LAWRENCE MAYNARD'S SENTENCING MEMORANDUM**</u>

<u>**BACKGROUND**</u>

By superseding indictment filed March 21, 2007, defendant Lawrence Maynard and co-defendant Antoine Jones were charged with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii) and (b)(1)(A)(iii).[1]

Following a lengthy trial, the jury by special verdict found defendant Maynard guilty of narcotics conspiracy.  The jury also found that the government had not proven beyond a reasonable

---

[1] Kirk Carter, Francisco Javier Gonzalez-Ruan, Guadalupe Barrone, Jose Garcia, and Carlos Reyna were also charged in this indictment.  Gonzalez-Ruan was inadvertently released from the jail; Barrone, Garcia and Reyna were never apprehended; and Kirk Carter pleaded guilty a few days before the scheduled trial.

doubt that defendant Maynard was responsible for conspiracy to distribute or possess with the intent to distribute five kilograms or more of cocaine.  The jury did, however, find beyond a reasonable doubt that defendant Maynard was responsible for 500 grams or more of cocaine but less than 5 kilograms.  Lastly, the jury found that defendant Maynard was not responsible for any amount of cocaine base.[2]

Put another way, the jury found defendant Maynard not guilty of Count One as charged (five kilograms of cocaine and/or fifty grams of cocaine base), but guilty of the lesser-included statutory offense of conspiracy to distribute or possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B)(ii).  The statutory penalty for this lesser-included offense is a mandatory minimum of five years and a maximum of forty years.

## THE PROPER PROCEDURAL SENTENCING STEPS AFTER BOOKER

In Gall v. United States, 128 S.Ct. 586 (2007), the Supreme Court laid out the procedures to be taken by federal district courts in determining a proper post-Booker[3] sentence:

---

[2]  The jury found defendant Jones guilty as charged in Count One.

[3]  United States v. Booker, 543 U.S. 220 (2005).  The Supreme Court jurisprudence that gave rise to Booker may be briefly summarized as follows.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court held that a defendant's right to a jury trial under the Sixth Amendment mandated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury, and proved beyond a
(continued...)

1.   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however."  128 S.Ct. at 596.[4]

2.   "[A]fter giving both parties an opportunity to argue

---

[3](...continued)
reasonable doubt."  Id. at 490.  Thereafter, in Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court in dealing with guideline sentencing in the state of Washington held that "[o]ur precedents make clear . . . that the 'statutory maximum' for Apprendi purposes is the maximum sentence a jury may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.  Id at 303-304.  The Court made clear that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum [the judge] may impose without any additional findings."  Id.  In other words, the term "statutory maximum" in Apprendi did not mean the maximum sentence in a statute, but rather meant the top end of a guideline range in a mandatory guideline sentence.  Blakely set the stage for consideration of the Sixth Amendment vis-a-vis the federal sentencing guidelines.

In Booker I, Justice Stevens -- author of Apprendi -- together with Justices Scalia, Souter, Thomas, and Ginsburg, held that Blakely controlled and that the mandatory federal sentencing guidelines were unconstitutional.  543 U.S. at 226-227.  Although Justice Stevens won this aspect of Booker, Justice Breyer managed to peel Justice Ginsburg from the Booker I majority, and delivered a compromise "remedial" decision in Booker II.  Reasoning that Congress would not have wanted the federal guidelines completely destroyed, Justice Breyer -- joined by Chief Justice Rehnquist and Justices O'Conner, Kennedy, and Ginsburg -- "excised" portions of the guidelines that made the guidelines mandatory.  543 U.S. at 245.  Because the judicially-amended guidelines were now only advisory, they survived Sixth Amendment attack by a 5-4 majority.

[4]   In a companion case to Gall, the Supreme Court in Kimbrough v. United States, 128 S.Ct. 558 (2007), held that while a district court must "include the Guidelines range in the array of factors warranting consideration" and "give respectful consideration to the Guidelines," the court "may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines," e.g., the 100-1 disparity between the crack and cocaine Guidelines.  Id. at 564, 570 (alteration in original) (quotation marks omitted).

for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party.  In so doing, [the judge] <u>may not presume that the Guidelines range is reasonable</u>. [The judge] must make an individualized assessment based on the facts presented."  128 S.Ct. at 596-597.  (Emphasis added.)

3.    "If [the judge] decides that an outside-Guidelines sentence is warranted, [the judge] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  128 S.Ct. at 597.

4.    "After settling on the appropriate sentence, [the judge] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."  <u>Id</u>.[5]

---

[5]    The Supreme Court in <u>Gall</u> also laid out the procedures to be taken by a circuit court in reviewing a district court's post-<u>Booker</u> sentence:  (1) the sentence -- whether within or outside the guidelines -- must be reviewed under an "abuse of discretion" standard; (2) the appellate court should ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the guideline range, treating the guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence; (3) assuming no procedural error, the circuit court should consider the substantive reasonableness of the imposed sentence under an abuse of discretion standard; (4) the circuit court may <u>not</u> presume unreasonableness should the sentence be outside the guideline range, <u>i.e</u>., no presumption of unreasonableness exists as regards a sentence outside the guideline range; and (5) because a sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in an individual case, an appellate court is prohibited from substituting its judgement in lieu of the judgement of the sentencing

(continued...)

**A.    The Proper Calculation Of Defendant's Sentence
Under The Federal Sentencing Guidelines**

**1.    Inapplicability of Upward Adjustments for
Role in the Offense and Possession of a Weapon**

At the outset we note that the PSI does not impose any upward adjustment to defendant's base level for role in the offense under § 3B1.1.  PSI at 10, ¶ 50.  Also, the government does not seek an upward adjustment on the ground that defendant was a manager or supervisor or an organizer or leader of the criminal enterprise.  We agree.

Although the evidence considered in the most favorable light to the government shows that defendant had a close relationship with Jones and with some of the other co-conspirators, e.g., Donald Hunter, there was no evidence that defendant had any control or role in setting the price or the method of payment of the drugs that were distributed, or that he set any policy for the enterprise, or that he had any direct supervision over any of the co-conspirators, i.e., that he had a hierarchically superior relationship with any subordinates, or that he directed or profited from drug sales of subordinate runners.  See United States v. Carter, 449 F.3d 1287, 1299 (D.C. Cir. 2006) (role enhancement reversed because no evidence that defendant was "hierarchically superior" to other co-conspirators); United States v. Quigley, 373 F.3d 133, 140 (D.C. Cir. 2004) (same). Accord, United States v. Graham, 162 F.3d 1180, 1185 (D.C. Cir.

---

[5](...continued)
court.  128 S.Ct. at 597.

1998).  Compare United States v. Strothers, 77 F.3d 1389, 1393-
1394 (D.C. Cir.), cert. denied, 519 U.S. 956 (1996) (role
enhancement affirmed where evidence showed that defendant
directed other co-conspirators and profited from numerous sales
conducted by subordinate runners).

We also note that neither the PSI nor the government
suggests an upward adjustment under § 2D1.1(b)(1) for possession
of a firearm or other dangerous weapon.  We agree.

Although a weapon was recovered from the desk drawer in the
office at Levels Nightclub ("Levels") (Tr. 11-30-07 a.m. at 30/1-
25[6]), there was no testimony that defendant possessed the weapon[7]
or that he knew the weapon was in the office.  Indeed, according
to the testimony of Donald Hunter, the weapon found at Levels
belonged to Jones.  (Tr. 12-05-07 p.m. at 77/1-25)

Moreover, no witness testified that defendant possessed a
gun outside of Levels; no gun was found in the minivan on April
5, 2005, when defendant was stopped in North Carolina (Tr. 12-03-
07 p.m. at 56/2-3); no gun was found in defendant's home during
the November 23, 2005, search (Tr. 12-19-07 a.m. at 16/14-25);
and there was no evidence that defendant knew that certain of the
co-defendants kept weapons at their homes.

## 2.    Determination of Defendant's Base Offense Level under USSG § 2D1.1(a)(3) and (3)(7)

---

[6]  The number(s) in front of the "/" refer to page(s) and the
number(s) after the "/" refer to line(s).

[7]  Defendant's fingerprints were not found on the weapon.  (Tr.
11-30-07 p.m. at 24/10-12)

As noted, the jury expressly found beyond a reasonable doubt (1) that defendant was responsible for 500 grams but less than five kilograms of cocaine and (2) that the government did not prove beyond a reasonable doubt that defendant was responsible for five or more kilograms of cocaine.[8]

Accordingly, when considered in view of the jury's verdict, the guidelines establish a base offense level of no less than level 26 ("[a]t least 500 grams but less than 2KG of [c]ocaine," § 2D1.1(c)(7)) and no greater than level 30 ("[a]t least 3.5 KG but less than 5 KG of [c]ocaine," § 2D1.1(c)(5)).[9]

### 3. Use of Acquitted Conduct As Relevant Conduct To Increase Defendant's Base Level from that Allowed By the Jury's Verdict

The government argues that the Court should increase defendant's base offense level from that allowed by the jury verdict (a maximum level of 30) and set the level at 34 (151 to 188 months) based on acquitted conduct that in the government's view establishes by a preponderance of evidence that defendant is

---

[8] The jury also found that defendant was not responsible for any of the cocaine base involved in the case.

[9] The jury special verdict form did not provide for individualized guideline findings, e.g., the amounts of cocaine specified in the various levels under § 2D1.1(c), but only for the statutory amounts of cocaine that would determine the statutory mandatory minimums, if any, and the statutory maximums of the conspiracy offense charged in Count One, i.e., "(A) 5 kilograms or more . . . "; "(B) 500 grams or more but less than 5 kilograms . . ."; and "(C) Less than 500 grams . . . ." Thus, we do not know from the jury verdict form whether the jury found that defendant was responsible for "at least 2 KG but less than 3.5 KG of [c]ocaine" (Level 28), or for "at least 3.5 KG but less than 5 KG of [c]ocaine" (Level 30). What we do know, however, is that the jury expressly found that the government had not proven that defendant was responsible for 5 KG or more of cocaine.

7

responsible for "at least 15 KG" of cocaine under § 2D1.1(c)(3) and § 1B1.3 (Relevant Conduct). Government's Memorandum In Aid of Sentencing at 10-11. We disagree and submit that the Court should exercise its discretion and refrain from overstepping the outside boundaries of the jury verdict.

1. Post Gall and Kimbrough, the use of acquitted conduct in establishing federal guideline offense levels has emerged as a key issue in the law of sentencing. As noted in the March 2008 issue of the The Champion:

> The use of acquitted conduct is the next major front in the sentencing battle. Our attack is supported by the concerns set forth in the Apprendi/Booker line of cases and has the express support of various justices on the Supreme Court. Prior precedent (specifically, Watts[10]) can be distinguished in light of Apprendi/Booker and now Rita[11] and Gall. Finally, eliminating use of acquitted conduct at sentencing comports with the Framers' understanding of the right to a

---

[10]    In the pre-Booker opinion of United States v. Watts, 519 U.S. 148, 157 (1997) (per curiam), the Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." As described in Booker by Justice Stevens, Watts is limited by its review of the "very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause . . . ." Watts has been severely undercut by Booker and is arguably no long tenable. See United States v. Gray, 362 F.Supp.2d 714, 721 (S.D.W.Va. 2005) ("the reasoning in Watts was drawn into serious question by the constitutional majority in Booker"). Accord, United States v. Faust, 456 F.3d 1342, 1349-1351 (11th Cir. 2006) (Barkett, J., specially concurring).

[11]    Rita v. United States, 127 S.Ct. 2456 (2007) (appellate presumption of reasonableness for within-guideline sentences is not impermissible).

jury, and frankly is just plain fair.[12]

Indeed, Justice Scalia's concurring opinion in <u>Gall</u> invites defendants to bring as-applied challenges:

> The door . . . remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and <u>not</u> the jury.
> 128 S.Ct. at 602-603 (Scalia, J., concurring). (Emphasis added.)[13]

It also should be noted that in <u>Cunningham</u> v. <u>California</u>, 127 S.Ct. 856 (2007), which applied <u>Blakely</u> to California's determinate sentencing law, the five-member majority of <u>Apprendi/Blakely</u> grew to six justices, with the addition of Chief Justice Roberts.  This suggests that what was a slim majority in <u>Apprendi/Blakely</u> has now increased with the loss of Justices Rehnquist and O'Connor, both <u>Apprendi/Blakely</u> dissenters.  In holding that <u>Blakely</u> was applicable to California's sentencing laws, the majority remarked, "<u>Booker's</u> remedy for the Federal Guidelines . . . is not a recipe for rendering our Sixth Amendment case law toothless."  127 S.Ct. at 870.  (Citation

---

[12]   Stevan G. Kalar and Jon M. Sands, "An Object All Sublime -- Let the Punishment Fit the Crime," <u>The Champion</u> 20, 29 (March 2008).

[13]   In <u>Apprendi</u> itself, the Court cautioned that "the judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury."  530 U.S. at 438, n.10.  In <u>Blakely</u>, the Court explained that <u>Apprendi</u> "ensures that the judge's authority derives wholly from the jury's verdict."  542 U.S. at 306.  And, as recently as last year, the Court flatly stated that "if the jury's verdict alone does not authorize the sentence . . . the Sixth Amendment requirement is not satisfied."  <u>Cunningham</u> v. <u>California</u>, <u>supra</u>, 127 S.Ct. at 869 (2007).

omitted.)  See generally, James J. Bilsborrow, Sentencing
Acquitted Conduct to the Post-Booker Dustbin, 49 Wm and Mary L.
Rev. 289 (2007).

    2.   Notwithstanding the likelihood that a majority of the
Supreme Court today would rule that the Sixth Amendment prohibits
use of acquitted conduct for purposes of sentencing under the
federal guidelines, undersigned counsel recognizes that he must
frame the acquitted conduct issue to this Court in light of our
Court of Appeals decision in United States v. Dorcely, 454 F.3d
366 (D.C. Cir.), cert. denied, 166 L.Ed.2d 518 (2006).

    In Dorcely, the Court held that because the Supreme Court in
Booker did not expressly overturn United States v. Watts, supra,
use of acquitted conduct in sentencing does not violate either
the Sixth Amendment right to jury trial or the Fifth Amendment
right to due process.  Id. at 372.  Dorcely also held that under
Booker, facts encompassed in acquitted conduct may be established
by a preponderance of evidence.  Id.[14]  Accord, United States v.
Brown, 2008 U.S.App.LEXIS 4380 (D.C. Cir., Feb. 29, 2008).

    3.   As regards Dorcely, we ask the Court to adopt the
approach recently taken by Judge Paul Friedman in United States
v. Safavian, 461 F.Supp.2d 76 (D.D.C. 2006), in which Judge

---

    [14]  We note that the First, Second, Third, Fourth, Fifth,
Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have ruled that
use of acquitted conduct at sentencing does not violate the
Constitution.  See United States v. Mercado, 474 F.3d 654, 657 (9th
Cir. 2007), cert. denied, 2008 U.S. LEXIS 2935 (U.S., Mar. 31, 2008)
(collecting cases).  The Sixth Circuit is currently reviewing the
issue en banc in United States v. White, 2007 U.S. App. LEXIS 28902
(Sixth Cir., November 30, 2007).

Friedman declined to incorporate acquitted conduct at sentencing.

In Safavian, the defendant was convicted by the jury of three counts of false statements and one count of obstruction of a GSA-OIG investigation.  He was acquitted of one count of obstructing a Senate Committee investigation.  At sentencing, the government argued that under Dorcely, Judge Friedman should find by a preponderance of evidence that the defendant obstructed the Senate Committee investigation, as charged in Count Four for which he was acquitted, and include Count Four in the determination of defendant's total offense level.  Judge Friedman rejected the government's request and stated as follows:

> The holding in Dorcely, however, does not mandate consideration of acquitted conduct under the Guidelines, stating only that "we believe [Booker's] language is broad enough to allow consideration of acquitted conduct so long as the court "deems [it] relevant." (Citation omitted.)  The opinion goes on to cite the language in United States v. Watts that takes a similarly permissive view of whether a judge may consider acquitted conduct.  United States v. Dorcely, 454 F.3d at 372 ("a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence") (quoting United States v. Watts 519 U.S. at 157 (internal punctuation omitted) (emphasis added).  This Court declines to exercise its discretion under the advisory Guidelines to consider such conduct, because [the Court] has long believed that consideration of acquitted conduct "trivializes 'legal guilt' or 'legal innocence,' which is what a jury decides."  United States v. Pimental, 367 F.Supp.2d 143, 152 (D. Mass. 2005).  461 F.

Supp.2d at 83.   (Emphasis added.)[15]

4.   Judge Friedman's citation to <u>Pimental</u> is most appropriate.   In <u>Pimental</u>, Massachusetts District Court Judge Nancy Gertner, who has written and lectured extensively on the acquitted conduct issue, fully and incisively analyzed the interplay between the Fifth and Sixth Amendments and <u>Booker</u> and refused to rely on acquitted conduct under a preponderance of evidence standard to establish guideline offense levels.

Judge Gertner summed up her analysis as follows:

> It makes absolutely no sense to conclude that the <u>Sixth</u> <u>Amendment</u> is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, and <u>also</u> conclude that the fruits of the jury's efforts can be ignored with impunity by the judge at sentencing.   367 F.Supp.2d at 150. (Emphasis in original.)

<u>See</u> <u>generally</u> Judge Nancy Gertner, <u>Circumventing Juries, Undermining Justice:  Lessons from Criminal Trials and Sentencing</u>, 32 Suffolk U. L. Rev. 419 (1999).   <u>See</u> <u>also</u> Barry L. Johnson, <u>If at First You Don't Succeed -- Abolishing the Use of Acquitted Conduct in Guidelines Sentencing</u>, 75 N.C. L. Rev. 153, 182-183 (1996).

---

[15]   Judge Friedman reaffirmed his position in <u>United States</u> v. <u>Garris</u>, No. 03-268 (D.D.C., Feb. 10, 2006), Tr. at 35-44, in which he stated:   "If the criminal justice system means anything, it ought to mean that once somebody is acquitted of something, that ought to have no bearing."

Moreover, Judge Friedman pointed out that even under the reasonable doubt standard, a court-imposed enhancement based on acquitted conduct "becomes sort of a metaphysical impossibility if one wants to respect the jury because they have already found to the contrary."

5.    Judge Friedman and Judge Gertner's reasoning in
declining to use acquitted conduct at sentencing is incorporated
in and expounded on by Circuit Judge B. Fletcher of the Ninth
Circuit in his pellucid dissent in <u>United States</u> v. <u>Mercado</u>,
<u>supra</u>, and we cite his opinion at some length:

> These principles [of giving "intelligible
> content to the right of jury trial," <u>Blakely</u>,
> 542 U.S. at 305] apply with even greater
> force to the consideration of acquitted
> conduct at sentencing.  By considering
> acquitted conduct, a judge thwarts the
> express will of the jury -- as opposed to the
> implicit or imputed will of the legislature
> that is thwarted by a sentence above the
> statutory maximum -- and imposes a punishment
> based on conduct for which the government
> tried, but failed, to get a conviction.  Such
> a sentencing has little relation to the
> actual conviction, and is based on an
> accusation that failed to receive
> confirmation from the defendant's equals and
> neighbors.
>
> *      *      *      *
>
> The jury's powers in criminal cases are
> confined to issuing verdicts.  As such, any
> authorization or withholding of authorization
> must be communicated through the jury's
> verdict, and the jury's ability to insulate
> defendants from the government -- as the
> Constitution requires -- is entirely
> dependent upon the integrity of its verdict.
> As the connection between verdict and
> punishment erodes, the significance of the
> jury's verdict is correspondingly diminished.
> Such attenuation makes it increasingly
> unlikely that the jury verdict has authorized
> the punishment.  Just because the jury
> authorized <u>a</u> punishment does not mean that
> the jury has authorized <u>any</u> punishment.
>
> If the jury does not substantively
> authorize the defendant's sentence, it cannot
> ensure the people's "control in the
> judiciary," as required by the Sixth
> Amendment.  <u>Blakely</u>, 542 U.S. at 306.  Its

role can be slowly whittled away by the same
erosion that both the Framers and Blackstone warned
against.[16]  (Citations in original omitted.)

\*        \*        \*        \*

[Judge Gertner's opinion] in <u>Pimental</u>
states the point well.  The fact that a jury
has not authorized a particular punishment is
never more clear than when the jury is asked

---

[16]    In <u>Jones</u> v. <u>United States</u>, 526 U.S. 227 (1999), the Supreme
Court in emphasizing the importance of the right to trial by jury
relied, <u>inter</u> <u>alia</u>, on the following commentary by Blackstone:

Blackstone identified trial by jury as "the
grand bulwark" of English liberties . . . [and]
contended that other liberties would remain
secure only "so long as this <u>palladium</u> remains
sacred and inviolate, not only from all open
attacks, (which none will be so hardy as to make)
but also from all secret machinations, which may
say and undermine it; by introducing new and
arbitrary methods of trial, by justice of the
peace, commissioners of the revenue, and courts
of conscience.  And however <u>convenient</u>, these may
appear at first, (as doubtless all arbitrary
powers, well executed, are the most <u>convenient</u>),
yet let it be again remembered, that delays, and
little inconveniences in the forms of justice,
are the price that all free nations must pay for
their liberty in more substantial matters."  <u>Id</u>.
at 246 (quoting 4 W. Blackstone, Commentaries on
the Laws of England 342-344 (1769)).  (Emphasis
in original.)

We note that every state constitution written between 1776 and
1787 unanimously guaranteed only one right:  the right of trial by
jury in criminal cases.  The United States Constitution echoed its
states predecessors by providing for the right to jury trial in
Article III and the Sixth Amendment.  <u>See</u> Akhil Reed Amar, <u>The Bill of
Rights as a Constitution</u>, 100 Yale L.J. 1131, 1183-1186 (1991).

Alexander De Tocqueville, an early observer of American
democracy, summed up the importance of America's Sixth Amendment right
to jury trial as follows:

[The jury] invests the people, or the class of
citizens, with the direction of society.  The
jury system as it is understood in America
appears to me to be as direct and extreme a
consequence of the sovereignty of the people as
universal suffrage.  <u>Democracy in America</u> 293-294
(Vintage ed. 1945).

for, yet specifically withholds, that authorization. In many ways, consideration of acquitted conduct is a more direct repudiation of the jury verdict than is a sentence that exceeds the statutory maximum. In the case of acquitted conduct, the jury has been given the opportunity to authorize punishment and specifically withheld it. When a judge imposes a sentence above the statutory maximum, the jury has never specifically denied authority; it has simply never been asked for it. By allowing judges to consider conduct rejected by the jury, the court allows the jury role to be circumvented by the prosecutor and usurped by the judge -- two of the primary entities against whom the jury is supposed to protect the defendant. See Duncan v. Louisiana, 391 U.S. 145, 156 (1968) ("Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the correct or overzealous prosecutor and against the compliant, biased or eccentric judge."). The jury simply cannot protect a defendant against the overzealous prosecutor or the compliant, biased, or eccentric judge, if those same individuals have the authority to ignore the jury's verdict. To reiterate, consideration of acquitted conduct severs the connection between verdict and sentence.

*      *      *      *

Had the district court not rejected the jury's finding, defendants would have received a dramatically reduced sentence -- a fact disputed by nobody in this case. To hold that any sentence beneath the statutory maximum is acceptable is not enough: Apprendi requires examination "not of form, but of effect." 530 U.S. at 494. And here the effect was to expose defendants to a dramatic increase in punishment based upon conduct for which the jury refused to authorize punishment in the only way it could -- by acquitting defendants of the most serious conduct with which they were charged.

Neither <u>Jones</u>, nor <u>Apprendi</u>, nor <u>Ring</u>,[17] nor
<u>Blakely</u>, nor <u>Booker</u> countenance this result.
474 F.3d at 662-665.

6.   In sum, we ask the Court -- like Judge Friedman did in

<u>Safavian</u> -- to limit its determination of defendant's base

offense level to that which is permitted by the jury's verdict,

<u>i.e</u>., a level not greater than 30.  By so doing, the Court will

not offend <u>Dorcely</u> or <u>Brown</u>[18] and will at the same time give the

proper respect to the jury's verdict as demanded by the Sixth

Amendment.[19]

_____

[17]   <u>Ring</u> v. <u>Arizona</u>, 536 U.S. 584 (2002) (holding Arizona death
penalty statute unconstitutional because it exposed defendant to a
greater punishment than that authorized by the jury verdict).

[18]   The recent opinion of our Court of Appeals in <u>United States</u>
v. <u>Brown</u>, <u>supra</u>, is fully consistent with Judge Friedman's analysis
that <u>Dorcely</u> <u>permits</u> but does not <u>compel</u> a judge to consider acquitted
conduct in determining guideline ranges.

[19]   For the record we make the following points in objecting to
the Court's use of acquitted conduct in this case.

First, the plain language of the Sentencing Reform Act does not
authorize the use of acquitted crimes in calculating the guideline
range.  Congress directed the Commission to take into account "the
circumstances under which the <u>offense was committed</u>" and the "nature
and degree of the harm cause by the <u>offense</u>," and to "avoid[]
unwarranted sentencing disparities among defendants  . . .  who have
been <u>found guilty</u> of similar conduct." 28 U.S.C. §§ 994(c)(2),(3),
991(b)(1)(B).  (Emphasis added.)  In § 3553(a)(1), (2)(A), (6),
Congress directed that the courts "shall impose a sentence sufficient,
but not greater than necessary to reflect the seriousness of the
<u>offense</u>" and "to provide just punishment for the <u>offense</u>," and in
doing so to consider the "nature and circumstances of the <u>offense</u>,"
and the "need to avoid unwarranted sentence disparities among
defendants . . . who have been <u>found guilty</u> similar conduct.
(Emphasis added.)  A "straightforward reading" of the word "offense"
means the "offense of conviction."  <u>Hughey</u> v. <u>United States</u>, 495 U.S.
41, 416 (1990), and this is particularly clear where Congress
simultaneously directed the Commission and the courts to avoid
disparity among defendants "found guilty" of similar conduct.

Second, the legislative history of the Sentencing Reform Act
supports this reading.  <u>See</u> S.Rep. No. 98-225, at 168 (1983) and
(continued...)

**4.    Even Considering Acquitted Conduct under a Preponderance of the Evidence Standard, Defendant's Base Offense Level Should Be No Greater than Level 32 -- At Least 5 But Less than 15 KG of Cocaine.**

We take issue with the government's argument that the evidence shows by a preponderance of the evidence that defendant should be held accountable under the guidelines for in excess of fifteen kilograms, level 34.

---

[19](...continued)
H.R.Rep. No. 98-1017, at 98 (1984).  See also Kate Stith & Steve Y. Koh, The Politics of Sentencing Reform:  The Legislative History of the Federal Sentencing Guidelines, 28 Wake Forest L. Rev. 233, 236, 257-280 (1984).

Third, Congress has never reviewed, much less approved, the use of acquitted conduct to calculate the guideline range.  Over the years the Commission has submitted to Congress "amendments to the guidelines," which Congress may modify or disapprove but otherwise automatically take effect.  See 28 U.S.C. § 994(p); Stinson v. United States, 508 U.S. 36, 40-46 (1993).  Policy statements, commentary to guidelines, and commentary to policy statements are not reviewed by Congress.  Id.  The initial relevant conduct guideline, presumably examined by Congress, refers to "all conduct, circumstances, and injuries relevant to the offense of conviction," and makes no reference to acquitted conduct.  USSG § 1B1.3 (Nov. 1, 1987). (Emphasis added.)

Moreover, in an amendment to a guideline which Congress did review, the Commission stated that "[i]n determining the sentence within the guidelines range, or whether a departure is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."  § 1B1.4; App. C Amend. 4 (Jan. 15, 1988). (Emphasis added.)  Thus, even assuming Congress recognized that such information encompassed acquitted offenses, the guideline by its terms does not permit its use in calculating the guideline range.

Lastly, the commentary to the relevant conduct guideline authorizes the use of acquitted conduct in calculating the guideline range "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." § 1B1.3(a)(2), comment 3.  As is apparent, this case does not involve acquittal of counts in a multi-count indictment that would bring § 3D1.2(d) into play.

The foregoing argument based on the language and legislative history of the Sentencing Reform Act was not presented to the Court of Appeals by the appellants in Dorcely and Brown.

17

1.    In our view, the only amounts of drugs that can arguably be attributed to defendant under a preponderance standard[20] add up to less than fifteen kilograms, i.e., level 32. The amounts are as follows:

- 1/2 kilogram  --  Donald Hunter (Tr. 12-04-07 p.m. at 42-43)

- 1/4 kilogram  --  Donald Hunter (Tr. 12-04-07 p.m. at 46-48)[21]

- 1/4 kilogram  --  Donald Hunter (Tr. 12-04-07 p.m. at 49-50)[22]

- 1 kilogram  --  John Adams (Tr. 11-13-06 a.m. at 90/20-22) (transaction 1 -- Adams picked up a kilogram of cocaine from defendant at Levels)

- 1 kilogram  --  John Adams (Tr. 11-13-06 a.m. at 91/12-17 (transaction 2 -- Adams delivers a kilogram of cocaine to Maynard at Levels)

We note that the government in discussing these two transactions between Adams and defendant refers to activation 843

---

[20]    For the record we maintain that use of a preponderance standard instead of a reasonable doubt standard violates defendant's right to due process under the Fifth Amendment (which is a separate argument from our Sixth Amendment claim). We recognize that our Court of Appeals in Dorcely has held that the preponderance standard is not violative of the Fifth Amendment. 454 F.3d at 372. But, as Judge Friedman pointed out in Safavian, Dorcely does not compel the preponderance standard but only permits it. We urge the Court to follow the post-Booker decisions of other district courts and use the reasonable doubt standard, or at least the clear and convincing evidence standard. See e.g., United States v. Pimental, supra J. Gertner); United States v. Huerta-Rodriguez, 355 F.Supp.2d 1019, 1028-1029 (D. Neb. 2005) (J. Bataillon). See also United States v. Gray, supra.

[21]    Hunter testified that on this occasion defendant gave him "nine ounces," which is "a quarter of [a] kilo." Tr. 12-04-07 p.m. at 48/22-25; 49/1.

[22]    Hunter testified that on this occasion he got "about nine [ounces]" from defendant. Tr. 12-04-07 p.m. at 50/3.

in which Jones tells Adams to "catch up with Lawrence" and give him that . . . ticket." Government's Memorandum at 8.  It is not clear whether the government is arguing that the "ticket" (one kilogram) in activation 843 should be added to the two kilograms about which Adams testified in transactions one and two.

A fair reading of Adams' testimony and activation 843, however, indicates that the "ticket" in activation 843 is the same kilogram that Adams said he delivered to defendant at Levels in transaction two.  Adams testified:

> A.   One time Lawrence was in the Club and I gave him a kilo of coke.
>
> Q.   How did that come about?
>
> A.   By Mr. Jones.
>
> Q.   Would you tell us what happened.
>
> A.   Mr. Jones <u>called me</u> and told me to take something to Mr. Maynard and I took him a kilo of cocaine.
>
> Q.   Now, where was the kilo of cocaine when he called you?
>
> A.   In my house.
>
> Q.   Who had you gotten that kilo of cocaine from?
>
> A.   Mr. Jones.  (Tr. 11-13-06 a.m. at 91/12-17) (Emphasis added.)

The government also discusses activations 55, 584 and 845-1 relating to Pauline Spense as if Spense and Maynard had a separate transaction that involved a kilogram of cocaine. Government's Memorandum at 9-10.  From our reading of the activations, it appears that Jones wanted to provide Spense with a kilogram ("ticket") of cocaine and that the kilogram was being

19

held by Adams.  Jones called Adams (activation 843) and
instructed him to take the drugs to defendant at Levels, which
Adams did.  See activation 845-1; (Tr. 11-13-06 a.m. at 91/12-17)

Sometime later, defendant got together with Spense and gave
her the kilogram that Adams had delivered to him at Jones's
direction.  In short, the Spense "ticket" (one kilogram) is
already included in transaction 2 testified to by Adams at the
first trial and should not be counted twice.

2.  As regards the other amounts of drugs for which the
government argues defendant should be held accountable, we make
the following points.

a.  The government cites activations 2521, 2524, 4074,
and 4079, involving Kirk Carter, Kevin Holland, Alvin Proctor,
and Derrick Barrett, respectively.  Government's Memorandum at
10.  In our view, none of these activations shows -- even by a
preponderance -- that defendant was dealing in drugs with any of
these individuals.  First, unlike Hunter and Adams, none of these
individuals testified at trial that they dealt with defendant in
specific amounts of drugs.  Second, no evidence was presented
that defendant was in the company of Jones when Jones was dealing
drugs with any of the four individuals in the Branch Avenue area,
or that defendant himself actually met with any of the four
individuals.  Third, unlike the "ticket" reference in the Spense
activations,[23] the language in these particular calls, e.g.,

---

[23]  As the Court will recall, several witnesses testified that
the term "ticket" in certain circumstances referred to a kilogram of
(continued...)

"box," "put it in an envelope and give it to Lawrence," does not provide a sound basis to conclude that the calls are referring to drugs. Lastly, and most importantly, even assuming the calls were in some fashion drug related, the calls provide the Court with no non-speculative basis to make findings that any specific amounts of drugs were involved.

b.    The government argues that defendant should be held responsible for the two kilograms that Demetrius Johnson testified that he passed off to defendant at the doorway of Levels. Government's Memorandum at 8-9. In our view, Johnson's testimony on this point does not tip the scale in favor of accountability. First, Johnson did not testify that prior to this incident he dealt drugs with defendant. Second, he did not say that defendant was in the office when he got the two kilograms from Jones. Indeed, defendant just happened to be standing in the doorway area when Jones spotted the police. Tr. 12-10-07 p.m. at 39/1-3. Third, as the government acknowledges, the drugs were wrapped in a black coating and were at the bottom of an opaque bag.[24] Moreover, when Johnson handed the bag to defendant as Jones directed, he did not say anything to defendant to indicate that the bag contained drugs, nor did the defendant say anything to indicate that he knew about the drugs. Id. at 39/14-23. Lastly, when Johnson later got two kilograms from

---

[23](...continued)
cocaine.

[24]    See Government's Memorandum at 8, n. 5.

21

Jones he dealt with Jones, not defendant. Id. at 40/4-12.

In sum, we submit that Johnson's testimony fails to support a finding by the preponderance that defendant actually knew that the bag contained two kilograms of cocaine when the bag was unexpectedly thrust upon him by Johnson. Accordingly, we do not believe that defendant can fairly be held accountable for these particular drugs.

c. The government's rendition of the so-called ICE investigation adds nothing, in our view, to any specific amount of drugs that should be added to the jury's verdict. Not one gram of drugs was recovered from the Myrtle Avenue residence that was rented by defendant[25]; no surveillance testimony was presented to show that defendant was seen with any of the

---

[25] The government makes the point that Mrs. Maynard "testified that she and defendant had been happily married for many years," although the lease documents for the Myrtle residence list a "separation from his spouse as one of the reasons for Maynard renting the house." Government's Memorandum at 5, n. 3. This reference to being "happily married for many years" should be put in context.

During the examination of Mrs. Maynard undersigned counsel purposely stayed away from any characterization of Mrs. Maynard's marriage. On cross-examination, the prosecutor prefaced his examination with the following gratuitous comment: Q. "Good morning ma'am. I'll be very brief. First congratulations on 26 years of happy marriage." Mrs. Maynard simply replied, "Thank you." Tr. 12-19-07 a.m. at 18/14-16. She was never asked by the prosecutor about any marital discord during her marriage. Nor was she asked any specifics about why defendant rented the Myrtle Avenue residence. We note that in her letter to the Court, Exhibit A, Mrs. Maynard candidly admits that "[o]ver the years Lawrence and I have had our share of differences," and that in 2004 she had "vowed to seek counsel to initiate divorce proceedings from Lawrence." Thus, we do not believe that her trial testimony is any "smoking gun" as regards defendant's statement in his rental application for Myrtle Avenue that he was separated from his wife.

Hispanics at Myrtle Avenue or anywhere else in the area [26]; no forensic evidence showed that defendant was using the premises; and Bermea did not testify that he dealt with defendant (or Jones) during the period of the ICE investigation. In short, the ICE investigation on analysis simply "melts away" as regards defendant Maynard.

d. To establish defendant's responsibility for fifteen or more kilograms of cocaine, the government relies heavily on Bermea's testimony about his purported two meetings with defendant in Atlanta in the spring of 2005. Government's Memorandum at 6-8. This reliance is not well founded.

While we do not know the details of the jury's deliberations as to whether the jury credited cooperators Donald Hunter and Demetrius Johnson as regards their testimony about their drug dealings with defendant Maynard, we do know for a certainty that the jury rejected Bermea's testimony about the amount of drugs he purportedly sold to defendant Maynard.

Bermea testified that he sold defendant "roughly about 8 to 10 [kilograms]" at the second meeting. Tr. 11-27-07 a.m. at 89/20-22.[27] If the jury credited Bermea's testimony on this

---

[26] Although Agent Gikas testified that on one occasion she observed the white Isuzu truck pull up in front of the Myrtle Avenue residence and saw the passenger get out of the truck and go into the house, she did not identify defendant Maynard as the passenger (or the driver) of the truck. See Tr. 11-20-07 a.m. at 60/16-21. We can find no reference in Agent Gikas's testimony that defendant was ever observed going into or coming out of the Myrtle Avenue residence.

[27] Bermea did not mention the amount of drugs he claimed he sold defendant at their first meeting.

point, the jury obviously would not have acquitted defendant of
conspiring to distribute "5 kilograms or more" of cocaine.
In our view, the jury had good reason to question Bermea's
testimony.  Besides carrying the baggage of being a cooperator
with the inherent motive to lie or exaggerate, Bermea also had
the credibility problem of having never mentioned the Atlanta
drug dealings with defendant at the first trial.  Bermea's
belated rendition of his two direct dealings with Maynard in
Atlanta was especially suspect.

In any event, notwithstanding the government's argument that
Bermea's testimony was corroborated by independent documentary
and physical evidence, the jury saw fit to reject it.  And, we
ask the Court to do the same -- even though the evidentiary
standard is now lowered to a preponderance.[28]

In sum, we submit to the Court that a non-speculative and
reasoned calculation of the drugs for which defendant should be
held accountable under a preponderance standard may approach but
does not cross the threshold of fifteen or more kilograms of
cocaine.  Accordingly, irrespective of the jury's verdict, the
Court should set defendant's base offense level at no greater
than level 32 (five or more but less than fifteen kilograms of
cocaine).

---

[28]  We recognize that an argument can be made that considering
all of the evidence under a preponderance standard, the $67,000 found
during the North Carolina stop on April 5, 2005, should be converted
to three kilograms of cocaine (approximately $20,000/kilogram) for
which defendant should be held accountable.  Even so, the three
kilograms added to the other drug amounts that we have accepted do not
total fifteen or more kilograms.

**B.** **The § 3553(a) Sentencing Goals and Factors As Applied To Defendant's Case Suggest That A Variance To The Midpoint Range Of The Guideline Ranges Authorized By The Jury Verdict Is Appropriate.**

As noted, calculation of defendant's offense level as allowed by the jury's verdict results in a level of no less than level 26 (63 to 78 months)[29] and no more than level 30 (97 to 121 months). The midpoint of the lows and highs of these ranges is 80 months on the low end (63 + 97 = 160 ÷ 2 = 80) and 99.5 months on the high end (78 + 121 = 199 ÷ 2 = 99.5).

Even if the Court concludes that defendant's guideline range should be level 34 (151 to 188 months), as the government contends, we submit that the § 3553(a) sentencing goals and factors as applied to this case should result in a downward variance to at least the midpoint range of the guideline ranges authorized by the jury verdict, _i.e._, 80 to 99.5 months. In our view, a sentence in this range is fully consistent with the sentencing goals of 18 U.S.C. § 3553(a).

**1.** **The § 3553(a) Sentencing Goals and Factors**

Section 3553(a) of Title 18 of the United States Code specifies a number of goals and factors that a court should consider when imposing sentence. In particular, the statute provides that the court must impose a sentence "sufficient but not greater than necessary" to achieve four broad goals:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and

---

[29] Because defendant has no convictions as an adult or as a juvenile, his Criminal History Category is Category I. See PSI at 11, ¶ 66.

to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2). (Emphasis added.)[30]

### 2.    Use of Acquitted Conduct Does Not Further § 3553(a)'s Sentencing Goals

Assuming acquitted conduct can properly be used to establish defendant's offense level under the guidelines, we believe that by granting the requested variance the Court will further the

---

[30]    In addition to the goals in (a)(2), the court should consider:

(1) the nature and circumstances of the offense and the history and characteristics of the accused;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for --

(A) the applicable category of offense committed by the applicable category of defendant set forth in the guidelines . . ;

(5)   and pertinent policy statement issued by the Sentencing Commission . . .;

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.  § 3553(a).

sentencing goals of § 3553(a)(2)(A) to "promote respect for the law" and "provide just punishment for the offense."  The requested variance is also consistent with the goals that the sentence "reflect the seriousness of the offense" and "protect the public from further crimes of the defendant."

### a.  <u>Respect for the Law</u>

From defendant's perspective, what could instill more confusion and disrespect than finding out that you will be sentenced to extra years in prison for the alleged crime of which you were acquitted?  The law would have turned into a farce and a sham.[31]

From the public's perspective, we think most people would be shocked to learn that in this great country -- where the hallmark of our criminal justice system is that a man is presumed innocent until proven guilty beyond a reasonable doubt -- citizens can be and routinely are punished for crimes of which they were acquitted by a jury.  <u>See</u> <u>United States</u> v. <u>Coleman</u>, 370 F.Supp.2d 661, 670 (S.D. Ohio) ("A layperson would undoubtedly be revolted by the idea that, for example, a person's sentence for crimes for which he was convicted may be multiplied . . . by taking into account conduct of which he has been acquitted.") (internal quotations omitted).  Put another way, confining an accused behind bars for a crime the jury found he or she did not commit

---

[31]  As Charles Dickens character Mr. Bumble famously noted, "If the law supposes that, . . . the law is an ass -- an idiot."  Charles Dickens, <u>Oliver Twist</u> 463 (3d ed.  The New American Library 1961).

is simply Kafkaesque.[32]  Or, as Judge Oakes observed in his concurring opinion in United States v. Frias, 39 F.3d 391, (2nd Cir. 1994), allowing acquitted conduct to be used at sentencing is a "jurisprudence reminiscent of Alice in Wonderland.  As the Queen of Hearts might say, 'Acquittal first, sentence afterwards.'"  Id. at 393.

In short, enhancements based on acquitted conduct convey the deleterious message to the community that acquittals are legally of no consequence; this message in turn promotes disrespect for the historic and esteemed rule that juries play in our American legal system.  In the words of Judge Wald of our Court of Appeals, use of acquitted conduct for purposes of sentencing is a "jagged scar on our constitutional complexion" and "does not pass the test of fairness or even common sense from the vantage point of an ordinary citizen."  United States v. Baylor, 97 F.3d 542, 550-551 (D.C. Cir. 1996) (Wald, J., concurring specially). (Emphasis added.)

### b.    Just Punishment for the Offense

It is hard to fathom how "just punishment" is achieved when acquitted conduct is "priced" exactly the same as convicted conduct, i.e., with no discount to reflect the fact that a jury already has rejected the charges.  As a number of judges have

---

[32]    In his novel The Trial, Franz Kafka describes a totalitarian state in which the judicial system was used to suppress freedom.  One of the techniques used by the state was non-final "acquittals," which have a strong resemblance to the use of acquitted conduct at sentencing.  Franz Kafka, The Trial, 158 (Willa & Edwin Muir, trans., Alfred A. Knopf, 1992).

observed pre-<u>Apprendi/Booker</u>, using acquitted conduct in sentencing violates basic fairness. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Concepcion</u>, 983 F.2d 369, 396 (2nd Cir. 1992) (Newman, J., concurring) (observing that the Commission's decision to count acquitted conduct the same as convicted conduct was "entirely unjustified"); <u>United States</u> v. <u>Hunter</u>, 19 F.3d 895, 898 (4th Cir. 1994) (Hall, Jr., concurring) (recognizing that using acquitted conduct for sentencing is at best "a poor policy choice" and is "just wrong"); <u>United States</u> v. <u>Baylor</u>, 97 F.3d 542, 550-551 (D.C. Cir. 1996) (Wald, J., concurring specially).[33] <u>See also</u> <u>United States</u> v. <u>Virgil</u>, 476 F.Supp.2d 1231 (D.N.M. 2007) (court granted downward variance in acquitted conduct case to promote respect for the law and to provide just punishment.

Post <u>Apprendi/Booker</u>, the Supreme Court itself in <u>Kimbrough</u> has held that a district court "<u>may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines</u>." 128 S.Ct. at 564, 570. (Emphasis added.) Thus, under <u>Kimbrough</u>, the Court has ample leeway to utilize a variance to ameliorate the harshness, unfairness, and unreasonableness of using acquitted conduct at sentencing -- an "intolerable" practice.

In this case, the government is requesting the Court to add four and one-half years (55.4%) to the high end of the maximum

---

[33]    In her concurring opinion in <u>Baylor</u>, Judge Wald cites numerous cases and law reviews that have "condemned" the use of acquitted conduct at sentencing and forcefully and cogently explains why "it is time to turn back" from this "intolerable" practice. 97 F.3d at 549-553.

guideline range allowed by the jury verdict -- four and one-half years based _solely_ on conduct that the jury said the government had not proven at trial.[34]   Surely such a sentence does not equate with "just punishment" for the offense for which defendant was convicted.

### c.    __Seriousness of the Offense__

The variance we suggest does not in any way denigrate the seriousness of the wide-ranging multi-kilogram conspiracy that was involved in this case -- a conspiracy that spanned years in time and stretched from the Washington metropolitan area down the eastern seaboard and into Mexico.

As our Court of Appeals has made clear, the scope of a defendant's liability under conspiracy law for sentencing is "_always_ determined by the scope of his agreement with his co-conspirators.  Mere foreseeability is not enough . . ." United States v. Tabron, 437 F.3d 63, 67 (D.C. Cir. 2006), citing United States v. Saro, 24 F.3d 283, 288 (D.C. Cir. (1994) (emphasis in original).  Accord, United States v. Carter, 449 F.3d 1287, 1299 (D.C. Cir. 2006).

Consistent with the notion that a defendant's liability is not necessarily coextensive with the conspiracy as a whole, which is the law under Tabron/Saro, the Court specifically instructed the jury to make a determination of the amount of drugs that

---

[34]    Perhaps an enhancement based on acquitted conduct could be so modest, e.g., a few months, as not to be inconsistent with the goals of promoting respect for the law and providing just punishment.  But, surely that is not the case here where the differential the government seeks is not one or two or three months, but four and one-half years.

defendant Maynard was responsible for.  The jury was further instructed that defendant Maynard is "only responsible for those drugs that he agreed would be distributed or possessed with intent to distribute, and those drug amounts distributed or possessed with intent to distribute by other co-conspirators which the defendant reasonably could have foreseen would be distributed or possessed in furtherance of the conspiracy." Instruction No. 40.  (Emphasis added.)

By its verdict the jury found that defendant Maynard's conspiratorial agreement with Antoine Jones (and other co-conspirators) was limited to less than five kilograms of cocaine and no amount of cocaine base -- far less than the amount of drugs involved in the overall conspiracy.

Furthermore, defendant held no managerial role in the conspiracy and he was not involved in any way with weapons or violence.  Thus, there are no special reasons to suggest a sentence higher than that provided for by the guidelines vis-a-vis the jury's verdict.

In addition, the sentence we request -- in the range of the midpoint of the lows and highs of the guideline ranges encompassed in the jury's verdict, i.e., 80 to 99.5 months -- is fully consistent with the sentences imposed on the other co-conspirators involved here and does not create "disparities among defendants with similar records who have been found guilty of similar conduct." See § 3553(a)(6).

Cooperating co-defendants Roel Bermea and Demetrius Johnson

31

both have been sentenced to less than three years; Ricardo
Sanchez-Gonzalez and Alberto Rolando Carrillo-Montelongo received
45 months and 36 months, respectively[35]; and Kirk Carter, who
previously was convicted of narcotics conspiracy, was sentenced
to 60 months under a Rule 11(c)(1)(C) plea agreement.

Lastly, we note that our requested sentence range is within
the 8-year Rule 11(c)(1)(C) plea/sentence that the government
offered to defendant Maynard a few days prior to the start of the
trial.  Indeed, the high end of our requested sentence range is
only 8 and 1/2 months shy of the 9-year Rule 11(c)(1)(C)
plea/sentence that was offered to defendant during jury
deliberations.  Thus, even from the government's perspective, it
cannot be said that our requested sentence range would take away
from the seriousness of the offense for which defendant was
convicted.

### d.    Protection of the Public

We do not believe that a sentence greater than the sentence
range requested is necessary "to protect the public from further
crimes of the defendant."

First, unlike several of the other co-conspirators in this
case, e.g., Kirk Carter, Donald Hunter, and Demetrius Johnson,
defendant Maynard has no prior history of convictions for drug
trafficking or other crimes that might suggest a continuing
propensity to commit future crimes.  Indeed, defendant has never

---

[35]    Counsel is not privy to whether Sanchez-Gonzalez and
Carrillo-Montelongo had cooperator agreements with the government.

been arrested for a criminal offense, other than a narcotics charge for which he was found not guilty almost 15 years ago.

Second, defendant's involvement in this conspiracy arose out of his non-criminal early relationship with Antoine Jones.[36]  The evidence in the case showed that defendant helped Jones out on occasion as regards Jones' drug trafficking -- not that defendant himself was a major drug trafficker with his own sources of supply and his own wholesale or retail customers.  Moreover, defendant's involvement in the conspiracy was due in part because he started using cocaine again after he commenced employment with Levels in 2004.  See PSI, 14 at ¶ 81.  Defendant intends to participate in an intensive drug program during his incarceration and shake his addiction once and for all so that when he is eventually released, he will not be tempted to go back to his old ways.  Id.

Third, defendant was in the community from October 24, 2005, when the "take down" was executed, until November 23, 2005, when he was arrested.  There was no evidence that during this time defendant was purchasing or selling drugs on his own.

Fourth, defendant's connection to the conspiracy -- Antoine

---

[36]  Defendant first met Antoine Jones in 1982 when they both were working at the Hyatt Regency Hotel in Washington, D.C.  Jones's future father-in-law was a close friend of defendant's father-in-law.  In mid-2003, defendant lost his job as a driver with Instiform East because of a suspension of his commercial driver's license insurance by State Farm Insurance Company.  Defendant borrowed $4,500 from Jones and Jones's wife to cover the costs of reinstating his license.  It was agreed that defendant could pay back the loan from his weekly salary at FTN Delivery Service, which Mr. and Mrs. Jones had started.

Jones -- will be removed from the community effectively for the
rest of his life because of his two prior drug convictions.
Thus, Jones will not be in a position to elicit defendant to
engage in any drug dealing after defendant is released from
confinement.

Fifth, following his incarceration, defendant will be
subject to a lengthy term of supervised release[37] with the
knowledge that violation of the terms of his release will subject
him to additional incarceration.  This supervised release will
provide the community with additional insurance that defendant
will not commit future crimes.

Lastly, the government's offer to defendant of a 9-year
Rule 11(c)(1)(C) plea/sentence is indicative that the government
itself does not believe that a sentence substantially longer than
what we request is necessary to protect the public from possible
future criminal activity by the defendant.

In sum, for all the foregoing reasons, we submit that a
sentence in the range we request -- 80 to 99.5 months -- fully
satisfies all of the sentencing goals of § 3553(a)(2) and
complies with the statutory mandate that the Court impose a
sentence "not greater than necessary" to achieve these goals.

**C.   Considering the History and Characteristics
       of Defendant, a Sentence at the Low End of the
       80 to 99.5 Month Range of the Jury's Verdict
       Is Appropriate.**

Considering the "history and characteristics" of defendant,

---

[37]   A minimum term of five years of supervised release is
required in defendant's case.  PSI at 18, ¶¶ 108-109.

as required by § 3553(a)(1), we believe that a sentence at the low end of the 80 to 99.5 month range of the jury's verdict is appropriate.

1.    Defendant, 46, was born August 21, 1961, in Washington, D.C.[38]  He attended Saint Benedict the Moor School, grades 1-6, and Elliot Junior High School, grades 7-9.  He then went to Eastern High School and received his high school diploma in the summer of 1979.  A few months after he graduated, defendant voluntarily enlisted in the United States Marine Corps Reserve. On September 3, 1979, he started boot camp at Parris Island, South Carolina, and successfully completed the strenuous 12-week training regimen.[39]

Following boot camp, defendant was assigned to the United States Marine Corps Headquarters Maintenance Supply Group (HMS 41) at Andrews Air Force Base, Camp Springs, Maryland.[40]  He served in the Marine Corps Reserve at Andrews Air Force Base from January 1980 until August 1986, when he was honorably discharged from further reserve duty.

While attending Eastern High School, defendant began dating

---

[38]  Defendant is one of three children born to Vincent and Marie Maynard.  Defendant's brother, Vernon Maynard, 42, lives in Temple Hills, Maryland; his sister, Veronica Maynard, 51, lives in Washington, D.C.  Defendant's parents separated when he was 5 years old.  His mother, who is in her 80s, lives in Crofton, Maryland; his father died in 1995.

[39]  Undersigned counsel, having gone through Parris Island boot camp over fifty years ago, can attest that defendant's successful completion of the 12-week regimen was no small accomplishment.

[40]  At the time, the Marine Corps had a Marine Air Group located at Andrews Air Force Base.

Joyce Pitt, whom he had known since he was a child, and who was also a student at Eastern.  Their relationship continued after they both graduated from Eastern[41] and they were married on December 17, 1982.  In July 1983, they purchased their current home, a modest 3-bedroom house, located at 7711 Greenleaf Road, Landover, Maryland.[42]

Mrs. Maynard is currently employed with the Department of Justice as an administrative assistant.  Previously, she worked at the Department of Defense for almost 20 years and she worked for 12 years at the Pentagon as a Management Assistant.

Defendant and his wife are the parents of two children: Bryan A. Maynard, born March 13, 1983; and Tyffany M. Maynard, born November 9, 1988.  Bryan is employed as a Budget Analyst with the Department of Justice in D.C.,[43] and Tyffany works at the Alexandria Virginia Courthouse as a Deputy Clerk.  Bryan, Tyffany and Tyffany's 15-month-old child live with Mrs. Maynard at the family home in Landover.

Defendant and his wife are also the legal guardians of Whitney M. Moten, 17, Mrs. Maynard's niece.[44]  Whitney has lived

---

[41]  Mrs. Maynard graduated from Eastern in 1980, a year after defendant graduated.

[42]  The purchase price for the residence was $46,000.

[43]  Prior to joining the Department of Justice, Bryan was employed as a budget analyst at NIH.  He attended junior college and is working on a college degree from the University of Maryland.

[44]  Whitney's mother, Mrs. Maynard's sister, was murdered in March 1995.  Not long after this tragedy, Mrs. Maynard and defendant petitioned the court and were awarded legal guardianship of Whitney.

(continued...)

with the Maynards at the Landover residence since she was four years old.[45]

During the past 25 years, defendant had been gainfully employed up to his arrest in this case.  Based on defendant's best recollection, defendant's work history is summarized as follows:

- 12/79 to 4/80[46]    Clerical Assistant/Volunteer
  National Legal Aid and
  Defenders Association
  1725 K Street, N.W.
  Washington, D.C.

- 4/80 to 1/86    Storeroom Manager
  S.S. Kresge Company
  500 7th Street, N.W.
  Washington, D.C.

- 12/82 to 6/86    Night Cleaner
  Hyatt Regency Hotel
  400 New Jersey Avenue, N.W.
  Washington, D.C.

- 6/86 to 12/90    Route Sales Driver[47]
  Coca Cola/Potomac Beverage Supply
  Capitol Heights, MD

- 12/90 to 1/93    Driver
  Embassy Dairy
  Waldorf, Maryland

---

[44](...continued)

[45]  Whitney attends DuVal High School in Lanham, Maryland.

[46]  Defendant began his volunteer work after returning home from boot camp at Parris Island.  In addition to the jobs listed during January 1980 to August 1986, defendant, as noted, also served in the United States Marine Corps Reserve, assigned to the Marine Air Group HMS 41 at Andrews Air Force Base, Camp Springs, Maryland.

[47]  Defendant obtained a commercial B-Class driver's license in 1985, and his Commercial Driver's License ("CDL") in 1990.

- 1/93 to 2/96[48]
  Driver
  Jack & Jill Ice Cream
  Forestville, Maryland

- 2/96 to 4/98
  Driver
  Pepsi Cola Company
  Forestville, Maryland

- 5/98 to 5/01
  Driver
  Room Store
  Landover, Maryland[49]

- 5/01 to 9/01
  Driver/Mover
  Bennett Delivery Service
  Upper Marlboro, Maryland

- 9/01 to 8/03
  Driver/Laborer
  Instiform East
  Landover, Maryland[50]

- 8/03 to 2/04
  Driver/Manager
  Faith Travel Network (FTN) Delivery
  Brandywine, Maryland[51]

- 2/04 to 10/05
  Manager,[52] Levels Nightclub
  1960 Montana Avenue, N.E.
  Washington, D.C.

---

[48]   During the period from 1992 to 1995, besides his regular employment as indicated, defendant did volunteer work with his wife and some of her co-workers at the Emory Elementary School Men's Shelter, Lincoln Road, N.E., Washington, D.C.

[49]   Defendant's position at Room Store included:  local and long-distance delivery; daily inspection of trucks; inspection of merchandise prior to and after delivery; routing of deliveries from PA, MD, VA, NJ, and DC; and operation of a 26-foot, 6-speed truck with a lift gate.

[50]   Defendant's duties at Instiform East included:  local and long-distance daily driving of vehicles, varying from light trucks with trailers to 16-speed boiler and vacuum trucks; and loading and unloading various equipment needed at job sites, e.g., pumps, traffic signs, generators, and personal protection equipment.

[51]   Defendant's duties at FTN Delivery included:  delivery and pickup service; storing and taking inventory; customer service; routing multiple deliveries; daily light maintenance and fueling of a 16-foot, 14-ton truck; and loading and unloading shipments.

[52]   While employed at Levels defendant was a licensed ABC manager.

- 11/05 to 11/23/05    Driver
                       NBS Janitorial Supply Company
                       Beltsville, Maryland[53]

In addition to his clean criminal record, defendant has a spotless institutional record since his incarceration.  He has never been "written up" for any criminal violation or for any administrative violation while at CTF or at D.C. Jail.[54]  During his incarceration at CTF, defendant, a Catholic,[55] served as the Religious Coordinator for his unit under the supervision of Reverend Napper.  At D.C. Jail, he is currently the Religious Coordinator for Unit Southeast 2 and works with Chaplain Betty Green and Reverend McKinley Battle, and he is active is helping other inmates study for their GED tests.

2.   To provide greater insight into defendant's character, we have appended letters from defendant's wife and children and several of his friends.[56]  These letters, especially the candid

---

[53]   As noted, the "take down" of Antoine Jones and others in this case, as well as the execution of the search warrant for Levels Nightclub, occurred October 24, 2005.  Because the FBI seized the ABC license for Levels it was impracticable to keep the club open for business, and defendant found himself unemployed.  After a few weeks, defendant got a job as a truck driver for NBS Janitorial Supply Company, located in Beltsville, Maryland.  He was on the job for only a few days when on November 23, 2005, he was arrested in this case.

[54]   Defendant was originally housed at D.C. Jail.  On December 13, 2005, he was transferred to CTF, and on August 7, 2006, he was sent back to D.C. Jail.

[55]   Defendant was baptized into the Catholic faith in August 1961 and was raised a Catholic.  After moving to Maryland, he became a member of Saint Joseph's Catholic Church in Landover, Maryland, and on occasion attended services at his mother's parish, Saint Mary's Catholic Church in Upper Marlboro, Maryland.

[56]   See letters from Joyce Y. Maynard, Tyffany M. Maynard, Bryan A. Maynard, Dominic Harris, and Elton T. Brown (Exhibit A).

and poignant letters from his family, show that notwithstanding his past misdeeds and his criminal involvement in this case, defendant has a certain "basic goodness" in his character and soul -- a "basic goodness" that has led his family and friends to stand behind him and to give him their love and support.  In our view, this "basic goodness" is truly deserving of the Court's consideration.

3.  Lastly, we ask the Court to consider defendant's Personal Statement which we believe shows that counsel's use of the phrase "basic goodness" is well founded.  Defendant writes:

> Dear Judge Huvelle,
>
> First, I want to respectfully thank you for taking the time to read this statement.
>
> In the past 28 months, I have been able to examine so much.  Trying to get to God and what he wants me to be.  It is going to cost commitment on my part, with God's help.  I am struggling everyday your Honor.  I have to also say that I have put my family through so much.  Looking at the negative is not what I want to focus on, but I have to realize and take responsibility for what has become a burden emotionally, spiritually and financially, on my family.
>
> From the time of my arrest, with God, family and friends, I have tried to successfully concentrate on a conversion not a conviction.  Being in jail and finding that I have so much to be thankful for and to focus on my character.
>
> In January 2006, I was chosen to be religious coordinator at the Central Treatment Facility, CCA.  While working with the Praise Team and Reverend Napper helped me to evolve from the inside, a transformation.  How?  By changing mind and heart it is possible to grow spiritually in any situation and under any circumstance.  If I do not do

it in jail, I will not do it out there.  It
hurts feeling remorse and not being able to
accept incarceration.  So making adjustments
was the direction I wanted to be consistent.
I spent 8 months in graphic arts class where
I received several perfect attendance awards.
After leaving CTF, and returning to the jail,
Chaplain Betty Green gave me an opportunity
to participate as coordinator on my unit,
South East 2 as well as in the Chapel,
working together with World Hope ministry's
Brother Kary Gould, Reverend McKinley
Battle[57] and many other volunteers.  I am
headed in a more rewarding direction.  Being
involved with religious services has revealed
some issues that I have failed to deal with
in my life.  Being an unfaithful spouse, drug
usage, not giving my children more time,
becoming a workaholic, taking on the
responsibility of reconciling with my wife
and family, communicating and accepting the
hurt that I have inflicted on them.

     Since my arrest, my son, Bryan has
returned home to help with bills.  He
unselfishly gave up his apartment after being
on his own for two years.  He left his
position with the National Institute of
Health and joined the Department of Justice.
My daughter, Tyffany has graduated from High
School with a State License in Cosmetology
and a 3.8 grade average.  She is presently
employed as a Deputy Clerk with the
Department of Records in Alexandria,
Virginia.  She also has given birth to our
first grandchild, Makayal, and is expecting
another daughter in July 2008.

My wife, Joyce, has had to adjust by
declaring bankruptcy, avoided foreclosure
of our home, changing her career from 18 years
with the Department of Defense to begin a
position with the Department of Justice's
Criminal Investigation Division.  They all
have been very, very supportive.  My family
wants me home as much as ever and I hope you
will take into consideration my past work

---

[57]  We have attached as Exhibit B a letter from Reverend McKinley
L. Battle of World Hope that describes the religious work defendant is
doing at the jail and defendant's rehabilitative transformation.

history.

I am learning to change by remorse and by
not denying my faults and failures but by
addressing the issues that need to be
corrected.  Seeing and seeking pleasures that
are temporary, blinded me, separated me from
the joy and happiness in life.  God, marriage
and family has been my focus since my arrest.
I can still contribute to society as a law
abiding, tax paying citizen.  As I have been
in the past.  It will be a struggle with more
trials and tribulations along the way, but
this is only the beginning.  I am just asking
for a chance to return to my family that
forgave and wife that loves me in spite of my
faults.  Even under the strictest probation
or supervised release conditions, I will
comply.

Please Judge Huvelle, can I have another
chance at life and not be put away and
forgotten?  I am asking the Court to please
consider leniency.  I have accepted the
verdict from the Jury finding me guilty.  I
understand that there has to be punishment
for the offense.  I am just asking that my
work history, family, marriage, tutoring in
the GED Program and revelation of God's
purpose for my life be taken into
consideration.  I am asking the Court to show
mercy and to consider sentencing me below the
guidelines.

Respectfully,


/s/ Lawrence Maynard[58]

In sum, in our view, defendant Maynard's foregoing "history

and characteristics"  -- his lack of a criminal record, his

service to his country in the United States Marine Corps, his

---

[58]  Defendant's Personal Statement is attached as Exhibit C.
Also enclosed with Exhibit C are letters showing defendant's
participation in the inmate-run G.E.D. program at the jail.

willingness to protect and care for his wife's niece, his good impact on others, and his exemplary and rehabilitative conduct during his incarceration the past 28 months -- strongly suggest that the Court should sentence defendant at the low end of the 80 to 99.5 month range of the jury's verdict.

<u>**CONCLUSION**</u>

**WHEREFORE,** for all the foregoing reasons, we respectfully ask the Court to sentence defendant to a term of imprisonment no greater than 80 months.

Respectfully submitted,



James L. Lyons  (50690)
Kellogg, Williams & Lyons
1350 Connecticut Avenue, N.W. #600
Washington, D.C.  20036
(202) 496-0722
(202) 331-1257  (fax)
JamesLyons@verizon.net (e-mail)

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 15th day of April, 2008, I caused a true and correct copy of the foregoing pleading to be delivered to the parties in this case via the Court's Electronic Case Filing (ECF).

/s/
James L. Lyons